*Execution Version*

---

**ASSET PURCHASE AGREEMENT**

**DATED AS OF JUNE 19, 2026**

**BY AND BETWEEN**

**R3 LITHIUM, INC.,**
**AS PURCHASER,**

**AND**

**ASCEND ELEMENTS, INC.,**
**AS SELLER**

---

304753461.7

## TABLE OF CONTENTS

**Page**

**ARTICLE I PURCHASE AND SALE OF ACQUIRED ASSETS; ASSUMPTION OF ASSUMED LIABILITIES**....................................................................1

Section 1.1    Purchase and Sale of the Acquired Assets .....................................1
Section 1.2    Excluded Assets ..............................................................................3
Section 1.3    Assumption of Certain Liabilities ...................................................4
Section 1.4    Excluded Liabilities ........................................................................5
Section 1.5    Assumption/Rejection of Certain Acquired Assets .........................7

**ARTICLE II CONSIDERATION; PAYMENT; CLOSING**......................................12

Section 2.1    Consideration; Payment ................................................................12
Section 2.2    Closing ..........................................................................................13
Section 2.3    Closing Deliveries by Seller .........................................................13
Section 2.4    Closing Deliveries by Purchaser ...................................................14
Section 2.5    Withholding ...................................................................................14

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLER**...........................15

Section 3.1    Organization and Qualification......................................................15
Section 3.2    Authorization of Agreement ..........................................................15
Section 3.3    Conflicts; Consents .......................................................................15
Section 3.4    Financial Statements .....................................................................16
Section 3.5    Title to Properties..........................................................................17
Section 3.6    Contracts .......................................................................................17
Section 3.7    No Litigation..................................................................................17
Section 3.8    Permits; Compliance with Laws ...................................................17
Section 3.9    Environmental Matters...................................................................18
Section 3.10   Intellectual Property......................................................................19
Section 3.11   Tax Matters....................................................................................19
Section 3.12   Insurance; Support Obligations.....................................................20
Section 3.13   Brokers ..........................................................................................21
Section 3.14   Inter-Company Transactions..........................................................21
Section 3.15   Title to Assets ...............................................................................21
Section 3.16   No Material Adverse Effect ...........................................................21
Section 3.17   Absence of Changes.......................................................................21
Section 3.18   CFIUS 21
Section 3.19   No Other Representations or Warranties ........................................22

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER**.................22

Section 4.1    Organization and Qualification......................................................22
Section 4.2    Authorization of Agreement ..........................................................22
Section 4.3    Conflicts; Consents .......................................................................23
Section 4.4    Financing........................................................................................23
Section 4.5    Brokers ..........................................................................................23
Section 4.6    No Litigation..................................................................................23
Section 4.7    Certain Arrangements ....................................................................23
Section 4.8    No Other Representations or Warranties ........................................24

## TABLE OF CONTENTS

**Page**

**ARTICLE V BANKRUPTCY COURT MATTERS**................................................................**24**
    Section 5.1    Bankruptcy Actions .............................................................24
    Section 5.2    Sale Order ...........................................................................26
    Section 5.3    Approval .............................................................................26

**ARTICLE VI COVENANTS AND AGREEMENTS**.........................................................**27**
    Section 6.1    Conduct of the Business of Seller ......................................27
    Section 6.2    Access to Information .........................................................29
    Section 6.3    Restricted Use of Confidential Information..........................31
    Section 6.4    Employee Matters ..............................................................31
    Section 6.5    Regulatory Approvals .........................................................32
    Section 6.6    Reasonable Efforts; Cooperation ........................................33
    Section 6.7    Further Assurances..............................................................33
    Section 6.8    Insurance Matters................................................................33
    Section 6.9    Receipt of Misdirected Assets; Liabilities ..........................34
    Section 6.10    Acknowledgment by Purchaser ..........................................35
    Section 6.11    Releases...............................................................................36
    Section 6.12    Environmental Insurance Policies.......................................38
    Section 6.13    Letters of Credit .................................................................38
    Section 6.14    AE Poland Purchase Option................................................38
    Section 6.15    Material Assigned Contracts and Material Permits. ................................39
    Section 6.16    Appeal of Tax Assessment for Acquired Leased Real Property................39

**ARTICLE VII CONDITIONS TO CLOSING** .........................................................**40**
    Section 7.1    Conditions Precedent to the Obligations of Purchaser and Sellers............40
    Section 7.2    Conditions Precedent to the Obligations of Purchaser ...........................40
    Section 7.3    Conditions Precedent to the Obligations of Seller................................41
    Section 7.4    Waiver of Conditions.........................................................41
    Section 7.5    Fiduciary Duty ...................................................................41

**ARTICLE VIII TERMINATION** .........................................................................**42**
    Section 8.1    Termination of Agreement..................................................42
    Section 8.2    Effect of Termination.........................................................43

**ARTICLE IX TAXES**........................................................................................**44**
    Section 9.1    Transfer Taxes ...................................................................44
    Section 9.2    Allocation of Purchase Price...............................................44
    Section 9.3    Cooperation........................................................................45
    Section 9.4    Allocation of Taxes for Straddle Period .............................45
    Section 9.5    Preparation of Tax Returns and Payment of Taxes .................................45
    Section 9.6    Tax Treatment ....................................................................46

**ARTICLE X MISCELLANEOUS** .......................................................................**46**
    Section 10.1    Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers ........................................46
    Section 10.2    Expenses ............................................................................46

304753461.7

## TABLE OF CONTENTS

**Page**

Section 10.3   Notices ...................................................................................................47
Section 10.4   Binding Effect; Assignment.................................................................48
Section 10.5   Amendment and Waiver .....................................................................48
Section 10.6   Third Party Beneficiaries ...................................................................48
Section 10.7   Non-Recourse .....................................................................................48
Section 10.8   Severability .........................................................................................49
Section 10.9   Construction ........................................................................................49
Section 10.10  Schedules ............................................................................................49
Section 10.11  Complete Agreement ..........................................................................50
Section 10.12  Specific Performance ..........................................................................50
Section 10.13  Jurisdiction and Exclusive Venue .......................................................51
Section 10.14  Governing Law; Waiver of Jury Trial .................................................51
Section 10.15  Counterparts and PDF .........................................................................52
Section 10.16  Publicity ..............................................................................................52
Section 10.17  Bulk Sales Laws...................................................................................52

**ARTICLE XI ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS ...........53**
Section 11.1   Certain Definitions...............................................................................53
Section 11.2   Index of Defined Terms .......................................................................65
Section 11.3   Rules of Interpretation .........................................................................65

## INDEX OF EXHIBITS

| | |
|---|---|
| Exhibit A | FORM OF SALE ORDER |
| Exhibit B | FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT |
| Exhibit C | FORM OF LEASE ASSIGNMENT AGREEMENT |
| Exhibit D | FORM OF COVINGTON IP LICENSE AGREEMENT |
| Exhibit E | FORM OF TRANSITION SERVICES AGREEMENT |

304753461.7

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement"), dated as of June 19, 2026 (the "Effective Date"), is made by and between R3 Lithium, Inc. or its assignee ("Purchaser") and Ascend Elements, Inc. ("Seller"). Purchaser and Seller are referred to herein individually as a "Party" and collectively as the "Parties."

WHEREAS, on April 9, 2026 (the "Petition Date"), Seller, together with certain of Seller's Subsidiaries and Affiliates, commenced voluntary cases under chapter 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court") (the "Chapter 11 Case"); and

WHEREAS, Purchaser desires to purchase, acquire and accept the Acquired Assets and assume the Assumed Liabilities from Seller, and Seller desires to sell, transfer, convey, assign, and deliver to Purchaser the Acquired Assets together with the Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, inter alia, Sections 105, 363 and 365 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement and subject to the entry and terms of the Sale Order;

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants, and agreements set forth herein, intending to be legally bound hereby, the Purchaser and Seller hereby agree as follows.

## ARTICLE I
### PURCHASE AND SALE OF ACQUIRED ASSETS;
### ASSUMPTION OF ASSUMED LIABILITIES

**Section 1.1      Purchase and Sale of the Acquired Assets**. Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth herein and subject to the issuance and terms of the Sale Order, at the Closing, Seller shall  sell, transfer, assign, convey, and deliver to Purchaser, and Purchaser shall  purchase, acquire, and accept from Seller, all of Seller's right, title and interest in and to the Acquired Assets, free and clear of all Encumbrances other than Permitted Encumbrances. "Acquired Assets" means all of Seller's right, title, and interest in and to the assets of the Business, including the following assets of Seller, but excluding in all cases the Excluded Assets and subject to Section 1.5:

(a)      The Leased Real Property listed on Schedule 1.1(a) (the "Acquired Leased Real Property" and each Lease to which such Acquired Leased Real Property is subject, an "Acquired Lease");

(b)      all Contracts to which Seller is a party that support, facilitate, or relate to the Business and the other Acquired Assets or any Assumed Liabilities, including without limitation those listed on Schedule 1.1(b)  (collectively, the "Assigned Contracts");

304753461.7

(c)       all Documents relating to any of the Acquired Assets or Assumed Liabilities (excluding any Documents or information that may not be transferred pursuant to this Agreement by applicable Law);

(d)       all tangible assets (including Equipment and IT Assets) located at or on the Acquired Leased Real Property, including the tangible assets of Seller or any of its Subsidiaries located at the Acquired Leased Real Property and any tangible assets on order to be delivered to Seller or any of its Subsidiaries at, or for use or installation at, the Acquired Leased Real Property, and the personal property located at the Acquired Leased Real Property;

(e)       all tangible assets (including Equipment and IT Assets) that are not located at or on the Acquired Leased Real Property that are intended primarily for use in connection with Seller's business conducted at the Acquired Leased Real Property, and any tangible assets on order to be delivered to Seller or any of its Subsidiaries at, or for use in connection with or installation at, the Acquired Leased Real Property, including without limitation those tangible assets listed on Schedule 1.1(e);

(f)       except as set forth in Section 1.2(h), all rights and claims against third parties (including customers, suppliers, vendors, merchants, manufacturers and counterparties to any Assigned Contract) other than with respect solely to Excluded Assets or Excluded Liabilities, including Causes of Action, claims, counterclaims, defenses, credits, rebates (including any vendor or supplier rebates), demands, allowances, refunds (other than Tax refunds described in Section 1.2(h)), rights of set off, rights of recovery, rights of recoupment or rights under or with respect to express or implied guarantees, warranties, representations, covenants or indemnities made or provided by such third parties, and other similar rights, in each case, whether direct or derivative, unknown, liquidated or unliquidated, contingent or otherwise, in each case, including with respect to any of the Acquired Assets or Assumed Liabilities;

(g)       all of the rights, interests and benefits (if any) accruing under all Permits, Governmental Authorizations and Environmental Credits, and all pending applications therefor, in each case to the extent relating to or covering the Acquired Leased Real Property, any other Acquired Assets or any Assumed Liabilities, including without limitation those Permits, Governmental Authorizations and Environmental Credits listed on Schedule 1.1(g);

(h)       all Inventory and supplies of Seller located at, purchased for use or consumption  at, on order to be delivered to Seller or any of its Subsidiaries at, or for use or consumption  at, the Acquired Leased Real Property or otherwise relating to any of the Acquired Assets or the Business; and

(i)       all deposits, escrows, cash collateral, prepayments and similar amounts (including maintenance deposits, and security deposits for rent, electricity, Internet, telephone, or otherwise), and all prepaid or deferred charges and expenses (including all lease and rental payments) in connection with the Acquired Leased Real Property or any other Acquired Assets, including without limitation those listed on Schedule 1.1(i), including Cash and Cash Equivalents and other cash collateral posted in support of Transferred Letters of Credit and Replacement Letters of Credit pursuant to Section 6.13(b).

**Section 1.2    Excluded Assets**. Notwithstanding anything to the contrary in this Agreement, in no event shall Seller be deemed to sell, transfer, assign, convey or deliver, and Seller shall retain all right, title and interest to, in and under assets other than the Acquired Assets, including, without limitation, the following properties, rights, interests and other assets of Seller (collectively, the "Excluded Assets"), subject to Section 1.5:

(a)    subject to the option granted to Purchaser pursuant to Section 6.14 hereof, all Equity Interests of Seller or any of its respective Subsidiaries (collectively, the "Excluded Entities");

(b)    (i) all Cash and Cash Equivalents (excluding, for the avoidance of doubt any deposits, escrows or other amounts described in Section 1.1(i)), (ii) all bank accounts, and (iii) any retainers or similar amounts paid to Advisors or other professional service providers;

(c)    all Excluded Contracts;

(d)    all Documents (including information stored on the computer systems, data networks or servers of Seller or any of its Affiliates) (i) to the extent they relate solely to any of the Excluded Assets or Excluded Liabilities, (ii) that are Seller's or its Affiliate's minute books, Organizational Documents, stock certificates or other Equity Interests instruments, stock registers and other books and records pertaining to the ownership, organization or existence of Seller or its Affiliates, Tax Returns (and any related work papers), corporate seal, checkbooks, canceled checks, employee and personnel files and records of the Business Employees, or (iii) that contain, and solely to the extent they contain, Personal Information that is subject to applicable data privacy Laws that prohibit the transfer or sale thereof; provided that, with respect to the foregoing clause (i), (ii) and (iii), Purchaser shall have the right to make copies of, and have access to, any relevant portions of such Documents to the extent not prohibited by Applicable Law;

(e)    all privileged materials, documents, files and records to the extent relating exclusively to any Excluded Assets or Excluded Liabilities;

(f)    other than those included in the Assigned Contracts, all current and prior insurance policies of Seller or any of its Subsidiaries that are not included among the Assigned Contracts, including all director and officer insurance policies (collectively, the "Business Insurance Policies"), all of which are subject to Section 6.8, and the sponsorship of, and all rights, interests and assets associated with, any benefit or compensation plan, program, policy, contract, or arrangement of Seller or any of its Subsidiaries and the Employee Benefit Plans;

(g)    (i) Seller's claims, Causes of Action or other rights of Seller expressly set forth under this Agreement, including the Purchase Price, or any agreement, certificate, instrument, or other document executed and delivered between Seller, on the one hand, and Purchaser or any member of the Purchaser Group, on the other hand, in connection with the Transactions, or any other agreement between Seller, on the one hand, and Purchaser or any member of the Purchaser Group, on the other hand, entered into on or after the date hereof and (ii) except for those claims and Causes of Action which relate to an Acquired Asset or an Assumed Liability acquired or assumed by Purchaser under this Agreement, all other claims and Causes of Action of Seller and its Affiliates, including without limitation: (A) Avoidance Actions, (B) commercial tort claims,

304753461.7

(C) claims, Causes of Action or other rights of Seller against current or former directors or officers of Seller, and (D) any and all claims and Causes of Action of Seller or its Affiliates that do not relate to the ownership, use, function or value of any of the Acquired Assets;

(h)     all Tax refunds, Tax attributes and Tax assets of Seller allocable to the Pre-Closing Tax Period other than (i) any such Tax refunds, attributes or assets that transfer by operation of Law, (ii) any such Tax refunds, attributes or assets that are Acquired Assets and (iii) for the avoidance of doubt, any grants or credits that are earned or otherwise paid to Purchaser or an Affiliate thereof in a Post-Closing Tax Period;

(i)     all demands, credits, statements, allowances, refunds, rebates (including any vendor or supplier rebates), rights (including under or with respect to express or implied guarantees, warranties, representations, covenants and indemnities), claims, counterclaims, defenses, credits, Causes of Action, rights of set off, rights of recovery or rights of recoupment relating to or arising against suppliers, vendors, merchants, manufacturers and counterparties to any Contract that is not an Assigned Contract to the extent arising out of or relating to events occurring on or prior to the Closing Date, and in all cases, solely with regard to other categories of Excluded Assets set forth in the other clauses of this Section 1.2 or Excluded Liabilities;

(j)     the sponsorship of, and all rights, interests and assets associated with, the Employee Benefit Plans of Seller or its Affiliates, including for the avoidance of doubt all director and officer insurance policies, and all rights and benefits of any nature of Seller or its Affiliates with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

(k)     all accounts receivable, notes receivable, negotiable instruments and chattel paper owing from Persons, together with any unpaid interest or fees accrued thereon or other amounts due with respect thereto;

(l)     all Leased Real Property of Seller and its Affiliates, and all owned real property of Seller and its Affiliates other than the Acquired Leased Real Property;

(m)     all Intellectual Property of Seller and its Affiliates other than any rights, interests and benefits under the Covington IP License; and

(n)     all IT Assets of Seller and its Affiliates, wherever located, to the extent not used in connection with the  Business.

**Section 1.3    Assumption of Certain Liabilities**. On the terms and subject to the conditions set forth herein and subject to the entry and terms of the Sale Order, effective as of the Closing, in addition to the payment of the Purchase Price in accordance with Section 2.1, Purchaser shall irrevocably assume from Seller, and from and after the Closing, pay, perform, discharge, or otherwise satisfy in accordance with their respective terms, and Seller shall irrevocably transfer, assign, convey, and deliver to Purchaser, only the following Liabilities (which shall exclude any such Liabilities which are Liabilities for Taxes except as set forth in clause (c)), without duplication and only to the extent not paid on or prior to the Closing (collectively, the "Assumed Liabilities"), subject to Section 1.5:

(a)     all Liabilities and obligations of Seller under the Assigned Contracts that first become due after the Closing and only to the extent arising out of facts, circumstances, conditions or events that first occur or first come into existence after the Closing (but excluding any Liabilities arising from or relating to any breaches under such Assigned Contract, or any facts, circumstances, conditions or events that first occur or first come into existence, on or prior to the Closing);

(b)     any Liabilities relating to any remediation at the Acquired Leased Real Property first occurring following the Closing and required under Environmental Laws because of any Release of Hazardous Materials first occurring after the Closing (the "Assumed Environmental Liabilities"); provided that, for the avoidance of doubt, no Liability arising out of any Release of Hazardous Materials, condition or violation of Environmental Law in existence on or prior to the Closing Date (whether or not known to either Party or first identified or manifested following the Closing) shall be an Assumed Environmental Liability;

(c)     all Liabilities for property Taxes allocable to the 2025 and 2026 tax years as identified on Schedule 1.3(c) and any Post-Closing Tax Period, in each case solely with respect to the Acquired Leased Real Property, and 50% of the Transfer Taxes payable by Purchaser pursuant to Section 9.1;

(d)     Purchaser's Allocated Portion of the cure costs required to be paid pursuant to Section 365(b) of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts (the "Cure Costs");

(e)     all Liabilities relating to amounts required to be paid, or actions required to be taken or not to be taken, by Purchaser under this Agreement; and

(f)     all Liabilities relating to Transferred Employees that arise after the Closing Date and that do not relate to facts, matters, circumstances, conditions or events occurring or in existence on or prior to the Closing Date.

**Section 1.4     Excluded Liabilities**. Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of Seller or any Subsidiary of Seller, other than the Assumed Liabilities (all such Liabilities that are not Assumed Liabilities being referred to collectively herein as the "Excluded Liabilities"). Without limiting the generality of the foregoing, the Excluded Liabilities shall include the following Liabilities of Seller and its Affiliates:

(a)     All Cure Costs other than Purchaser's Allocated Portion, with Seller acknowledging that Seller's allocated portion of the Cure Costs are to be paid by Seller from the proceeds of the sale or from the bankruptcy estate prior to or at Closing;

(b)     all Liabilities of Seller arising under the WARN Act, ERISA or other Laws relating to the engagement or employment, payment or compensation, or termination of employment or engagement, of any current or former Business Employees or Business Service Providers, and including any current, threatened or potential claims for compensation, benefits or other relief, in each such case, to the extent related to such engagement or employment, payment

or compensation, or termination of employment or engagement, whether arising prior to, on or after the Closing Date;

(c)     all Liabilities at any time arising under, pursuant to or in connection with any Employee Benefit Plans (whether arising prior to, on or after the Closing Date) and all Liabilities for compliance with the requirements of section 4980B of the Tax Code and the rules and regulations thereunder with respect to all individuals who are "M&A qualified beneficiaries" (as such term is defined in 26 C.F.R. § 54.4980B-9);

(d)     all Liabilities arising under, pursuant to or in connection with Environmental Laws, including such Liabilities (x) that are dischargeable, or capable of being sold free and clear, pursuant to Section 363 of the Bankruptcy Code, (y) that are otherwise dischargeable pursuant to Section 1141 of the Bankruptcy Code, and (z) from which the Acquired Assets are otherwise released as of the Closing pursuant to an Order of the Bankruptcy Court, in each case other than the Assumed Environmental Liabilities (for the avoidance of doubt and without limitation, the Excluded Liabilities include (i) all Liabilities arising from or relating to any Notice of Violation, Consent Order or other administrative or judicial enforcement action issued by the Georgia Environmental Protection Division or any other Governmental Body relating to the Acquired Leased Real Property on or prior to the Closing Date, including any fines, penalties, remediation, monitoring or compliance obligations arising therefrom; (ii) all Liabilities arising from or relating to any OSHA citation, complaint, inspection finding or enforcement action commenced or pending on or prior to the Closing Date relating to the Acquired Leased Real Property; and (iii) any Liability arising out of any Release of Hazardous Materials, condition, exceedance or violation of any Environmental Law first occurring or first in existence on or prior to the Closing Date, whether or not known to either Party or first identified or manifested following the Closing);

(e)     any Liability of Seller or any of its Affiliates, or otherwise imposed on the Acquired Assets or with respect to the Business, in respect of any Tax, including without limitation (i) any Liability of Seller for the Taxes of any other Person under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local or foreign law), as a transferee or successor, by Contract or otherwise, (ii) 50% of Transfer Taxes, but excluding property Taxes allocable to any Post-Closing Tax Period to the extent constituting Assumed Liabilities pursuant to Section 1.3(c);

(f)     all Liabilities relating to Transferred Employees that relate to facts, matters, circumstances, conditions or events on or prior to the Closing Date;

(g)     any Liability of Seller or any of its Affiliates or any of their respective predecessors associated with any and all indebtedness, including any guarantees of third party obligations and reimbursement obligations to guarantors of Seller's or any of its Affiliates' or any of their respective predecessors' obligations, and including any guarantee obligations or imputed Liability through veil piercing or similar theories or Laws incurred by or through Seller or any of its Affiliates or their respective predecessors;

(h)     all Liability of Seller, any of its Affiliates or any of their respective predecessors associated with payments for the purchase of goods for the period prior to Closing, including but not limited to customer deposits and prepaid amounts;

304753461.7

(i)        all Liabilities of Seller or any of its Affiliates or any of their respective predecessors to their respective equity holders with respect to dividends, distributions in liquidation, redemptions of interests, option payments or otherwise;

(j)        all Liabilities outstanding as of and arising after the Closing for any Contract for delivery of or returns of products previously sold to customers, whether or not any customer has provided a deposit for the sale, except under any Assigned Contract to the extent constituting Assumed Liabilities pursuant to Section 1.3(a);

(k)        all Liabilities of Seller or of any of its predecessors arising out of any Contract, Permit, or claim that is not transferred to Purchaser hereunder;

(l)        except as otherwise set forth in Section 1.3(f), all Liabilities arising prior to, on or after the Closing Date, or that relates to facts, matters, circumstances, conditions or events on, prior to, on or following the Closing with respect to any former or current Business Employees and any former or current Business Service Providers;

(m)        all Liabilities of Seller, its Affiliates or any of its or their predecessors arising out of any alleged infringement, misappropriation or other violation of any third party's Intellectual Property on or prior to the Closing Date, including Liabilities arising out of or related to the Intellectual Property related to the Business on or prior to the Closing Date; and

(n)        all other Liabilities owed to any third party, the U.S. Government or any other Governmental Body that are not expressly included in the Assumed Liabilities.

**Section 1.5        Assumption/Rejection of Certain Acquired Assets**.

(a)        *Assumption and Assignment of Contracts*. Seller shall provide notice of its motion seeking entry of the Sale Order to all parties to any executory Contracts or unexpired Leases to which a Seller is a party that are Assigned Contracts, and take all other actions reasonably necessary to cause such Contracts to be assumed by Seller and assigned to Purchaser pursuant to Section 365 of the Bankruptcy Code to the extent that such Contracts are Assigned Contracts at Closing. The Sale Order shall provide that as of and conditioned upon the occurrence of the Closing, Seller shall assign or cause to be assigned to Purchaser, as applicable, the Assigned Contracts, each of which shall be identified by the name or appropriate description and date of the Assigned Contract (if available), the counterparty to the Assigned Contract and the address of such counterparty for notice purposes, all being included in a notice filed with the Bankruptcy Court. Such notice to Assigned Contract counterparties shall also set forth Seller's good faith estimate of the amounts necessary to cure any defaults under each of the Assigned Contracts, as determined by Seller based on its books and records or as otherwise determined by the Bankruptcy Court, and summarizing the procedures for objecting thereto. At the Closing, or as soon as reasonably practicable thereafter, Seller shall, pursuant to the Sale Order, and the Assignment and Assumption Agreement, assume and assign to Purchaser (the consideration for which is included in the Purchase Price) and Purchaser shall accept and assume all Assigned Contracts that may be assigned by Seller to Purchaser pursuant to Sections 363 and 365 of the Bankruptcy Code, subject to adjustment pursuant to Section 1.5(b). Subject to entry of the Sale Order, at or prior to Closing (or, in the case of any Contract that is to be assigned following the Closing pursuant to

Section 1.5(d)(iii), on or prior to the date of such assignment), (i) Seller shall pay, or cause to be paid, the first $750,000 of the Cure Costs, and Purchaser shall pay, or cause to be paid, all remaining Cure Costs (such payment to be made in the manner expressed in Section 1.3(d) hereof) (such Cure Costs allocated to Purchaser pursuant to this Section 1.5(a)(i), "Purchaser's Allocated Portion"), (ii) following satisfaction of clause (i), Seller shall assign such Assigned Contracts to Purchaser pursuant to the Assignment and Assumption Agreement in accordance with the provisions of Section 365 of the Bankruptcy Code and this Agreement, and (iii) following satisfaction of clause (ii), Purchaser shall in accordance with its respective terms pay and fully satisfy, discharge and perform all of the obligations under each Assigned Contract to the extent such obligations are Assumed Liabilities. Attached as Schedule 1.5(a) hereto is Seller's good-faith estimate of the Cure Costs for each Assigned Contract, identifying any disputed or unliquidated amounts. Seller shall use commercially reasonable efforts to obtain, prior to Closing, any written counterparty consent to assignment required under any of the Assigned Contracts.

(b)     Excluding or Adding Acquired Assets Prior to Closing. The Parties acknowledge and agree that at the Closing, Purchaser intends to acquire solely the Acquired Assets, and to assume solely the Assumed Liabilities. The Parties agree to cooperate in good faith to take all actions necessary or advisable to transfer all such Acquired Assets to Purchaser and for Purchaser to assume only such Assumed Liabilities (and exclude all other Liabilities), effective as of the Closing and for no additional consideration, so that the intention of the Parties as set forth in the preceding sentence is effectuated. Without limiting the generality of the foregoing and subject to the last sentence of Section 1.5(c), Purchaser shall have the right to notify Seller through one or more notices (any such notice, a "Designation Notice") of (i) any Acquired Asset (including any Assigned Contract) that it does not wish to assume or acquire, (ii) any Contract to which Seller or any of its Affiliates is a party or otherwise relating to any assets or properties of Seller or any of its Affiliates, or any other Excluded Asset, that it wishes to add as an Acquired Asset except for Excluded Assets expressly set forth in clauses (b)(i), (d), (e), (g), (h), and (k) of Section 1.2, (iii) any Assumed Liability that it reasonably determines is inconsistent with the first sentence of this Section 1.5(b), or (iv) the corresponding addition of a Person as a Seller, as a party to this Agreement, if applicable, resulting from the changes set forth in clauses (i), (ii), (iii) or (iv), in any case of clauses (i), (ii), (iii), or (iv), at any time and from time to time up to the time of the Closing, (A) any such previously considered Acquired Asset that Purchaser has informed Seller that it no longer wishes to assume or acquire shall be automatically deemed removed as an Acquired Asset hereunder (and removed from any applicable Schedules related to such Acquired Asset) and, notwithstanding anything to the contrary herein, automatically deemed added as an Excluded Asset hereunder (and added to the applicable Schedules related to the Excluded Assets) and any Liabilities with respect to such Acquired Asset shall automatically be deemed to be added as Excluded Liabilities hereunder (and added to the applicable Schedules related to the Excluded Liabilities), in each case, without any adjustment to the Purchase Price as a result of such exclusion or change in designation, (B) any such previously considered Excluded Asset (including any Contracts) that such Purchaser wishes to assume or acquire as an Acquired Asset shall be automatically deemed added as an Acquired Asset hereunder (and added to the applicable Schedules related to Acquired Assets) and, notwithstanding anything to the contrary herein, automatically deemed removed as an Excluded Asset hereunder (and removed from the applicable Schedules related to Excluded Assets), and sold and assigned by Seller to Purchaser and accepted and assumed by Purchaser as an Acquired Asset (and added to the applicable Schedules related to Acquired Assets, including Schedule 1.1(b)), in each case, without any adjustment to the Purchase

304753461.7

Price as a result of such assumption, acquisition or change in designation, (C) any such previously considered Assumed Liability that Purchaser in good faith determines is inconsistent with the first sentence of this Section 1.5(b) shall be automatically deemed removed as an Assumed Liability hereunder (and removed from the applicable Schedules related to Assumed Liabilities) and, notwithstanding anything to the contrary herein, automatically deemed added as an Excluded Liability hereunder (and added to the applicable Schedules related to Excluded Liabilities), in each case, without any adjustment to the Purchase Price as a result of such exclusion or change in designation; and (D) any such Person that is selling such previously considered Excluded Asset that Purchaser wishes to assume as an Acquired Asset who is not a party to this Agreement shall be joined as a party to this Agreement pursuant to a joinder agreement in form and substance reasonably acceptable to Purchaser. Any action of Purchaser permitted under this Section 1.5(b) shall be made in Purchaser's sole and absolute discretion. Notwithstanding anything herein to the contrary, in no event shall Purchaser have the right to notify Seller in writing that any Assumed Liability that is expressly set forth in Section 1.3(a) through Section 1.3(c) (other than those relating to an Assigned Contract that is to be removed in accordance with this Section 1.5) is inconsistent with the first sentence of this Section 1.5(b), or otherwise seek to remove, limit or otherwise modify the Assumed Liabilities as set forth in Section 1.3, which the Parties agree are to remain Assumed Liabilities in any event notwithstanding any modifications made pursuant to this Section 1.5. Notwithstanding the foregoing, in no event shall Purchaser have a right to add an Acquired Asset if the transfer or inclusion of such asset is otherwise restricted pursuant to the Chapter 11 Cases.

(c)     Cure Costs.

(i)     Schedule 1.5(c)(i) sets forth each Assigned Contract and Seller's good faith estimate as of the Effective Date of the amount of the Cure Costs payable with respect to each such Assigned Contract; *provided* that if no Cure Cost is estimated by Seller to be payable with respect to any particular Assigned Contract, the amount of such Cure Cost designated for such Contract shall be "$0.00".

(ii)     At the Closing, Purchaser shall pay Purchaser's Allocated Portion of Cure Costs and assume, and thereafter in due course and in accordance with its respective terms, pay and fully satisfy, discharge and perform all of the applicable Assumed Liabilities with respect to each Assigned Contract pursuant to Section 365(b) of the Bankruptcy Code and subject to the terms and conditions hereof.  If Purchaser does not pay Purchaser's Allocated Portion of Cure Costs associated with the assignment and assumption of an Assigned Contract or fails to provide adequate assurance of future performance as required by the Bankruptcy Court, (x) such Contract(s) shall not be an Assigned Contract(s) and such Contract(s) shall be automatically deemed removed from Schedule 1.1(b) without any adjustment to the Purchase Price, subject to any procedures set forth in the Bidding Procedures Order, if applicable, and (y) Purchaser is and shall remain obligated to timely consummate the Closing (including paying the Purchase Price in full at Closing) and comply with its obligations under this Agreement and any Ancillary Document and shall not have the right to terminate this Agreement as a result of the failure to assume and assign any such Contract.  Notwithstanding anything to the contrary herein, Seller shall not be required to pay or assume any Purchaser's Allocated Portion of

304753461.7

Cure Costs or provide any assurances, and Seller shall not be obligated to assume and assign any Contract with respect to which Purchaser fails to pay Purchaser's Allocated Portion of Cure Costs or fails to satisfy the party to the proposed Assigned Contract and the Bankruptcy Court as to adequate assurance of future performance.

(iii)    To the extent a counterparty to an Assigned Contract objects or otherwise challenges the Cure Costs determined by Seller and asserts a different monetary amount that must be paid and/or nonmonetary obligations that otherwise must be satisfied, including pursuant to Section 365(b)(1)(A) and (B) of the Bankruptcy Code, in order for Purchaser to acquire and assume such Assigned Contract pursuant to this Agreement (any such Contract, a "Disputed Contract"), and such objection or challenge has not been resolved prior to the Closing, then Purchaser shall provide written notice to Seller prior to the Closing Date (or such earlier date on which the Bankruptcy Code or Bankruptcy Court otherwise would require a determination to assume or reject any such Assigned Contract) either (x) electing to remove any such Disputed Contract from Schedule 1.1(b), in which case the Disputed Contract will be an Excluded Contract and not assigned to Purchaser at Closing or (y) requesting an extension of the period of time following the Closing to resolve any such dispute (such period, an "Extension Period"); provided that any such extension period shall be no longer than ninety (90) days following the Closing Date (or such shorter period of time as required in order to wind-down or liquidate Seller); provided, further, that Seller's obligations to provide such Extension Period is subject to Purchaser's ongoing compliance with Purchaser's obligations pursuant to the final sentence of this Section 1.5(c)(iii).  If Purchaser does not deliver written notice to Seller agreeing to assume such Disputed Contract and pay all Purchaser's Allocated Portion of Cure Costs associated with such Disputed Contract prior to the expiration of the Extension Period or such dispute is not resolved by the expiration of the Extension Period, such Disputed Contract shall automatically be deemed an Excluded Contract.  Purchaser shall be responsible for and reimburse Seller for any reasonable and documented out-of-pocket costs and expenses of Seller arising following the Closing during any Extension Period, including any such incremental costs or expenses (A) that arise out of Seller's extension and continuation of the Bankruptcy Cases solely to the extent that such extension and continuation are attributable to the Extension Period and (B) are incurred as a result of the Seller's performance of its obligations under Section 1.5(c)(iii).

(d)    Non-Assignment.

(i)    Notwithstanding anything to the contrary in this Agreement, a Contract shall not be an Assigned Contract hereunder and shall not be assigned to, or assumed by, Purchaser to the extent that such Contract is rejected by Seller or its Affiliates or is terminated by Seller, its Affiliates or any other party thereto, in either case subject to Purchaser's prior written consent to such action in its sole discretion, or terminates or expires by its terms without the right of renewal, on or prior to such time as it is to be assumed by Purchaser as an Assigned Contract hereunder and is not continued or otherwise extended upon assumption.

(ii)     Schedule 1.5(d)(ii) sets forth each Acquired Asset that requires a Consent or Governmental Authorization (other than, and in addition to and determined after giving effect to any order of the Bankruptcy Court, including the Sale Order) in order to permit the assignment, sale, or transfer to Purchaser of Seller's right, title and interest in and to such Acquired Asset (each, a "Required Consent"). Seller shall send letters seeking each Required Consent within five Business Days after the Sale Order is entered. Notwithstanding anything to the contrary in this Agreement, if (A) an Acquired Asset is subject to a Required Consent, (B) no Order of the Bankruptcy Court, including the Sale Order, is then in effect that precludes satisfaction of such Required Consent, and (C) such Required Consent has not been obtained prior to such time as such right, title and interest is to be assigned, sold, or transferred by Purchaser as an Acquired Asset hereunder, such asset shall not be an Acquired Asset hereunder and shall not be assigned, sold, or transferred to, or received by, Purchaser until either (1) such an Order is in effect or (2) such Required Consent has been obtained.

(iii)     If any Acquired Asset is deemed not to be assigned, sold, or, transferred pursuant to Section 1.5(d)(i) or Section 1.5(d)(ii) or cannot otherwise be assigned, sold or transferred to Purchaser for any other reason outside of Purchaser's control (including if such assignment, sale or transfer would be a violation of Law), the Closing shall nonetheless take place subject to the terms and conditions set forth in this Agreement. In such event and notwithstanding anything to the contrary set forth in this Agreement, the Purchase Price shall be equitably adjusted to reflect the Acquired Assets that are not transferred at Closing based on a good faith determination of the value of any such Acquired Asset. Thereafter, through the earliest of (A) such time as such Consent or Governmental Authorization is obtained or such restriction prohibiting the assignment, sale or transfer of such Acquired Asset is removed, (B) such time as such an Order is in effect, (C) in the case of an Assigned Contract, the expiration of the term of such Contract in accordance with its current term or the execution of a replacement Contract by Purchaser or its Affiliate, and (D) the closing of the Chapter 11 Cases or dissolution of the Seller, Seller and Purchaser shall (and Seller shall cause its Affiliates to) (1) use reasonable best efforts to secure such Consent or Governmental Authorization or Order or otherwise remove such restrictions prohibiting the transfer of such Acquired Assets as promptly as practicable after the Closing and (2) cooperate in good faith in any lawful and commercially reasonable arrangement by Purchaser and Seller and its Affiliates, including subcontracting, licensing, or sublicensing to Purchaser any or all of Seller's or its Affiliates' rights and obligations with respect to any such Acquired Asset, under which (x) Purchaser shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits with respect to which Consent or Governmental Authorization has not been obtained, and (y) Purchaser shall assume and discharge any related obligation with respect to such Acquired Asset. Upon the effectiveness of such Order or satisfying any requisite Consent or Governmental Authorization requirement applicable to, or otherwise removing such restrictions prohibiting the transfer of, such Acquired Assets after the Closing, the Seller shall transfer (or shall cause its Affiliates to transfer) to Purchaser and Purchaser shall

304753461.7

accept Seller's or its Affiliates' (as applicable) right, title, and interest in and to such Acquired Asset to Purchaser, and Purchaser shall pay to Seller the portion of the Purchase Price that was withheld in respect of such Acquired Assets, in each case, in accordance with the terms of this Agreement, the Sale Order, and the Bankruptcy Code.

(iv)     Notwithstanding anything in this Agreement to the contrary, (A) the provisions of Section 1.5(d)(ii) shall not apply to any Consent or Governmental Authorization required under the HSR Act, if applicable, and any Competition Laws, which Consent or Governmental Authorization shall be governed by Section 6.5 and (B) neither Seller nor Purchaser will be obligated to pay any consideration to any third party from whom Consent or Governmental Authorization is requested (other than in a *de minimis* amount) or to initiate any litigation to obtain any such Consent or Governmental Authorization.

(v)     The Parties shall reasonably cooperate to effect any transfers or other arrangements described in this Section 1.5 in a manner that is mutually Tax efficient for the Parties and their respective Affiliates, including by treating any Seller (or applicable Affiliate thereof) initially in possession of any payment referenced in this Section 1.5 after the Closing as holding such payment as an agent or nominee for the Purchaser for income and other applicable Tax purposes to the extent permitted by applicable Law.

(vi)     Notwithstanding anything in this Agreement to the contrary, neither Seller nor Purchaser shall be obligated to pay any fees or other consideration to obtain any third party consent for the transfer of Acquired Assets under this Section 1.5(d), except for Cure Costs which shall be paid in accordance with this Agreement and filing fees and other ordinary administrative or other charges provided for in the Assigned Contracts which shall be paid by Purchaser to the third party from whom such approval, consent or waiver is requested.

## ARTICLE II
### CONSIDERATION; PAYMENT; CLOSING

**Section 2.1     Consideration; Payment**.

(a)     Subject to any adjustment pursuant to Section 1.5(b) and Section 1.5(d)(iii), the aggregate consideration (collectively, the "Purchase Price") to be paid by Purchaser for the purchase of the Acquired Assets shall be: (i) the assumption of Assumed Liabilities, *plus* (ii) cash in an amount equal to US$3,000,000.00 (the "Cash Purchase Price").

(b)     In accordance with Section 2.1(a), Purchaser shall (i) deliver, or cause to be delivered, to Seller an aggregate amount equal to the Cash Purchase Price, and (ii) pay Purchaser's Allocated Portion of Cure Costs.

(c)     The Parties acknowledge that Purchaser has paid to or on behalf of Seller a good faith deposit in the amount of US$300,000.00 (the "Deposit Amount"), which has been deposited by Seller into a separate, interest-bearing bank account with a federally insured banking

304753461.7

institution. At the Closing, the Deposit Amount shall be applied towards the Cash Purchase Price and Purchaser shall deliver, or cause to be delivered, to Seller the difference between the Cash Purchase Price and such Deposit Amount (such difference, the "Closing Date Payment"). The Closing Date Payment and any payment required to be made pursuant to any other provision hereof shall be made in cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by the applicable Party to (or for the benefit of) whom such payment is to be made, and such designation shall be made, at least two (2) Business Days prior to the date such payment is to be made.

Section 2.2    **Closing**. The closing of the purchase and sale of the Acquired Assets, the delivery of the Purchase Price, the assumption of the Assumed Liabilities in accordance with this Agreement (the "Closing") will take place by telephone conference and electronic exchange of documents (or, if the Parties agree to hold a physical closing, at a location mutually agreeable to Seller and Purchaser) as soon as is practicable following full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in Section 7.1, Section 7.2 and Section 7.3 (other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions at the Closing), or at such other place and time, and by such other method, as the Parties may agree in writing. The date on which the Closing actually occurs is referred to herein as the "Closing Date".

Section 2.3    **Closing Deliveries by Seller**. At or prior to the Closing, Seller shall deliver, or cause to be delivered, as applicable, to Purchaser:

(a)    a bill of sale and assignment and assumption agreement in the form to be mutually and reasonably agreed to by Seller and Purchaser consistent with the terms of this Agreement between the Effective Date and the Closing Date and to thereafter be attached hereto as **Exhibit B** (the "Assignment and Assumption Agreement"), duly executed by Seller;

(b)    an IRS Form W-9 executed by Seller or Seller's regarded owner for U.S. federal income Tax purposes; provided that Purchaser's sole remedy for the failure to provide any such form shall be to withhold any required amount under applicable Tax Law;

(c)    if requested by Purchaser, an assignment of each Government Authorization in the form required by the applicable Governmental Body;

(d)    an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Seller (i) certifying that the conditions set forth in Sections 7.2(a), 7.2(b) and 7.2(c) have been satisfied, (ii) attaching and certifying on behalf of Seller complete and correct copies of the resolutions of the special committee of Seller authorizing the execution, delivery, and performance by Seller of this Agreement and the Transactions, which resolutions or consent shall be dated prior to the Effective Date, and (iii) certifying on behalf of Seller the incumbency of each officer of Seller or other authorized person executing this Agreement or any document delivered in connection with the Closing on behalf of Seller;

(e)    with respect to each Assigned Contract constituting an Acquired Lease, an assignment and assumption agreement conveying all rights, title and interest of Seller under such Acquired Lease to Purchaser, in each case in the form to be mutually and reasonably agreed to by

Seller and Purchaser consistent with the terms of this Agreement between the Effective Date and the Closing Date and to thereafter be attached hereto as **Exhibit C** or, if required by any landlord to an Acquired Lease, such other customary form approved by Purchaser (each, a "Lease Assignment Agreement"), duly executed by Seller and the applicable landlord;

(f)      the Covington IP License Assignment, in a form to be mutually and reasonably agreed to by Seller and Purchaser consistent with the terms of this Agreement between the Effective Date and the Closing Date and to thereafter be attached hereto as **Exhibit D**, duly executed by Seller and Bluegrass; and

(g)      a transition services agreement in the form to be mutually and reasonably agreed to by Seller and Purchaser between the Effective Date and the Closing Date consistent with the terms of this Agreement and attached hereto as **Exhibit E** (the "Transition Services Agreement"), duly executed by Seller.

**Section 2.4      Closing Deliveries by Purchaser**. At the Closing, Purchaser shall deliver to (or at the direction of) Seller:

(a)      the Closing Date Payment;

(b)      the Assignment and Assumption Agreement, duly executed by Purchaser;

(c)      an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Purchaser, certifying that the conditions set forth in 7.3(a) and 7.3(b) have been satisfied;

(d)      the Lease Assignment Agreements, duly executed by Purchaser;

(e)      the Covington IP License Agreement, duly executed by Purchaser; and

(f)      the Transition Services Agreement, duly executed by Purchaser.

**Section 2.5      Withholding**. Purchaser shall be entitled to deduct and withhold any Taxes from any amounts otherwise payable pursuant to this Agreement, as Purchaser is required to deduct and withhold under any applicable Tax law; provided, that if Purchaser believes any such deduction or withholding of Tax (other than any deduction or withholding resulting from Seller's failure to satisfy its obligations under Section 2.3(b)) is required, Purchaser shall use commercially reasonable efforts to provide notice to Seller prior to making such deduction or withholding and shall reasonably cooperate with Seller to reduce or eliminate the requirement to deduct and withhold Tax. Such withheld amounts that are paid to the appropriate taxing authority shall be treated for all purposes of this Agreement as having been paid to the applicable Seller in respect of whom such deduction or withholding was made.

## ARTICLE III
### REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants, excepting those matters reflected in a disclosure schedule attached to this Agreement (the "Disclosure Schedule"), which shall be subject to Section 10.10, the following to Purchaser as of the date hereof and as of the Closing Date.

**Section 3.1    Organization and Qualification**. Seller is a corporation duly incorporated, validly existing, and in good standing under the Laws of the jurisdiction of its incorporation and has all the requisite corporate power and authority to own or lease all of its properties and assets and to carry on its business as it is now being conducted. Seller has made available to Purchaser complete and correct copies of its respective constitutive documents, in each case as amended. Seller is duly licensed or qualified to do business under the Laws of each jurisdiction in which the nature of the business conducted by it makes such licensing or qualification necessary, except where failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

**Section 3.2    Authorization of Agreement**. Subject to requisite Bankruptcy Court approvals:

(a)    Seller has all necessary power and authority to execute and deliver this Agreement and the other Transaction Agreements to which Seller is a party and to perform its obligations hereunder and thereunder and to consummate the Transactions;

(b)    the execution, delivery and performance by Seller of this Agreement and the other Transaction Agreements to which Seller is a party, and the consummation by Seller of the Transactions, have been duly authorized by all requisite corporate action or limited liability company action on the part of Seller, as applicable and no other organizational proceedings on Seller's part are necessary to authorize the execution, delivery and performance by Seller of this Agreement or the other Transaction Agreements and the consummation by it of the Transactions; and

(c)    this Agreement and the other Transaction Agreements to which Seller is a party have been, or will be, duly executed and delivered by Seller and, assuming due authorization, execution and delivery hereof and thereof by Purchaser and Seller, as applicable, constitutes, or will constitute, legal, valid and binding obligations of Seller, enforceable against Seller in accordance with its and their terms, except that such enforceability (i) may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws of general application affecting or relating to the enforcement of creditors' rights generally and (ii) is subject to general principles of equity, whether considered in a proceeding at law or in equity (collectively, the "Enforceability Exceptions").

**Section 3.3    Conflicts; Consents**.

(a)    Assuming that (a) requisite Bankruptcy Court approvals are obtained, including the Sale Order, (b) the notices, authorizations, approvals, Orders, Permits, or Consents set forth on Schedule 3.3 are made, given or obtained (as applicable), and (c) the requirements of the HSR Act, any applicable antitrust, competition, foreign direct investment or "FDI", or merger

304753461.7

control Laws promulgated by any Governmental Body ("Competition Laws"), if applicable, are complied with, neither the execution and delivery by Seller of this Agreement or the other Transaction Agreements, nor the consummation by Seller of the Transactions contemplated by such Transaction Agreements, nor performance or compliance by Seller with any of the terms or provisions hereof or thereof, will (i) conflict with or violate any provision of the Organizational Documents of Seller, (ii) subject to the entry of the Sale Order, violate any Law or Order to which Seller or Seller's applicable Affiliates is subject, (iii) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, acceleration, vesting or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of any Assigned Contract or Permit included in the Acquired Assets or accelerate Seller's obligations under any such Assigned Contract or Permit, or (iv) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any Acquired Assets, except, in the case of clauses (iii) and (iv), as would not, individually or in the aggregate, reasonable be expected to have a Material Adverse Effect.

(b)     Except for the Sale Order and as set forth on Schedule 3.3(b), Seller is not required to file, seek or obtain any notice, Governmental Authorization, approval, Order, Permit or Consent of or with any Governmental Body or any other Person in connection with the execution, delivery and performance by Seller of this Agreement or the consummation by Seller of the Transactions, except (i) any filings required to be made under the HSR Act, if applicable, or (ii) where failure to obtain such Consent, approval, authorization or action, or to make such filing or notification, would not, individually or in the aggregate, reasonably be expected to prevent or materially impair the ability of Seller to consummate the Transactions.

**Section 3.4     Financial Statements.**

(a)     Seller has provided true, correct and complete copies of the (i) the audited consolidated balance sheets, statements of operations, statements of stockholders' equity and statements of cash flows of Seller and its Subsidiaries as of and for the fiscal years ended December 31, 2024 (the "Audited Financial Statements"); and (ii) the internally prepared unaudited consolidated balance sheet (the "Latest Balance Sheet"), statement of operations, statement of stockholders' equity and statement of cash flows of Seller and its Subsidiaries as of and for the fiscal year ended December 31, 2025 and for the four-month period ending on April 30, 2026 (the "Unaudited Financial Statements") to Purchaser, copies of which are attached in Schedule 3.4(a).

(b)     The Financial Statements (i) present fairly in all material respects the consolidated financial position of Seller and its Subsidiaries as of and for the dates and periods designated therein and the results of operations and cash flows for the periods designated therein, (ii) except as set forth on Schedule 3.4(b), have been prepared in accordance with GAAP applied on a consistent basis during the periods involved (except as may be indicated in the notes thereto and, in the case of unaudited Financial Statements, subject to (x) normal and recurring year-end audit adjustments, (y) the absence of notes and (z) any other immaterial and non-recurring adjustments described therein, including in any notes thereto (not material in amount) and fairly present in all material respects the consolidated financial position of Seller and its consolidated Subsidiaries as of the dates thereof and the consolidated results of their operations and cash flows for the periods shown, except as may be indicated in the notes thereto.

304753461.7

**Section 3.5**    **Title to Properties**.  Seller has a good and valid leasehold interest in the Acquired Leased Real Property, free and clear of all Encumbrances (other than Permitted Encumbrances), other than those interests of the lessors of such Acquired Leased Real Property.

**Section 3.6**    **Contracts**.

(a)    Schedule 3.6 sets forth a list of each Material Contract, as of the date of this Agreement. "Material Contract" means any Contract to which Seller or any of its Affiliates is a party relating to any Acquired Assets or Assumed Liabilities, other than purchase orders.

(b)    True, correct and complete copies of all Material Contracts, including all material amendments, supplements and modifications thereto, have previously been made available to Purchaser or Purchaser's Advisors. Subject to requisite Bankruptcy Court approvals, and assumption by Seller of the applicable Contract in accordance with Applicable Law and except (i) as a result of the commencement of the Chapter 11 Cases, or (ii) as set forth in Schedule 3.6(b), (A) each Material Contract is valid and binding on Seller or its Affiliate that is a party thereto and, to the Knowledge of Seller, each other party thereto, and is in full force and effect, subject to the Enforceability Exceptions, (B) Seller or its Affiliate that is a party thereto, and, to the Knowledge of Seller, any other party thereto, have performed all obligations required to be performed by it under each Material Contract, (C) none of Seller or any of its Affiliates has received any notice (or to the Knowledge of Seller, oral notice) of the existence of any breach or default on the part of Seller under any Material Contract, (D) there are no events or conditions that constitute, or, after notice or lapse of time or both, will constitute a default on the part of Seller or any of its Affiliates, or to the Knowledge of Seller, any counterparty under such Material Contract and (E) Seller has not received any written notice (or to the Knowledge of Seller, oral notice) from any Person that such Person intends to terminate, or not renew, any Material Contract, except in each case of clauses (A) through (E), as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

**Section 3.7**    **No Litigation**. Except as set forth on Schedule 3.7, there are no Actions pending or, to the Knowledge of Seller, threatened (whether or not in writing), against or affecting Seller, the Acquired Assets or the Assumed Liabilities that would reasonably be expected to have an adverse effect on Seller's performance of its obligations under this Agreement or the Transaction Documents or the consummation of the Transactions, or that would otherwise be material, individually or in the aggregate, to the Acquired Assets or the Assumed Liabilities.

**Section 3.8**    **Permits; Compliance with Laws**.

(a)    Except as set forth on Schedule 3.8, (i) Seller (with respect to the Business and the Acquired Assets) is, and has been since January 1, 2021, in compliance in all material respects with all Applicable Laws and applicable Orders with respect to the Business, the Acquired Assets and the Assumed Liabilities, and (ii) Seller holds all licenses, identification numbers, registrations, franchises, permits, variances, certificates, approvals and authorizations from Governmental Bodies necessary for the lawful conduct of the Business at the Acquired Leased Real Property as currently conducted, in each case, except as would not, individually or in the aggregate, reasonably be expected to be material, individually or in the aggregate, to the Acquired Assets or the Assumed Liabilities (collectively, "Permits"). Schedule 1.1(g) set forth a list of all

304753461.7

Permits necessary for (A) the lawful conduct of the Business in the ordinary course of business as currently conducted by Seller, and (B) the occupancy and operation of the Business at the Acquired Leased Real Property

(b)     Seller and each of its Subsidiaries and each of their respective directors, officers and employees acting in such capacity and, to the Knowledge of Seller, each of its and their other agents acting on its or their behalf, is, and has been, since April 24, 2019 with respect to Sanctions and for the last five (5) years with respect to International Trade Laws, in compliance with applicable Sanctions and International Trade Laws. Without limiting any of the foregoing, neither Seller nor any Subsidiary, nor any of their respective directors, officers, or employees, nor, to the Knowledge of Seller, any other Person acting on behalf of Seller or any Subsidiary (i) is a Sanctioned Person, (ii) is subject to debarment or any list-based designations under any International Trade Laws, or (iii) has engaged in any business or dealings, directly or indirectly, with or involving a Sanctioned Country or a Sanctioned Person, or otherwise in violation of applicable Sanctions or International Trade Laws.

(c)     Neither Seller nor any Subsidiary has received from any Governmental Body or any other Person any written or verbal notice of any violation, alleged violation, or any suspected violation of any Sanctions, Anti-Corruption Law or International Trade Law, or conducted any internal investigation with respect to, or made any voluntary or involuntary disclosure to a Governmental Body, or been the subject of any investigation by a Governmental Body concerning, any actual, suspected, or alleged violation of any Sanctions, Anti-Corruption Law or International Trade Law. Seller and each Subsidiary has maintained books and records that, in reasonable detail, accurately and fairly reflect their transactions and dispositions of assets, and Seller and each Subsidiary has implemented and maintained effective policies, procedures, and internal controls that promote compliance with all applicable Sanctions, Anti-Corruption Laws and International Trade Laws.

**Section 3.9**    **Environmental Matters**.

Except as would not, individually or in the aggregate, reasonably be expected to be material to the Acquired Assets or the Assumed Liabilities, and except as set forth on Schedule 3.9:

(a)     Seller and the Subsidiaries are, and have been since January 1, 2021 (or earlier, if Liability remains), in compliance with all applicable Environmental Laws, in each case with respect to the conduct of the Business or the occupancy or operation of the Acquired Leased Real Property.

(b)     Since January 1, 2021 (or earlier if unresolved), none of Seller or the Subsidiaries has received any written, or to the Knowledge of Seller oral, notice, report, or other information alleging that Seller or any Subsidiary is in material violation of or materially liable under, any Environmental Law.

(c)     Seller and the Subsidiaries possess and are, and since January 1, 2021 (or earlier, if Liability remains), have been, in compliance with all Permits required under applicable

304753461.7

Environmental Laws for the operation of the Business or to occupy the Acquired Leased Real Property.

(d)     There is no Action under or pursuant to any Environmental Law that is pending or, to the Knowledge of Seller, threatened against Seller (with respect to the Business) or any Subsidiary

(e)     Seller (with respect to the Business, the Acquired Assets or the Assumed Liabilities) and the Subsidiaries are not subject to any Order imposed by any Governmental Body pursuant to Environmental Laws under which there are material uncompleted, outstanding or unresolved obligations on the part of Seller or any Subsidiary.

(f)     Neither Seller (with respect to the Business, the Acquired Assets or the Assumed Liabilities) nor the Subsidiaries have assumed, undertaken, or provided any indemnification with respect to any material Liability of any Person arising under any Environmental Law or otherwise assumed any material Liability under Environmental Law via operation of Law.

(g)     There has been no Release, disposal or transportation of, contamination by, or exposure of any Person to any Hazardous Materials at, from, or to any location, in each case for which Seller (with respect to the Business, the Acquired Assets or the Assumed Liabilities) or the Subsidiaries are or could be materially liable under any Environmental Law.

(h)     Seller has made available to Purchaser true, correct and complete copies of all material environmental or health and safety reports, studies, records, audits and Permits relating to Seller's or its affiliates' or predecessors', past or current businesses, operations or assets, including, without limitation, the Acquired Assets and Assumed Liabilities, that are within Seller's possession or under their control.

Section 3.10   **Intellectual Property**.   No Intellectual Property owned or licensed by Seller or its Affiliates, or otherwise in which Seller or its Affiliates has any right, title or interest, is included or embodied in any of the Acquired Assets, and, to the extent that any such Intellectual Property is found to be included or embodied in any of the Acquired Assets in any way, Seller hereby waives, on behalf of itself and its Affiliates, successors and assigns, any and all claims or remedies that it or they may have against Purchaser or its Affiliates, successors or assigns, with respect to such inclusion of embodiment of such Intellectual Property in the Acquired Assets; provided that nothing herein shall be deemed to cause any such Intellectual Property, or any licenses or rights with respect thereto, to become, or otherwise be deemed to be, Acquired Assets.

Section 3.11   **Tax Matters**.

(a)     Seller (or its applicable Affiliate) has prepared (or caused to be prepared) and timely filed (taking into account valid extensions of time within which to file obtained in the Ordinary Course) all Tax Returns required to be filed by or with respect to it or the Acquired Assets. All such Tax Returns (taking into account all amendments thereto) are true, complete and accurate in all material respects.

(b)     Except as set forth on <u>Schedule 3.11(b)</u>, all Taxes owed by Seller that are due (whether or not shown on any Tax Return) have been timely paid in full, except to the extent the nonpayment thereof is permitted or required by the Bankruptcy Code.

(c)     Except as set forth on <u>Schedule 3.11(b)</u>, all Taxes owed by or with respect to Seller that are due (whether or not shown on any Tax Return) have been timely paid in full.

(d)     There are no Encumbrances for Taxes on any of the Acquired Assets other than Permitted Encumbrances.

(e)     No written claim has been made in a jurisdiction where Seller does not file Tax Returns that Seller (with respect to the Acquired Assets) is or may be subject to taxation in that jurisdiction.

(f)     Seller has not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to an assessment or deficiency for Taxes , in each case, which waiver or extension is currently in force and would have effect after the Closing Date.

(g)     Seller has complied with all applicable Laws relating to the withholding of Taxes and the payment thereof to appropriate authorities, including Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee or independent contractor, and Taxes required to be withheld and paid pursuant to Tax Code Sections 1441 and 1442 or similar provisions under foreign Law.

(h)     Seller is not a "foreign person" as defined in Tax Code Section 1445(f)(3) or a "foreign entity" as defined in Tax Code Section 1473(5), and the transaction contemplated herein is not subject to the withholding provisions of Code Sec. 3406, subchapter A of Chapter 3 of the Tax Code or Chapter 4 of the Tax Code.

(i)     Seller is not a party to any Tax allocation or sharing agreement and Seller has not been a member of an affiliated group filing a consolidated federal income Tax Return (other than a group the common parent of which is Seller) or has any Tax Liability of any Person under Treasury Regulation Section 1.1502-6 or any similar provision of state, local or foreign law (other than the other members of the consolidated group of which Seller is parent), or as a transferee or successor, by contract or otherwise.

**Section 3.12   <u>Insurance; Support Obligations</u>.** Seller has in full force and effect insurance policies (the "<u>Business Insurance Policies</u>") as would be reasonable and customary for companies like Seller.

(b)     True, correct and complete copies of the Business Insurance Policies have been made available to Purchaser.

(c)     All premiums due and payable under the Business Insurance Policies have been paid when due, and there have been no material defaults under any such Insurance Policy by the Seller or any of its Subsidiaries in the past year.

304753461.7

(d)      All financial assurances, including letters of credit, sureties, bonds, or similar arrangements supporting the operation, monitoring, closure, remediation, reclamation, or post-closure obligations relating to or with respect to the Acquired Assets over the last five (5) years are set forth in Schedule 3.12(d).

**Section 3.13     Brokers**. Except as set forth on Schedule 3.13, the fees and expenses of which will be paid by Seller, no broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the Transactions based upon arrangements made by or on behalf of Seller or its Affiliates.

**Section 3.14     Inter-Company Transactions**. A true, correct and complete list and description of all Contracts (including any amendments, supplements, restatements or modifications thereto) between Seller or any of its Affiliates, or between any Affiliates of Seller, relating to any Acquired Assets or any Assumed Liabilities, is set forth on Schedule 3.14, and true, correct and complete copies of such Contracts have been made available to Purchaser.

**Section 3.15     Title to Assets**. Subject to any Permitted Encumbrances and except as set forth on Schedule 3.15, Seller has good and valid title to, and the right to use and sell without limitation, free and clear of all interests and Encumbrances subject to section 363 of the Bankruptcy Code, the tangible Acquired Assets except to the extent the failure to have such title or right to use would not be expected to be material to the Business. At the Closing, pursuant to the Sale Order, Seller will convey such good and valid title to or rights to use all of the tangible Acquired Assets, free and clear of all Encumbrances (other than Permitted Encumbrances that will be released at the Closing Date) to Purchaser. The tangible Acquired Assets are (to the extent applicable) in good operating condition and working order (ordinary wear and tear excepted) and are adequate for the uses to which they are being put, and none of such tangible Acquired Assets is in need of maintenance or repairs except for ordinary, routine maintenance and repairs.

**Section 3.16     No Material Adverse Effect**. Since the Balance Sheet Date through the date of this Agreement, except as set forth on Schedule 3.16, no Material Adverse Effect has occurred.

**Section 3.17     Absence of Changes**. Except as set forth on Schedule 3.17, and except as expressly contemplated by this Agreement, since the Balance Sheet Date, Seller (i) has, in all material respects, conducted the Business and operated the Acquired Assets and properties in the Ordinary Course and (ii) has not taken any action that would require the consent of Purchaser pursuant to Section 6.1 if such action had been taken during the Interim Period.

**Section 3.18     CFIUS**. Neither Seller nor any Subsidiary engages in (a) the design, fabrication, development, testing, production, or manufacture of one or more "critical technologies" within the meaning the DPA; (b) the ownership, operation, maintenance, supply, manufacture, or servicing of "covered investment critical infrastructure" within the meaning of the DPA (where such activities are covered by column 2 of Appendix A to 31 C.F.R. Part 800); or (c) the maintenance or collection, directly or indirectly, of "sensitive personal data" of U.S. citizens within the meaning of the DPA.

304753461.7

**Section 3.19   No Other Representations or Warranties**. Except for the representations and warranties expressly contained in this Article III (as qualified by the Schedules) and the Transaction Agreements (in each case, in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement and the Transaction Agreements) (the "Express Seller Representations") (it being understood that the Purchaser Group has relied only on the Express Seller Representations for purposes of the Transactions), no Seller nor any other Person on behalf of any Seller makes any express or implied representation or warranty with respect to any Seller, the Acquired Assets, or the Assumed Liabilities or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person (including in (x) any presentations or other materials prepared by Moelis, the "Information Presentation", (y) that certain virtual data room administered by Datasite (the "Dataroom"), or (z) in the Projections to Purchaser on behalf of Seller Parties).

## ARTICLE IV
### REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Seller as follows.

**Section 4.1   Organization and Qualification**. Purchaser is a Delaware corporation duly formed, validly existing, and in good standing under the Laws of the State of Delaware and has all requisite power and authority necessary to carry on its business as it is now being conducted, except (other than with respect to Purchaser's due formation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on such Purchaser's ability to consummate the Transactions.  Purchaser is duly licensed or qualified to do business and is in good standing (where such concept is recognized under applicable Law) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets owned or used by it makes such licensing or qualification necessary, except where the failure to be so licensed, qualified, or in good standing would not, individually or in the aggregate, reasonably be expected to prevent or adversely affect such Purchaser's ability to consummate the Transactions.

**Section 4.2   Authorization of Agreement**. Purchaser has all necessary organizational power and authority to execute and deliver this Agreement and the Transaction Agreements and to perform its obligations in this Agreement and to consummate the Transactions. The execution, delivery, and performance by Purchaser of this Agreement, and the consummation by Purchaser of the Transactions, subject to requisite Bankruptcy Court approvals, have been duly authorized by all requisite corporate or similar organizational action and no other corporate or similar organizational proceedings on Purchaser's part are necessary to authorize the execution, delivery, and performance by Purchaser of this Agreement and the consummation by it of the Transactions. Subject to requisite Bankruptcy Court approvals, this Agreement has been duly executed and delivered by Purchaser and, assuming due authorization, execution, and delivery of this Agreement by the other Parties, constitutes a legal, valid, and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except that such enforceability may be limited by the Enforceability Exceptions.

304753461.7

**Section 4.3**    <u>**Conflicts; Consents**</u>.

(a)    Assuming that (i) the Sale Order and all other requisite Bankruptcy Court approvals are obtained, and (ii) the requirements of any Competition Laws are complied with, neither the execution and delivery by Purchaser of this Agreement, nor the consummation by Purchaser of the Transactions, nor performance or compliance by Purchaser with any of the terms or provisions hereof, will (A) conflict with or violate any provision of Purchaser's Organizational Documents, (B) violate any Law or Order to which Purchaser is subject, (C) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under, (x) give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit under, (y) any of the terms or provisions of any loan or credit agreement or other material Contract to which Purchaser is a party, or (z) accelerate Purchaser's obligations under any such Contract, or (D) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of Purchaser or any of its Subsidiaries, except, in the case of <u>clauses (A)</u> through <u>(D)</u>, as would not, individually or in the aggregate, reasonably be expected to prevent or materially impair, alter, or delay Purchaser's ability to consummate the Transactions.

(b)    Purchaser is not required to file, seek or obtain any notice, Governmental Authorization, approval, Order, Permit or Consent of or with any Governmental Body in connection with the execution, delivery and performance by Purchaser of this Agreement or the consummation by Purchaser of the Transactions, except (i) any filings required to be made under the HSR Act, if applicable, or (iii) where failure to obtain such Consent, approval, authorization or action, or to make such filing or notification, would not, individually or in the aggregate, reasonably be expected to prevent or materially impair the ability of Purchaser to consummate the Transactions.

**Section 4.4**    <u>**Financing**</u>. At the Closing, Purchaser will have sufficient funds in an aggregate amount necessary to pay all amounts payable under this Agreement, including the Purchase Price and to perform the Assumed Liabilities as they become due in accordance with their terms, and (b) Purchaser is and shall be capable at the Closing of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts and the related Assumed Liabilities.

**Section 4.5**    <u>**Brokers**</u>. Except for any such person  whose fees and expenses will be paid by Purchaser or an Affiliate thereof, there is no investment banker, broker, finder, or other intermediary which has been retained by or is authorized to act on behalf of Purchaser that might be entitled to any success fee or commission in connection with the Transactions.

**Section 4.6**    <u>**No Litigation**</u>. There are no Actions pending or, to Purchaser's actual knowledge, threatened against or affecting Purchaser that will or would reasonably be expected to materially and adversely affect Purchaser's performance of its obligations under this Agreement or the consummation of the Transactions.

**Section 4.7**    <u>**Certain Arrangements**</u>. As of the date hereof, except for arrangements among any holders of bonds, indentures, notes or similar instruments of Seller or an Affiliate thereof, there are no Contracts, undertakings, commitments, agreements or obligations, whether written or oral, between any member of the Purchaser Group, on the one hand, and any member

304753461.7

of the management of Seller or its board of directors (or applicable governing body of any Affiliate of Seller), any holder of equity or debt securities of Seller, or any lender or creditor of Seller or any Affiliate of Seller, or any third party on the other hand, (a) relating in any way to the acquisition of the Acquired Assets or the Transactions (including any joint bidding, exclusivity or similar arrangement with any third party) or (b) that would be reasonably likely to prevent, restrict, impede or adversely affect the ability of Seller or any of their Affiliates to entertain, negotiate or participate in any such Transactions.

**Section 4.8     No Other Representations or Warranties**. Except for the representations and warranties expressly contained in this Article IV and the Transaction Agreements (in each case, in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement and the Transaction Agreements (the "Express Purchaser Representations")), it is understood that Seller has relied only on the Express Purchaser Representations for purposes of the Transactions. Seller is not relying on and will not rely on the accuracy or completeness of any other express or implied representation or warranty with respect to Purchaser, the Excluded Assets, or the Excluded Liabilities, or with respect to any other information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person to Seller on behalf of the Purchaser Group. Seller acknowledges that neither Purchaser nor any other Person on behalf of Purchaser makes any other express or implied representation or warranty with respect to Purchaser or with respect to any other information provided to Seller by Purchaser. Without limiting the foregoing, neither Purchaser nor any other Person will have or be subject to any Liability whatsoever to Seller resulting from the distribution to Seller, or Seller's use of or reliance on, any such information, statements, disclosures, documents, projections, forecasts, or other material provided in expectation of the Transactions, except for any Express Purchaser Representations. Notwithstanding anything to the contrary herein, the foregoing shall not limit any Express Purchaser Representations or claims or remedies in respect of Fraud.

**ARTICLE V**
**BANKRUPTCY COURT MATTERS**

**Section 5.1     Bankruptcy Actions**.

(a)     If applicable, the bidding procedures to be employed with respect to this Agreement shall be the Bidding Procedures reflected in the Bidding Procedures Order. Purchaser agrees and acknowledges that Seller, including through its representatives, are and may continue soliciting inquiries, proposals or offers from third parties in connection with any Alternative Transaction pursuant to the terms of the Bidding Procedures Order. Seller may modify the motion seeking approval of the Sale Order pursuant to discussions with the United States Trustee assigned to the Chapter 11 Cases, the Bankruptcy Court, any creditor or committee representing a group of creditors in the Chapter 11 Cases, or any other party in interest, with such modifications being subject to the approval of Purchaser in its commercially reasonable discretion. Notwithstanding the foregoing, any resulting changes to this Agreement or any related document or resulting material changes to the Sale Order shall be subject to the approval of Purchaser, which approval may be withheld by Purchaser in its commercially reasonable discretion.  Seller shall (A) provide Purchaser with drafts of any and all other pleadings and proposed orders to be filed or submitted in connection with this Agreement and the Transactions, and such pleadings and proposed orders shall be in form and substance reasonably acceptable to Purchaser and (B) make reasonable efforts

to consult and cooperate with Purchaser regarding any discovery taken in connection with seeking entry of the Sale Order (including any depositions).

(b)     From the date hereof until the earlier of (i) the termination of this Agreement in accordance with Section 8.1 and (ii) the Closing Date, the Parties shall use their respective commercially reasonable efforts to obtain entry by the Bankruptcy Court of the Sale Order.

(c)     Each of Seller and Purchaser shall (i) appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the Transactions and (ii) keep the other reasonably apprised of the status of material matters related to the Agreement, including, upon reasonable request promptly furnishing the other with copies of notices or other communications received by Seller from the Bankruptcy Court with respect to the Transactions.

(d)     If any party other than Purchaser or Seller appeals or seeks a stay of the Sale Order, Seller shall promptly notify Purchaser of such appeal or stay request and shall promptly provide to Purchaser a copy of the related notice of appeal or order of stay. Seller shall also provide Purchaser with written notice of any motion or application filed in connection with any appeal from either of such orders.

(e)     Seller and Purchaser acknowledge that this Agreement and the sale of the Acquired Assets are subject to the possible receipt by Seller of higher and better bids and Bankruptcy Court approval. Purchaser acknowledges that Seller is required by Applicable Law to act in good faith and take reasonable steps to demonstrate that it has sought to obtain the highest or otherwise best price for the Acquired Assets, including giving notice thereof to the creditors of Seller and other interested parties, providing information about Seller and the Business to prospective bidders, entertaining higher and better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Acquired Assets, conducting an Auction.

(f)     Purchaser shall use commercially reasonable efforts to provide adequate assurance of future performance as required under Section 365 of the Bankruptcy Code for the Assigned Contracts and to demonstrate that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. Purchaser agrees that it will use commercially reasonable efforts to assist in obtaining a Bankruptcy Court finding that there has been a sufficient demonstration of adequate assurance of future performance under the Assigned Contracts, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Purchaser's Advisors available to testify before the Bankruptcy Court.

(g)     From and after the Effective Date and prior to the Closing or the termination of this Agreement in accordance with Section 8.1, Seller shall not take any action which is intended to (or is reasonably likely to), or fail to take any action the intent (or the reasonably likely result) of which failure to act is to, result in the reversal, voiding, modification or staying of the Sale Order or this Agreement. Notwithstanding the foregoing, nothing in this Section 5.1 shall prevent Seller from modifying the Bidding Procedures reflected in the Bidding Procedures Order as necessary or appropriate to maximize value for Seller's estate in accordance with Seller's fiduciary

304753461.7

obligations, which modifications shall be subject to the prior approval of Purchaser in its commercially reasonable discretion.

(h)     Purchaser agrees not to solicit or enter into any joint bidder, exclusivity, or similar arrangement with respect to the Transactions prior to the Closing without the prior written consent of Seller, which consent shall not be unreasonably withheld.

**Section 5.2     Sale Order**. The Sale Order shall, among other things, (a) approve, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code (i) the execution, delivery and performance by Seller of this Agreement, (ii) the sale of the Acquired Assets to Purchaser on the terms set forth herein and free and clear of all Encumbrances (other than Permitted Encumbrances), and (iii) the execution, delivery, and performance by Seller of its obligations under this Agreement, (b) authorize and empower Seller to assume and assign to Purchaser the Assigned Contracts, (c) find that Purchaser is a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code, find that Purchaser is not a successor to Seller, and grant Purchaser the protections of Section 363(m) of the Bankruptcy Code, (d) find that Purchaser has provided adequate assurance (as that term is used in Section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assigned Contracts, and (e) find that Purchaser shall have no Liability for any Excluded Liability or responsibility for any Liability or other obligation of Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, successor, or transferee Liability, labor law, de facto merger, environmental, or substantial continuity. Without limiting Seller's obligation to take all such actions as are reasonably necessary to obtain Bankruptcy Court approval of the Sale Order, Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (A) demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code and (B) establishing adequate assurance of future performance within the meaning of Section 365 of the Bankruptcy Code and in accordance with the Bidding Procedures Order (if applicable). Without limiting the generality of the foregoing, Seller shall request that the Sale Order (i) expressly provide that, pursuant to Section 363(f) of the Bankruptcy Code, all Encumbrances (other than Permitted Encumbrances), including without limitation any mechanics', contractor's, statutory, tax and utility liens, shall attach to the proceeds of the Sale Transaction with the same validity and priority as such liens had against the Acquired Assets and shall not attach to or follow the Acquired Assets; (ii) expressly authorize the assumption and assignment to Purchaser of the Assigned Contracts, in each case notwithstanding any anti-assignment, ipso facto, change-of-control, material-adverse-change or similar provisions therein, to the extent permissible under Sections 365(e) and 365(f) of the Bankruptcy Code; (iii) expressly find that all pre-Closing environmental enforcement actions, notices of violation, consent orders, OSHA citations, and pre-Closing environmental remediation obligations of Seller relating to the Acquired Leased Real Property are Excluded Liabilities and shall not be assumed by or imposed on Purchaser; and (iv) provide such other findings, protections and authorizations as are customary in Section 363 sale orders entered by the Bankruptcy Court.

**Section 5.3     Approval**. Seller's obligations under this Agreement and in connection with the Transactions are subject to entry of and, to the extent entered, the terms of any Orders of

304753461.7

the Bankruptcy Court (including entry of the Sale Order). Nothing in this Agreement shall require Seller or its Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

## ARTICLE VI
### COVENANTS AND AGREEMENTS

**Section 6.1**     **Conduct of the Business of Seller**.

(a)     Except (i) as required by Applicable Law, Order or a Governmental Body, (ii) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, as the case may be, (iii) as expressly contemplated or required by this Agreement, or (iv) as set forth on Schedule 6.1, during the period from the Effective Date until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to Article VIII), unless Purchaser otherwise consents in writing, Seller shall (and shall cause its Affiliates to) (A) carry on the Business in the Ordinary Course, (B) conduct the Business in accordance with Applicable Law and (C) use commercially reasonable efforts to maintain its Permits, Equipment and Business Insurance Policies.

(b)     [*Reserved.*]

(c)     Except (i) as required by Applicable Law, Order or a Governmental Body, or (ii) as set forth on Schedule 6.1(c), during the period from the Effective Date until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to Article VIII), unless Purchaser otherwise consents in writing, Seller shall not, and shall cause its Affiliates not to, take any of the following actions with respect to the Business, the Acquired Assets or the Assumed Liabilities:

(i)     (A) incur, assume or otherwise become liable for any indebtedness for borrowed money, issue or sell any debt securities or rights to acquire any debt securities of Seller, guarantee any such indebtedness or any debt securities of another Person (collectively, "Indebtedness"), except for (1) letters of credit, bank guarantees, security or performance bonds or similar credit support instruments, overdraft facilities or cash management programs, in each case issued, made or entered into in the Ordinary Course and that do not constitute Assumed Liabilities, (2) Indebtedness incurred under arrangements that are not secured by the Acquired Assets and that do not constitute Assumed Liabilities, and (3) Indebtedness incurred under existing arrangements (including in respect of letters of credit) that do not constitute Assumed Liabilities, in each case of this clause (A), other than Excluded Liabilities, (B) enter into any swap or hedging transaction or other derivative agreements, or (C) make any loans, capital contributions or advances to, or investments in, any Person;

(ii)     sell or lease to any Person, in a single transaction or series of related transactions, any of the Acquired Assets;

304753461.7

(iii)     make or authorize capital expenditures including for property, plant and Equipment;

(iv)     except for acquisitions made with Purchaser's prior written consent, make any acquisition of, or investment in, any securities or business (including by merger) or consolidate with or into any legal entity, (which shall exclude acquisitions of Inventory in the Ordinary Course);

(v)     make any changes in financial accounting methods, principles or practices affecting the consolidated assets, Liabilities or results of operations of Seller and its Affiliates with respect to the Business, the Acquired Assets or the Assumed Liabilities except insofar as may be required (A) by GAAP (or any interpretation thereof), (B) by any applicable Law or (C) by any Governmental Body or quasi-governmental authority (including the Financial Accounting Standards Board or any similar organization);

(vi)     grant any Encumbrance (other than Permitted Encumbrances) on any of the Acquired Assets other than to secure Indebtedness and other obligations in existence at the date of this Agreement (and required to be so secured by their terms);

(vii)     settle any pending or threatened Action or consent to the entry of any order against Seller or any Subsidiary relating to the Business, the Acquired Assets or Assumed Liabilities;

(viii)     amend, supplement or modify in any material respect, terminate, reject or waive any material term under, exercise any material option under or give any material consent with respect to any Assigned Contract;

(ix)     enter into any Contract that would have been a Material Contract if entered into prior to the date hereof without the prior written consent of Purchaser, which consent shall not be unreasonably withheld;

(x)     acquire any material assets that would be Acquired Assets;

(xi)     resolve any Liability that would be an Assumed Liability;

(xii)     satisfy any Excluded Liability with an Acquired Asset;

(xiii)     grant any waiver under or amend or modify, or surrender, revoke, permit to lapse or otherwise terminate any Permits, other than waivers, amendments or modifications in the Ordinary Course;

(xiv)     acquire any fee interest (or local equivalent) or leasehold interest in any real property;

(xv)     make, change or rescind any material Tax election, change any annual tax accounting period, adopt or change any Tax accounting method, file any

304753461.7

material amended Tax Return, or enter into any closing agreement, consent or agree to any extension or waiver of the limitation period applicable to any claim or assessment in respect of a material amount of Taxes, enter into any Tax partnership agreement or any Tax allocation, sharing or indemnity Contract, agreement or arrangement that would be binding on Purchaser or any of its Affiliates (other than a Contract, agreement or arrangement the principal subject matter of which is not Taxes), settle any material Tax claim or assessment, or file any Tax Return or take any position with respect to Taxes that is inconsistent with the Intended Tax Treatment, in each case to the extent such action would adversely affect the Acquired Assets or the Business in a Post-Closing Tax Period;

(xvi)    file any claim for loss under any Business Insurance Policy without the prior written consent of the Purchaser (not to be unreasonably withheld, conditioned, or denied);

(xvii)   dissolve, liquidate or otherwise terminate its existence in a manner that would delay, prevent or impede the consummation of the Transactions;

(xviii)  amend or modify (whether by merger, consolidation or otherwise) the certificate of incorporation, bylaws or comparable organizational or governing documents of Seller or any of its respective Affiliates in a manner that would delay, prevent or impede the consummation of the Transaction; or

(xix)    commit or agree to take any of the foregoing actions.

(d)      Nothing contained in this Agreement is intended to give Purchaser or its Affiliates, directly or indirectly, the right to control or direct the Business (or the other business of Seller and its Affiliates) prior to the Closing, and nothing contained in this Agreement is intended to give Seller, directly or indirectly, the right to control or direct Purchaser's or its Subsidiaries' operations. Prior to the Closing, each of Purchaser and Seller shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its and its Subsidiaries' respective operations.

**Section 6.2    <u>Access to Information</u>**.

(a)      From the Effective Date until the Closing (or the earlier termination of this Agreement) pursuant to <u>Article VIII</u>, Seller will provide Purchaser and its authorized Advisors with reasonable access (during reasonable business hours and upon reasonable advance notice) to (w) Seller and its Affiliates, to the extent related to the Acquired Assets and the Assumed Liabilities, (x) Seller's accountants, counsel, financial advisors and other authorized outside representatives, officers and senior management in their respective principal places of business, (y) books, records and properties of Seller, to the extent related to the Acquired Assets and the Assumed Liabilities, except as prohibited by Applicable Law and (z) such financial and operating data and other information relating to the Acquired Assets and Assumed Liabilities as Purchaser and its authorized Advisors may reasonably request and Seller will instruct the employees, counsel and financial advisors of the Seller and their Affiliates to cooperate with Purchaser in its investigation of the Acquired Assets and Assumed Liabilities; <u>provided</u> that (i) such access does

not unreasonably interfere with the normal operations of Seller or any Subsidiary, (ii) Seller and its Affiliates are not obligated to disclose and may redact or remove any information that is not related to the Acquired Assets or the Assumed Liabilities, and (iii) nothing herein will require Seller or its Affiliates to provide access to, or to disclose any information to, Purchaser if such access or disclosure (A) would reasonably be expected to adversely affect any legal privilege, (B) would be in violation of applicable Laws (including the Competition Laws) or the provisions of any agreement to which Seller or any Affiliate thereof is bound or would violate any fiduciary duty, or (C) is in respect of Excluded Tax Returns; provided further, that the Parties shall use their respective commercially reasonable efforts to provide such access in a manner so as to not result in the waiver of such privilege or the violation of such Law, agreement or fiduciary duty.

(b)        The information provided pursuant to Section 6.2(a) will be used solely for the purpose of consummating the Transactions, and will be governed by all the terms and conditions of the Confidentiality Agreement, which Confidentiality Agreement shall not terminate upon the execution of this Agreement (but, for the avoidance of doubt, shall terminate on the earlier of (i) the date the Confidentiality Agreement terminates in accordance with its terms and (ii) the Closing Date) notwithstanding anything to the contrary therein. Purchaser will, and will cause its Advisors to, abide by the terms of the Confidentiality Agreement with respect to such access and any information furnished to Purchaser or any of its Advisors. Seller and its Affiliates make no representation or warranty as to the accuracy of any information, if any, provided pursuant to this Section 6.2, and Purchaser may not rely on the accuracy of any such information, in each case, other than the Express Seller Representations.

(c)        From the Closing Date until the earlier of (x) two years following the Closing Date, and (y) the date of a final, unappealable order resolving the Chapter 11 Cases, Purchaser will provide Seller and its Advisors, at Seller's sole cost and expense, with (i) reasonable access, during normal business hours, without undue disruption, and upon reasonable advance written notice, to the books and records, including work papers, schedules, memoranda, and other documents (for the purpose of examining and copying) relating to the Acquired Assets, the Excluded Assets, the Assumed Liabilities or the Excluded Liabilities to the extent relating to periods or occurrences prior to the Closing Date, and (ii) reasonable access, during normal business hours, without undue disruption, and upon reasonable advance written notice, to employees, officers, Advisors, accountants, offices and properties of Purchaser (including for the purpose of better understanding the books and records), in the case of each of the immediately preceding clauses (i) and (ii) solely for the purposes of Seller's wind-down activities; provided that (i) Purchaser shall not be obligated to disclose and may redact or remove any information that is not related to the Acquired Assets, the Excluded Assets, the Excluded Liabilities or the Assumed Liabilities, and (ii) nothing herein will require Purchaser to provide access to, or to disclose any information to, Seller if such access or disclosure (A) would reasonably be expected to adversely affect any legal privilege, or (B) would be in violation of applicable Laws (including the Competition Laws) or the provisions of any agreement to which Purchaser or Seller is bound or would violate any fiduciary duty; provided further, that the Parties shall use their respective commercially reasonable efforts to provide such access in a manner so as to not result in the waiver of such privilege or the violation of such Law, agreement or fiduciary duty.

(d)        Purchaser will not, and will not permit any member of the Purchaser Group to, contact any officer, manager, director, employee, customer, supplier, lessee, lessor, lender,

licensee, licensor, distributor, noteholder or other material business relation of Seller prior to the Closing with respect to Seller, the Business or the Transactions, without the prior written consent of Seller for each such contact, except for in accordance with Section 6.2(a).

**Section 6.3**   **Restricted Use of Confidential Information**. From and after the Closing Date, until the earlier of (a) the dissolution of Seller and (b) the two (2) year-period following Closing, Seller shall, and shall cause its Affiliates and its and their respective Advisors to, hold all Confidential Information, to the extent relating to any Acquired Assets, Assumed Liabilities, Transferred Employees, or the Business, in accordance with the confidentiality and non-use obligations set forth in the Confidentiality Agreement (as if Seller, its Affiliates and its and their respective Advisors were Recipients (as defined in the Confidentiality Agreement) thereunder).

**Section 6.4**   **Employee Matters**.

(a)   Prior to and contingent on the occurrence of the Closing, Purchaser may extend an offer of employment or engagement to one or more of the Business Employees or Business Service Providers on such terms and conditions as determined by Purchaser (such Business Employees or Business Service Providers who receive an offer of employment or engagement, the "Offer Employees"), with such employment or engagement to take effect under the terms set forth in this Section 6.4 ("Transfer Offer") and that, if accepted (which acceptances shall be delivered to Purchaser no later than the Closing Date), shall become effective immediately upon the Closing. No later than five days following the date hereof, Seller shall provide to Purchaser a list of all Business Employees and Business Service Providers as of the Effective Date and sets forth for each such individual the following: (i) name, (ii) title or position (including whether full-time or part-time); (iii) hire or retention date; (iv) current compensation rate or contract fee; (v) commission, bonus or other incentive-based compensation; and (vi) a reasonable description of the fringe benefits provided to each such individual as of the Effective Date. Seller and its Affiliates shall cooperate in good faith with and provide reasonable assistance to Purchaser and its Affiliates in its or their efforts to enter into a Transfer Offer with the Offer Employees, including by (A) making the Business Employees or Business Service Providers reasonably accessible to meet and interview with Purchaser or their Affiliates, and (B) otherwise facilitating Purchaser's and its Affiliates' interview and evaluation processes. Business Employees and Business Service Providers who accept such Transfer Offers and begin employment or engagement with Purchaser shall be collectively referred to herein as "Transferred Employees." Purchaser shall notify Seller on the Closing Date with respect to whether each such offer has been accepted or rejected. Nothing herein shall be construed as a representation or guarantee by Seller or any of its Affiliates that any Business Employees or Business Service Providers will accept the Transfer Offer, or that any Transferred Employee will continue in employment or engagement with Purchaser following the Closing for any period of time. Purchaser shall carry out all necessary actions to effect the timely employment or engagement by it of each Business Employee or Business Service Provider who has accepted a Transfer Offer. Effective as of the Closing, each Transferred Employee previously employed or engaged by Seller shall cease to be an employee or service provider of Seller.

(b)   On the Closing, Transferred Employees (and their eligible dependents and beneficiaries) shall cease active participation in the Employee Benefit Plans (if applicable).

304753461.7

(c)     Purchaser shall be responsible for paying, providing and satisfying when due all compensation for Transferred Employees, solely to the extent it arises from employment or engagement with the Purchaser after the Closing Date, and to the extent set forth in the Transfer Offer.

(d)     At the Closing, Seller and Purchaser shall enter into the Transition Services Agreement, pursuant to which Purchaser shall, for the period set forth therein following the Closing, cause certain Transferred Employees identified therein to provide transition services to Seller's estate in accordance with the terms thereof.

(e)     Except as otherwise set forth in Section 1.3(f), Seller and its Affiliates expressly agree to retain all obligations, Liabilities, and commitments with respect to its or their employees, including, without limitation, all obligations, Liabilities, and commitments under the Worker Adjustment and Retraining Notification Act of 1988 or any similar Laws (collectively, the "WARN Act"), including any requirement to provide notice, that accrue prior to, on or after the Closing Date. Notwithstanding anything to the contrary herein, Seller or its Affiliates shall be permitted to provide WARN Act notices prior to the Closing to any Business Employees who are owed notice under the WARN Act, in consultation with Purchaser.

(f)     Purchaser and its Affiliates shall be solely responsible for any and all obligations and Liabilities arising under Section 4980B of the Tax Code and applicable state Law (including satisfaction of any related notice requirements) with respect to employees of Seller and its Affiliates whose services relate primarily to the Business and who are or may become "M&A qualified beneficiaries" as defined in 26 C.F.R. § 54.4980B- 9 as a result of a qualifying event that occurred or occurs on or after the Closing Date.

**Section 6.5     Regulatory Approvals**.

(a)     Seller will (i) cooperate with Purchaser in exchanging such information and providing such assistance as Purchaser may reasonably request in connection with any filings made by the Purchaser Group pursuant to Section 6.5(b), and (ii) (A) supply promptly any additional information and documentary material that may be requested in connection with the filings made pursuant to this Section 6.5(a) or Section 6.5(b) and (B) use reasonable best efforts to take all actions necessary to obtain all required clearances in connection with such filings.

(b)     Purchaser will, and will cause its Affiliates and Advisors to, (i) make or cause to be made all filings and submissions required to be made by any member of the Purchaser Group under any applicable Laws for the consummation of the Transactions, if any, (ii) cooperate with Seller in exchanging such information and providing such assistance as Seller may reasonably request in connection with any filings made by Seller pursuant to Section 6.5(a), and (iii) (A) supply reasonably promptly any additional information and documentary material that may be requested in connection with the filings made pursuant to this Section 6.5(b) or Section 6.5(a) and (B) use reasonable best efforts to take all actions necessary to obtain all required clearances.

(c)     Notwithstanding anything to the contrary herein, Seller shall, at Sellers's sole cost and expense, prepare, submit, and diligently prosecute applications, filings, submissions

and other documents for the transfer, assignment or reissuance to Purchaser of any Permits desired by Purchaser and required under Law (including Environmental Law) to the extent such Permits are included in the Acquired Assets, and Seller shall reasonably cooperate with Purchaser to obtain the relevant issuing Governmental Bodies' approval of the transfer, assignment, or revocation and reissuance of such Permits.

**Section 6.6     Reasonable Efforts; Cooperation**.

(a)     Subject to the other terms of this Agreement, each Party shall, and shall (whether directly or through its Advisors), use its reasonable best efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper or advisable to cause the Transactions to be effected as soon as practicable, but in any event on or prior to the Outside Date, in accordance with the terms hereof, including the satisfaction of the conditions to the Closing set forth in Article VII, and to cooperate with each other Party and its Advisors in connection with any step required to be taken as part of its obligations hereunder.

(b)     The obligations of Seller pursuant to this Agreement, including this Section 6.6, shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Chapter 11 Cases), Seller's debtor-in-possession financing, and Seller's obligations as Debtor to comply with any Order of the Bankruptcy Court (including the Bidding Procedures Order, if applicable, and the Sale Order).

**Section 6.7     Further Assurances**. Subject to the terms and conditions of this Agreement, from time to time, as and when reasonably requested by any Party and at such requesting Party's expense, any other Party will execute and deliver, or cause to be executed and delivered, all such documents and instruments and will take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the Transactions.

**Section 6.8     Insurance Matters**.

(a)     Purchaser acknowledges that, upon Closing, all nontransferable insurance coverage provided in relation to Seller and the Acquired Assets that is maintained by Seller or its Affiliates (whether such policies are maintained with third party insurers or with Seller or its Affiliates) shall cease to provide any coverage to Purchaser, the Acquired Assets, and the Assumed Liabilities, and no further coverage shall be available to Purchaser with respect to the Acquired Assets or the Assumed Liabilities under any such policies. From and after the Closing, Purchaser shall have the right to make claims and to receive proceeds from such claims with respect to any matter to the extent related to the Acquired Assets or Assumed Liabilities for periods prior to the Closing, and Seller shall cooperate in seeking recovery or allowing Purchaser to seek recovery under the applicable occurrence-based insurance policies, and Seller shall cooperate with Purchaser's reasonable requests if it seeks recovery, with respect to such matters and shall remit (or, at Purchaser's request, direct any such insurer to pay directly to Purchaser) any insurance proceeds actually obtained with respect to such claims (net of Seller's reasonable and documented out-of-pocket costs and expenses of seeking recovery, to the extent not otherwise paid or reimbursed by Purchaser) to Purchaser.

(b)	To the extent that any Business Insurance Policy covers any Liability relating to the Acquired Assets and relating to or arising out of Pre-Closing Matters, Seller shall cooperate with Purchaser in submitting claims and seeking recovery with respect to Pre-Closing Matters on behalf of Purchaser under the Business Insurance Policies. Seller shall, on request from Purchaser, with respect to any claim arising from an Assumed Liability that is covered or potentially covered by the Seller's Insurance Policies, (A) report such claim to the appropriate insurer as promptly as practicable after such claim is reported to Seller, and (B) instruct that any proceeds of such Business Insurance Policy are paid as soon as reasonably practicable following the Closing directly to Purchaser, the attorneys handling the defense of such claim or, where applicable, to the claimant as a result of any judgment or settlement, rather than to Seller (but subject to all limitations and deductibles and exclusions under such policies and net of Seller's reasonable and documented out-of-pocket costs and expenses of seeking such recovery and any Taxes incurred by Seller with respect to such recovery, all of which shall be paid directly to Seller).

(c)	For a period of one year after the Closing, Seller may not release or waive any actual liability or potential liability of any insurer of a Business Insurance Policy with respect to Pre-Closing Matters (including but not limited to any cancel, lapse, or non-renewal of a Business Insurance Policy) without the prior written consent of Purchaser.

**Section 6.9	Receipt of Misdirected Assets; Liabilities**.

(a)	From and after the Closing, if Seller or any of its Affiliates becomes aware that any right, property or asset forming part of the Acquired Assets has not been transferred to Purchaser or receives any right, property or asset that is an Acquired Asset, the Seller shall (at no cost to Purchaser) promptly (i) notify Purchaser and (ii) transfer or cause such of its Affiliates to transfer such right, property or asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to Purchaser, and such asset will be deemed the property of Purchaser held in trust by Seller for Purchaser until so transferred. From and after the Closing, if Purchaser or any of its Affiliates receives any right, property or asset that is an Excluded Asset, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such asset (and shall promptly endorse and deliver any such right, property or asset that is received in the form of cash, checks, or other documents) to Seller, and such asset will be deemed the property of Seller held in trust by Purchaser for Seller until so transferred. From and after the Closing, if Purchaser or Seller discovers that any asset previously deemed an Excluded Asset should have been included as an Acquired Asset pursuant to the terms of this Agreement, Seller shall promptly (at no cost to Purchaser) transfer such asset to Purchaser.

(b)	From and after the Closing, if Seller or any of its Affiliates is subject to a Liability that is an Assumed Liability and therefore should belong to Purchaser or its Affiliates pursuant to the terms of this Agreement, Seller shall promptly transfer or cause such of its Affiliates to transfer such Assumed Liability to Purchaser, and Purchaser shall be deemed to have assumed and accepted such Assumed Liability without the need for any further action by Purchaser. From and after the Closing, if Purchaser or any of its Affiliates is subject to a Liability that is an Excluded Liability and should belong to Seller or its Affiliates pursuant to the terms of this Agreement, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such Excluded Liability to Seller or its Affiliates, and Seller or its Affiliates shall be deemed to have assumed and accepted such Excluded Liability without the need for any further action by Seller.

**Section 6.10    Acknowledgment by Purchaser**.

(a)    Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that it has conducted an independent investigation and verification of the Acquired Assets and the Assumed Liabilities and, in making its determination to execute this Agreement and proceed with the Transactions, the Purchaser Group has relied, is relying, and will rely solely on the Express Seller Representations and the results of the Purchaser Group's own independent investigation and verification and have not relied on, are not relying on, and will not rely on, any information, statements, disclosures, documents, projections, forecasts or other material (including in the Dataroom, the Information Presentation or the Projections), in each case, whether written or oral, made available or provided to the Purchaser Group by or on behalf of the Seller Parties, or any failure of any of the foregoing to disclose or contain any information, except for the Express Seller Representations (it being understood that the Purchaser Group has relied only on the Express Seller Representations).

(b)    Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that (i) the Express Seller Representations are the sole and exclusive representations, warranties and statements of any kind made to Purchaser or any member of the Purchaser Group and on which Purchaser or any member of the Purchaser Group may rely in connection with the Transactions and (ii) all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (A) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Seller Representations) including in the Dataroom, Information Presentation, Projections, meetings, calls or correspondence with management of Seller, any of the Seller Parties or any other Person on behalf of Seller or any of the Seller Parties or any of their respective Affiliates or Advisors and (B) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental, health or safety conditions and compliance, employee matters, regulatory compliance, business risks and prospects of the Business, or the quality, quantity or condition of any of the Acquired Assets, are, in each case, specifically disclaimed by Seller, on its behalf and on behalf of the Seller Parties, except to the extent set forth in the Express Seller Representations.

(c)    Without limiting the generality of the foregoing, in connection with the investigation by the Purchaser Group, Purchaser and the members of the Purchaser Group, and the Advisors of the foregoing, have received or may receive, from or on behalf of Seller, or other Seller Parties, certain projections, forward-looking statements and other forecasts (whether in written, electronic, or oral form, and including in the Information Presentation, Dataroom, management meetings, etc.) (collectively, the "Projections"). Seller represents and warrants to Purchaser that the Projections were prepared and made in good faith. Purchaser acknowledges and agrees, on behalf of itself and the Purchaser Group, that (i) such Projections are being provided solely for the convenience of Purchaser to facilitate its own independent investigation of Seller, (ii) there are uncertainties inherent in attempting to make such Projections, (iii) Purchaser is familiar with such uncertainties, and (iv) Purchaser is taking full responsibility for making its own evaluation of the adequacy and accuracy of all Projections (including the reasonableness of the assumptions underlying such Projections), except, in each case, to the extent expressly set forth in the Express Seller Representations.

(d)     Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that the covenants and agreements contained in this Section 6.10 (i) require performance after the Closing to the maximum extent permitted by applicable Law and (ii) are an integral part of the Transactions and that, without these agreements set forth in this Section 6.10, Seller would not enter into this Agreement.

**Section 6.11   Releases**.

(a)     As of the Closing, Seller, on behalf of itself and its Affiliates, and its and their Affiliates' representatives, heirs, estates successors or executors, partners, members, equity holders, directors, officers, employees, controlling persons, agents, successors, stockholders, trustees, principals, parents, Subsidiaries, joint ventures, predecessors, and assigns (as applicable) (collectively, the "Seller Releasing Parties"), (a) irrevocably and unconditionally waives, releases, and forever discharges Purchaser and its current, former and future Affiliates, Advisors, stockholders, members, directors, managers, trustees, principals, parents, Subsidiaries, joint ventures, predecessors, successors, assigns, beneficiaries, heirs or executors (collectively, the "Purchaser Released Parties") from any and all rights, commitments, actions, debts, claims, counterclaims, suits, Causes of Action, Avoidance Actions, damages, demands, losses, obligations, costs, expenses, compensation and other Liabilities of every kind and nature whatsoever, whether known or unknown, matured or contingent and whether arising in Law, in equity or otherwise, in each case based upon facts, circumstances or occurrences existing at or prior to Closing (collectively, the "Released Claims"), (b) irrevocably covenants to refrain from, directly or indirectly, asserting any claims or commencing, instituting or causing to be commenced, any Action of any kind against any Purchaser Released Party with respect to the Released Claims and (c) represents to the other Parties that Seller has not assigned or transferred, nor purported to assign or transfer, to any Person all or any part of, or any interest in, any Released Claim (and notwithstanding anything to the contrary in this Agreement, no such assignment or transfer shall be permitted, and any purported assignment or transfer shall be legally ineffective). Seller also hereby waives the benefits of, and any right that such Person may have under, any statute or common law principle of similar effect in any jurisdiction with respect to any Released Claim.

(b)     Without limiting the foregoing, Seller, on behalf of itself and the Seller Releasing Parties, expressly waives and releases any and all rights and benefits under Section 1542 of the California Civil Code (or any analogous law of any other state), which reads as follows: "A general release does not extend to claims which the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party." Seller, on behalf of itself and the other Seller Releasing Parties, expressly waives all rights afforded by any statute which limits the effect of a release with respect to unknown claims. Seller, on behalf of itself and the other Seller Releasing Parties, understands the significance of this release of unknown claims and waiver of statutory protection against a release of unknown claims, and acknowledges and agrees that this waiver is an essential and material term of this Agreement. Seller, on behalf of itself and the other Seller Releasing Parties, acknowledges that each of the Purchaser Released Parties will be relying on the waivers and releases provided in Section 6.11(a) and Section 6.11(b) in connection with entering into this Agreement and that Section 6.11(a) and

304753461.7

Section 6.11(b) are intended for the benefit of, and will grant express third party beneficiary rights to each Purchaser Released Party to enforce Section 6.11(a) and Section 6.11(b).

(c)     As of the Closing, Purchaser, on behalf of itself and its Affiliates, representatives, heirs, estates, partners, members, joint ventures, predecessors, successors, and assigns (as applicable) (collectively, the "Purchaser Releasing Parties"), (i) irrevocably and unconditionally waives, releases, and forever discharges Seller and their current, former and future Affiliates, Advisors, stockholders, members, directors, managers, trustees, principals, parents, Subsidiaries, joint ventures, predecessors, successors, assigns, beneficiaries, heirs or executors (collectively, the "Seller Released Parties") from any and all Released Claims of the Purchaser Releasing Parties against the Seller Released Parties, (ii) irrevocably covenants to refrain from, directly or indirectly, asserting any claims or commencing, instituting or causing to be commenced, any Action of any kind against any Seller Released Party with respect to the Released Claims, and (iii) represents to Seller that Purchaser has not assigned or transferred, nor purported to assign or transfer, to any Person all or any part of, or any interest in, any Released Claim (and notwithstanding anything to the contrary in this Agreement, no such assignment or transfer shall be permitted, and any purported assignment or transfer shall be legally ineffective). Purchaser also hereby waives the benefits of, and any right that such Person may have under, any statute or common law principle of similar effect in any jurisdiction with respect to any Released Claim.

(d)     Without limiting the foregoing, Purchaser, on behalf of itself and the Purchaser Releasing Parties, expressly waives and releases any and all rights and benefits under Section 1542 of the California Civil Code (or any analogous law of any other state), which reads as follows: "A general release does not extend to claims which the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party." Purchaser, on behalf of itself and the other Purchaser Releasing Parties, expressly waives all rights afforded by any statute which limits the effect of a release with respect to unknown claims. Purchaser, on behalf of itself and the Purchaser Releasing Parties, understands the significance of this release of unknown claims and waiver of statutory protection against a release of unknown claims, and acknowledges and agrees that this waiver is an essential and material term of this Agreement. Purchaser, on behalf of itself and the other Purchaser Releasing Parties, acknowledges that each of the Seller Released Parties will be relying on the waivers and releases provided in Section 6.11(c) and Section 6.11(d) in connection with entering into this Agreement and that Section 6.11(c) and Section 6.11(d) are intended for the benefit of, and will grant express third party beneficiary rights to each Seller Released Parties to enforce Section 6.11(c) and Section 6.11(d).

(e)     Notwithstanding the generality of the foregoing, nothing herein constitutes a waiver or release by any Person of, and Released Claims shall not be deemed to include any claim, action, suit, right or proceeding (i) arising under or relating to this Agreement or any Transaction Agreement, including any breach of this Agreement or any Transaction Agreement, (ii) arising as a result of Fraud or Willful Breach, (iii) in respect of bonds, indentures, notes or similar instruments of Seller or any Affiliate thereof, or (iv) in respect of, relating to or against any employee, contractor or other similar service provider of Seller or any of its Affiliates.

304753461.7

**Section 6.12   Environmental Insurance Policies**. From and after the Closing, Seller shall use reasonable best efforts to cause Purchaser to be named as an additional insured under any pollution liability insurance policy or contractor's pollution liability insurance policy maintained by Seller, in each case solely to the extent such policy provides coverage for claims, losses, or liabilities arising out of or relating to the Acquired Leased Property. Seller shall promptly notify Purchaser in writing upon obtaining any such additional insured endorsement and shall provide Purchaser with copies of any certificates of insurance or endorsements evidencing such coverage. Notwithstanding the foregoing, nothing in this Section 6.12 shall require Seller to obtain any new or additional insurance coverage.

**Section 6.13   Letters of Credit**.

(a)   Schedule 6.13(a) sets forth a true, correct, and complete list of all letters of credit outstanding as of the date hereof relating to any Acquired Asset, Assigned Contract or Assumed Liability for which Seller is the obligor (each, an "Existing Letter of Credit," and collectively, the "Existing Letters of Credit"), including for each Existing Letter of Credit the name of the beneficiary, the face amount, the amount of any Cash and Cash Equivalents or other cash collateral posted in support thereof, and the Acquired Asset, Assigned Contract or Assumed Liability to which it relates.

(b)   From and after the date hereof, and following Closing, Seller and Purchaser shall cooperate in good faith and use reasonable commercial efforts to cause, as soon as is reasonably practicable, each Existing Letter of Credit to be (i) terminated or cancelled without any replacement obligation by Purchaser (each, a "Terminated Letter of Credit"), (ii) assigned or otherwise transferred to Purchaser (each, a "Transferred Letter of Credit"), or (iii) replaced by Purchaser with a letter of credit or such other credit support on terms reasonably acceptable to Purchaser and the applicable beneficiary (each, a "Replacement Letter of Credit"). To the extent Purchaser is required to obtain a Replacement Letter of Credit, Seller shall reasonably cooperate with Purchaser in connection with obtaining any such Replacement Letter of Credit, including by providing such notices, consents, and other documentation as may be reasonably requested by Purchaser or the applicable issuing bank. With respect to each Terminated Letter of Credit, all Cash and Cash Equivalents and other cash collateral posted in support of each Terminated Letter of Credit shall be released to Seller. With respect to each Transferred Letter of Credit, all Cash and Cash Equivalents and other cash collateral posted in support of each Transferred Letter of Credit shall be transferred to Purchaser. With respect to each Replacement Letter of Credit, all Cash and Cash Equivalents and other cash collateral posted in support of the Existing Letter of Credit to which the Replacement Letter of Credit relates shall be transferred to Purchaser.

**Section 6.14   AE Poland Purchase Option**. In the event Bluegrass does not timely deliver written notice to Seller to exercise Bluegrass's option to acquire all of Seller's or its Affiliates' direct or indirect right, title and interest in and to, the Equity Interests of Ascend Elements Poland sp. z o.o., a limited liability company incorporated under the laws of Poland ("AEP"), and AE Elemental sp. z o.o., a limited liability company incorporated under the laws of Poland ("AEE") (such Equity Interests, the "AEP Equity Interests") within the period specified in and pursuant to Section 6.3(d) of that certain Third A&R Asset Purchase Agreement with Seller, then, promptly following the expiration of Bluegrass's purchase option, Seller shall notify Purchaser in writing that Bluegrass did not timely exercise its purchase option (the "Purchase

304753461.7

Option Notice"). For a period of thirty days following Purchaser's receipt of the Purchase Option Notice, Purchaser shall have the right to acquire the AEP Equity Interests by delivering a written notice to Seller of its election to exercise such option (in its discretion). Within ten (10) business days following Seller's receipt of such notice, Seller shall, and shall cause its Affiliates to sell, transfer and convey to Purchaser, all of Seller's and its Affiliates' right, title, and interest in and to the AEP Equity Interests free and clear of all Encumbrances for no additional consideration or purchase price from Purchaser, and such AEP Equity Interests shall constitute Acquired Assets. In the event that Purchaser elects to acquire the AEP Equity Interests pursuant to the option set forth in this section, Seller shall, and shall cause its Affiliates and its and their respective representatives to (x) cancel and terminate in full, without any payment of any amount or consideration by AEE or AEP, any and all intercompany notes, loans, payables or other similar amounts between AEE or AEP, on the one hand, and Seller or any of its Affiliates (other than AEE or AEP), on the other hand, in each case without further liability or obligation to Purchaser, AEE, AEP or any of their respective Affiliates, and (y) deliver written evidence thereof satisfactory to Purchaser. Seller shall, and shall cause its Affiliates and its and their respective representatives to, cooperate fully with Purchaser, its Affiliates and its and their respective representatives, take all such actions necessary or advisable, execute any and all such documents, instruments, certificates and agreements necessary or advisable, and deliver any and all notices in connection with the foregoing and to preserve the value of the AEP Equity Interests, AEP, AEE, and their respective assets and operations, and the relationships between AEP and AEE and any applicable Governmental Body or official. From and after the date hereof, and following the Closing, Seller shall, and shall cause its Affiliates and its and their respective representatives to, (i) use best efforts to resolve any outstanding disputes or matters with respect to the joint venture partner in AEE as promptly as practicable, (ii) keep Purchaser, its Affiliates and its and their respective representatives informed of any discussions or meetings with such joint venture partner, its Affiliates or their respective representatives, (iii) provide Purchaser and its representatives with an opportunity to participate in any such meetings and to review and comment on any such correspondences prior to their delivery to such joint venture partner, its Affiliates or its and their respective representatives, and (iv) incorporate any comments provided by Purchaser or any of its representatives into any such correspondence.

Section 6.15   **Material Assigned Contracts and Material Permits**. Within ten days following the Effective Date, Seller shall provide to Purchaser Schedule 6.15 listing (a) each Assigned Contract identified by Seller as a material Assigned Contact necessary for Purchaser to operate the Business in the ordinary course following the Closing in the same manner as operated by the Seller prior to the Closing, and (b) each Permit, Governmental Authorization or Environmental Credit, the absence or termination of which would materially impair the ability of the Purchaser to operate the Business in the ordinary course following the Closing in the same manner as operated by the Seller prior to the Closing.

Section 6.16   **Appeal of Tax Assessment for Acquired Leased Real Property**. Within five days following the Effective Date, Seller shall, and shall cause its applicable Affiliates to, (a) request and use reasonable best efforts to conduct a conference with the applicable Governmental Body that imposed the Tax assessment on the Acquired Leased Real Property for the 2025 and 2026 taxable years, and (b) commence a timely and valid appeal of such property Tax assessments. In connection therewith, Seller shall, and Seller shall cause its applicable Affiliates to, (i) promptly and properly file, with evidence and grounds for the appeal, to have the value of the Acquired

304753461.7

Leased Real Property assessed at an amount acceptable to Purchaser, (ii) provide to Purchaser and its representatives copies of such filing and related materials reasonably in advance of submitting such filing for Purchaser's review and comment, (iii) incorporate any comments proposed by Purchaser or any of its representatives, and (iv) cooperate with Purchaser and its representatives, and provide information and access to Purchaser and its representatives, in each case in connection with the foregoing. Purchaser and its representatives shall be entitled to attend any such conference.

**ARTICLE VII**
**CONDITIONS TO CLOSING**

**Section 7.1    Conditions Precedent to the Obligations of Purchaser and Sellers**. The respective obligations of each Party to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by the party receiving the benefit of such obligation) on or prior to the Closing Date, of each of the following conditions:

(a)    no Law shall be in effect that prohibits or makes illegal the Transactions;

(b)    the Bankruptcy Court shall have entered the Sale Order approving the sale free and clear of all Encumbrances (other than Permitted Encumbrances), and such order shall have become a Final Order and this Agreement shall become effective in accordance with the terms, and shall not have been stayed, reversed, or modified in a manner not reasonably acceptable to the Parties; and

(c)    all approvals, clearances, authorizations, expirations or waiting period expirations or terminations required under Competition Laws for the consummation of the Transactions shall have been issued or obtained, or shall have occurred, as applicable.

**Section 7.2    Conditions Precedent to the Obligations of Purchaser**. The obligations of Purchaser to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by Purchaser in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)    (i) the representations and warranties made by Seller in Article III (in each case, other than the Fundamental Representations) shall be true and correct in all respects as of the date of this Agreement and the Closing Date with the same force and effect as though made on and as of the Closing Date (without giving effect to materiality, Material Adverse Effect or similar phrases), except (A) that representations and warranties that are made as of a specified date need be true and correct only as of such date and (B) to the extent the failure of such representations and warranties to be true and correct as of such dates has not had or would not reasonably be expected to have a Material Adverse Effect, and (ii) the representations and warranties set forth in Section 3.1, Section 3.2, Section 3.3, Section 3.5, Section 3.11, Section 3.13 and Section 3.15 (collectively, the "Fundamental Representations") shall be true and correct in all respects as of the Closing Date as though made on and as of the date of this Agreement and the Closing Date, except that such Fundamental Representations and warranties that are made as of a specified date or period need be true and correct in all respects only as of such date or period;

304753461.7

(b)      Seller shall have performed and complied with the covenants required to be performed or complied with by Seller under this Agreement on or prior to Closing;

(c)      there shall not have been a Material Adverse Effect since the date of the Balance Sheet Date;

(d)      Seller shall have used commercially reasonable efforts to obtain any relevant consents, as applicable, related to assignment of all Permits, Governmental Authorizations and Environmental Credits;

(e)      Purchaser shall have received approval from its board of directors or other governing body to consummate the Transactions;

(f)      Seller shall have used commercially reasonable efforts to obtain any Required Consents, including without limitation those related to Assigned Contracts or Permits, Governmental Authorizations, and Environmental Credits listed in Schedule 6.15; and

(g)      Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 2.3.

Section 7.3      **Conditions Precedent to the Obligations of Seller**. The obligations of Seller to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by Seller in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)      the representations and warranties made by Purchaser in Article IV shall be true and correct as of the Closing Date with the same force and effect as though made on and as of the Closing Date, except that representations and warranties that are made as of a specified date need be true and correct only as of such date, except where the failure of such representations and warranties to be so true and correct would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations pursuant to this Agreement or to consummate the Transactions in a timely manner;

(b)      Purchaser shall have performed and complied with the covenants required to be performed or complied with by it under this Agreement on or prior to the Closing Date in all material respects; and

(c)      Purchaser shall have delivered, or caused to be delivered, to Seller all of the items set forth in Section 2.4.

Section 7.4      **Waiver of Conditions**. None of Purchaser or Seller may rely on the failure of any condition set forth in this Article VII, as applicable, to be satisfied if such failure was caused by such Party's failure to perform any of its obligations under this Agreement, including its obligation to use its reasonable best efforts to consummate the Transactions as required under this Agreement or otherwise comply with any provision of this Agreement, in all material respects.

Section 7.5      **Fiduciary Duty**. Notwithstanding anything to the contrary in this Agreement, if, prior to Bankruptcy Court approval of the Transactions contemplated herein, Seller

304753461.7

receives a proposal, offer, or inquiry for any Alternative Transaction (an "Alternative Transaction Offer" or "Alternative Transaction Proposal"), Seller shall in no way be prevented from fulfilling its fiduciary or statutory obligations under applicable Law, the Bankruptcy Code, or any order of the Bankruptcy Court, including, without limitation, pursuing any such Alternative Transaction.

**ARTICLE VIII**
**TERMINATION**

Section 8.1    **Termination of Agreement**. This Agreement may be terminated only in accordance with this Section 8.1. This Agreement may be terminated at any time prior to the Closing:

(a)    by the mutual written consent of Seller and Purchaser;

(b)    by written notice of either Purchaser or Seller, upon the issuance of an Order by a court of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Closing or declaring unlawful the Transactions, and such Order having become final, binding and non-appealable; provided that no Party may terminate this Agreement under this Section 8.1(b) if the issuance of such Order was caused by such Party's material breach of its obligations under this Agreement;

(c)    by written notice of either Purchaser or Seller, if the Closing shall not have occurred on or before July 3, 2026 (the "Outside Date") (or such later date as provided in the Bidding Procedures Order, if applicable); provided that a Party shall not be permitted to terminate this Agreement pursuant to this Section 8.1(c) if the failure of the Closing to have occurred by the Outside Date was caused by such Party's material breach of any of its obligations or material breach of any of its representations or warranties under this Agreement;

(d)    by written notice from Seller to Purchaser, if the board of directors, board of managers, or such similar governing body of Seller determines, after consulting with external counsel, if required by its fiduciary duties under applicable Law, to pursue an Alternative Transaction, as contemplated by and permitted under the Bidding Procedures (if applicable), and consummates such Alternative Transaction promptly following termination hereof;

(e)    by written notice from Seller to Purchaser, upon a material breach of any covenant or agreement on the part of Purchaser, or if any representation or warranty of Purchaser will have become untrue, in each case, such that the conditions set forth in Section 7.3(a) or Section 7.3(b) would not be satisfied, including a breach of Purchaser's obligation to consummate the Closing; provided that (i) if such breach is curable by Purchaser (other than a breach or failure by Purchaser to consummate the Closing within five (5) Business Days of when required pursuant to Section 2.2) then Seller may not terminate this Agreement under this Section 8.1(e) unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) 10 Business Days after Seller notifies Purchaser in writing of such breach and (ii) Seller's right to terminate this Agreement pursuant to this Section 8.1(e) will not be available to Seller at any time that Seller is in material breach of any agreement, covenant, representation or warranty of Seller hereunder;

304753461.7

(f)      by written notice from Purchaser to Seller, upon a material breach of any covenant or agreement on the part of Seller, or if any representation or warranty of Seller will have become untrue, in each case, such that any of the conditions set forth in Section 7.1 or Section 7.2 would not be satisfied, including a breach of Seller's obligation to consummate the Closing; provided that (i) if such breach is curable by Seller (other than a breach or failure by Seller to consummate the Closing within five (5) Business Days of when required pursuant to Section 2.2) then Purchaser may not terminate this Agreement under this Section 8.1(f) unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date, and (B) 10 Business Days after Purchaser notifies Seller in writing of such breach and (ii) Purchaser's right to terminate this Agreement pursuant to this Section 8.1(f) will not be available to Purchaser at any time that Purchaser is in material breach of any agreement, covenant, representation or warranty of Purchaser hereunder;

(g)      by written notice from either Seller or Purchaser, if all of the conditions set forth in Sections 7.1 and 7.2 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction and waiver of such conditions at the Closing) or waived, and the other Party fails to complete the Closing within five (5) Business Days of the time required by Section 2.2;

(h)      by written notice from Purchaser to Seller, if all of the conditions set forth in Section 7.2 have not been satisfied or will not be satisfied by the Closing;

(i)      by written notice of either Purchaser or Seller, if (i) Seller enters into one or more Alternative Transactions with one or more Persons other than Purchaser or the Successful Bidder or the Backup Bidder at the Auction or (ii) the Bankruptcy Court approves an Alternative Transaction other than with the Successful Bidder or the Backup Bidder;

(j)      by written notice from either Purchaser or Seller, if Purchaser (i) is not the Successful Bidder or the Backup Bidder at the Auction or (ii) is the Backup Bidder at the Auction and Seller consummates an Alternative Transaction with the Successful Bidder; or

(k)      by Purchaser if any of the Chapter 11 Cases are converted to a case under Chapter 7 of the Bankruptcy Code.

Section 8.2      **Effect of Termination**.

(a)      In the event of a valid termination of this Agreement pursuant to Section 8.1, this Agreement shall become null and void and no Party nor any of its partners, officers, directors, managers or equityholders will have any Liability under this Agreement, other than Seller's obligation to return the Deposit Amount to Purchaser in accordance with the terms of that certain Letter Agreement dated June 16, 2026 between Seller and Purchaser regarding return of the Deposit; provided that Section 6.2(a), this Section 8.2 and Article X (other than Section 10.12) shall survive any such termination; provided further that no termination will relieve Purchaser or Seller from any Liability for Willful Breach of this Agreement prior to the date of such termination (which, for the avoidance of doubt, will be deemed to include any failure by Purchaser or Seller to consummate the Closing if, and at the time that is, required to do so hereunder) or relieve any Person from any Liability for Fraud. Subject to Section 10.12, nothing

304753461.7

in this Section 8.2 will be deemed to impair the right of any Party to be entitled to specific performance or other equitable remedies to enforce specifically the terms and provisions of this Agreement prior to termination hereof.

(b)　　Subject in all cases to Section 10.12, prior to the Closing, in the event of any breach by either Party of this Agreement, the sole and exclusive remedy of the non-breaching Party shall be to terminate this Agreement in accordance with Section 8.1.

**ARTICLE IX**
**TAXES**

**Section 9.1** **Transfer Taxes**. Any U.S. federal, state, local, and non-U.S., sales Tax, consumption sales, use, excise, value added, registration, real property, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use or other similar Taxes and recording charges (including all related interest, penalties, and additions to any of the foregoing) payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Liabilities under this Agreement or the Transactions (the "Transfer Taxes") shall be borne and timely paid 50% by Purchaser and 50% by Seller when due; Seller shall timely file all Tax Returns related to any Transfer Taxes with the appropriate Taxing Authority. The Transfer Taxes shall be calculated assuming that no exemption from Transfer Taxes is available under the Bankruptcy Code unless otherwise indicated in the Sale Order. The Parties will cooperate in good faith prior to Closing to determine the amount of Transfer Taxes required to be paid in connection with the Transactions, and shall cooperate in good faith to reduce the amount of Transfer Taxes payable, including by soliciting and providing appropriate resale exemption certificates or other evidence acceptable to Purchaser or Seller, as appropriate, of exemption from such Transfer Taxes and by discussing in good faith whether adjustments to the Transaction structure (excluding acquiring the equity of an entity, rather than acquiring assets directly) as may be warranted to minimize the liability for Transfer Taxes arising hereunder.

**Section 9.2** **Allocation of Purchase Price**. For U.S. federal and applicable state and local income Tax purposes, Purchaser, Seller, and their respective Affiliates shall allocate the Purchase Price (and any Assumed Liabilities or other amounts treated as part of the purchase price for U.S. federal income Tax purposes) among the Acquired Assets in accordance with section 1060 of the Tax Code and analogous provisions of Applicable Law. Within 90 days following the Closing, Purchaser shall provide a proposed allocation to Seller setting forth the allocation of the Purchase Price (and other amounts treated as part of the purchase price for U.S. federal income Tax purposes) among the Acquired Assets (the "Allocation"), for Seller's approval, which approval shall not be unreasonably withheld.  Seller and Purchaser shall work in good faith to resolve any disputes relating to the Allocation within fifteen (15) days.  If Seller and Purchaser are unable to resolve any such dispute, such dispute shall be resolved promptly by a nationally recognized accounting firm acceptable to Purchaser and Seller, the costs of which shall be borne by Seller. If within fifteen (15) days after receiving the Allocation, Seller has not objected, the Allocation shall be final and binding on the Parties without any further action by either Party. The Parties and their respective Affiliates shall file all income Tax Returns in accordance with such Allocation (as finally determined under this Section 9.2) and not take any income Tax related action inconsistent with the Allocation, in each case, unless otherwise required by a "determination" within the meaning of section 1313(a) of the Tax Code.

304753461.7

**Section 9.3** **Cooperation**.

(a) Purchaser and Seller shall reasonably cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and any Action, audit, litigation, or other proceeding with respect to Taxes; provided that in providing such information, assistance and access, each Party shall be entitled to redact information that is not related to the Acquired Assets or Assumed Liabilities. Notwithstanding anything to the contrary in this Agreement, Seller shall not be obligated to provide or disclose any Excluded Tax Returns, provided, that Seller shall provide any reasonably requested information related to the Acquired Assets or Assumed Liabilities contained in any Excluded Tax Returns.

(b) Seller shall reasonably cooperate with Purchaser, as and to the extent reasonably requested by Purchaser, to amend the structure of the transactions undertaken pursuant to this Agreement in order to qualify for the Intended Tax Treatment or otherwise achieve a Tax-efficient outcome for the parties.

**Section 9.4** **Allocation of Taxes for Straddle Period**. Any Taxes attributable to a Straddle Period required to be apportioned under this Agreement shall be apportioned as follows: (a) the amount of ad valorem and other periodic Taxes allocable to the Pre-Closing Tax Period shall be equal to (i) the amount of such Taxes for the entire Straddle Period multiplied by (ii) a fraction, the numerator of which is the number of calendar days during the Straddle Period that are in the Pre-Closing Tax Period and the denominator of which is the number of calendar days in the entire Straddle Period; and (b) all Taxes not allocated under clause (a) shall be allocated to the Pre-Closing Tax Period (including, for the avoidance of doubt, any Taxes with respect to income included pursuant to Section 951 and Section 951A of the Code) on the basis of a "closing of the books," as if such taxable period ended as of the end of the day on the Closing Date; provided, that exemptions, allowances or deductions that are calculated on an annual basis (including depreciation and amortization deductions) shall be allocated between the period ending on the Closing Date and the period beginning after the Closing Date in proportion to the number of calendar days in each period; provided, that for the avoidance of doubt, (x) nothing contained in this Section 9.4 shall be construed so as to cause an Assumed Liability to become an Excluded Liability or *vice versa*, and (y) Purchaser shall be responsible and pay for all property Taxes that constitute Assumed Liabilities pursuant to Section 1.3(c).

**Section 9.5** **Preparation of Tax Returns and Payment of Taxes**.

(a) Seller shall prepare and timely file (i) all Tax Returns with respect to the Acquired Assets or Assumed Liabilities for any Tax period ending on or before the Closing Date (the "Applicable Seller Prepared Returns") (and Purchaser shall cooperate with Seller in causing such Tax Returns to be filed) and (ii) all income Tax Returns of Seller and its Affiliates and all other Tax Returns relating exclusively to the Excluded Assets or Excluded Liabilities, and, Purchaser shall have no rights to review and comment on any such Tax Returns described in this clause (ii). Seller shall provide Purchaser with a draft of all Applicable Seller Prepared Returns at least thirty (30) days (or such shorter period of time as is reasonably practicable) prior to the filing of any such Tax Return to the extent such Applicable Seller Prepared Returns relate to any Assumed Liability or Acquired Asset. Seller shall incorporate any changes reasonably requested by Purchaser with respect to such Tax Returns that are supported at a "more likely than not" (or

304753461.7

higher) level of confidence and consistent with past practice. Seller shall be responsible for and timely pay all Taxes due on any Tax Return Seller is obligated to file under this Section 9.5(a), except for Transfer Taxes allocated to Purchaser pursuant to Section 9.1. To the extent not otherwise provided in this Agreement, Seller shall be responsible for and shall promptly pay when due all property Taxes and levied with respect to the Acquired Assets attributable to the Pre-Closing Tax Period, including any and all interest and penalties with respect thereto (including due to any delay in payment of such property Taxes).

(b)      The parties agree that for purposes of filing any Tax Return related to the transactions contemplated by this Agreement the parties shall not apply the principles of Pierce v. Commissioner, 326 F. 2d 67 (8th Cir. 1964) with respect to any prepaid amount received or deferred revenue accrued prior to the Closing in connection with the Acquired Assets.

**Section 9.6**   **Tax Treatment**. Each party hereto agrees that, for U.S. federal (and applicable state and local) income Tax purposes, the purchase and sale or assumption, as the case may be, of the Acquired Assets and Assumed Liabilities contemplated by this Agreement shall be treated as a taxable exchange governed by Section 1001 of the Tax Code (the "Intended Tax Treatment"). Each party hereto shall file any federal, state and local income Tax Returns on a basis consistent with the Intended Tax Treatment, and each party hereto will assert the correctness of that treatment, and each party will not adopt any treatment that is contrary to or inconsistent with that treatment, in all dealings with the Internal Revenue Service unless otherwise required by a "determination" within the meaning of Section 1313(a) of the Tax Code.

## ARTICLE X
### MISCELLANEOUS

**Section 10.1**   **Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers**. Except in the case of Fraud, each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing. Each covenant and agreement in this Agreement or in any other Transaction Agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and nothing in this Section 10.1 will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement. Purchaser and Seller acknowledge and agree, on their own behalf and on behalf of the Purchaser Group or Seller Parties, as the case may be, that the agreements contained in this Section 10.1 (a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing and (b) are an integral part of the Transactions and that, without the agreements set forth in this Section 10.1, none of the Parties would enter into this Agreement.

**Section 10.2**   **Expenses**. Whether or not the Closing takes place, except as otherwise provided herein, all fees, costs and expenses (including fees, costs and expenses of Advisors) incurred in connection with the negotiation of this Agreement and the other Transaction

Agreements, the performance of this Agreement and the other Transaction Agreements and the consummation of the Transactions will be paid by the Party incurring such fees, costs and expenses; provided that (a) all Transfer Taxes will be allocated pursuant to Section 9.1 and (b) all Cure Costs will be allocated pursuant to Section 1.5(c).

**Section 10.3** **Notices**. Except as otherwise expressly provided herein, all notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail (provided, that no "bounce back" or other automatic notice of non-delivery is generated), (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such Party may specify by written notice to the other Parties.

Notices to Purchaser:

> R3 Lithium, Inc.
> One, Embarcadero Center, Suite 1200
> San Francisco, CA 94111
> Attention: Jacques-Alexandre Gerber
> Email: jag@axial.partners

with a copy to (which shall not constitute notice):

> Jones Walker LLP
> 201 St. Charles Avenue, Suite 5100
> New Orleans, LA 70170
> Attention:   Curtis R. Hearn
>                    Meredith G. Maxwell
> Email:        chearn@joneswalker.com
>                    mmaxwell@joneswalker.com

Notices to Seller:

> Ascend Elements, Inc.
> 133 Flanders Road
> Westborough, MA 01581
> Attention: Deacon Powell
> Email: dpowell@ascendelements.com

with copies to (which shall not constitute notice):

304753461.7

Norton Rose Fulbright US LLP
2200 Ross Avenue, Suite 3600
Dallas, Texas 75201
Attention:        Ryan Manns
                  Scarlet McNellie

Email:           ryan.manns@nortonrosefulbright.com
                 Scarlet.mcnellie@nortonrosefulbright.com

**Section 10.4   Binding  Effect;  Assignment**. This Agreement shall be binding upon Purchaser and, subject to the terms of the Bidding Procedures Order, if applicable (with respect to the matters covered thereby) and the entry and terms of the Sale Order, Seller, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Chapter 11 Cases or any successor Chapter 7 cases; provided that neither this Agreement nor any of the rights or obligations hereunder may be assigned or delegated without the prior written consent of Purchaser and Seller, and any attempted assignment or delegation without such prior written consent shall be null and void, except that Purchaser may assign or transfer any or all of its rights and/or obligations under this Agreement (including any of its rights to acquire any of the Acquired Assets hereunder or any of its obligations to assume any Assumed Liabilities hereunder) to one or more of its Affiliates without the prior written consent of any other party hereto (provided, however, that such assignment shall not relieve Purchaser of its obligations hereunder).

**Section 10.5   Amendment  and  Waiver**. Any provision of this Agreement or the Schedules or exhibits hereto may be (a) amended only in a writing signed by Purchaser and Seller or (b) waived only in a writing executed by the Party against which enforcement of such waiver is sought. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default.

**Section 10.6   Third Party Beneficiaries**. Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement will be construed to give any Person other than (i) for purposes of Section 10.7, the Non-Recourse Persons, and (ii) the Parties and such permitted assigns, any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

**Section 10.7   Non-Recourse**. This Agreement may only be enforced against, and any Action based upon, arising out of, or related to this Agreement may only be brought against, only the Persons that are expressly named as Parties and not against any other Persons. Except to the extent named as a Party, and then only to the extent of the specific obligations of such Parties set forth in this Agreement and in the Transaction Agreements, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or Advisor of any Party (each, a "Non-Recourse Person") will have any Liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the Parties or for any Agreement Dispute and (ii) in no event shall any Person have any shared or vicarious liability, or otherwise be the subject of legal or equitable claims, for the actions or omissions (including through equitable claims (such as unjust

304753461.7

enrichment) not requiring proof of wrongdoing committed by the subject of such claims) of any other Person, and each of such Persons and the Non-Recourse Persons are intended third party beneficiaries of this Section 10.7 and shall be entitled to enforce this Section 10.7 as if a party directly hereto. Notwithstanding anything to the contrary set forth herein, nothing in this Section 10.7 or elsewhere herein shall limit the rights or remedies in the case of Fraud against the Person committing Fraud.

Section 10.8    **Severability**. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction.

Section 10.9    **Construction**. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Party. The headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions hereof.

Section 10.10   **Schedules**. The Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement. However, each section of the Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Schedules, and any disclosure in the Schedules will be deemed a disclosure against any representation or warranty set forth in this Agreement, in each case only to the extent the applicability of such disclosure to such section of the Schedules is readily apparent on the face of such disclosure. Capitalized terms used in the Schedules and not otherwise defined therein have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Schedules, or the Exhibits does not imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course, and no Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Schedules, or Exhibits in any Agreement Dispute or other controversy between the Parties as to whether any obligation, item, or matter not set forth or included in this Agreement, the Schedules, or Exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course. In addition, matters reflected in the Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. No information set forth in the Schedules will be deemed to broaden in any way the scope of the Parties' representations and warranties. Any description of any agreement, document, instrument, plan, arrangement, or other item set forth on any Schedule is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item, and such terms will be deemed disclosed for all purposes of this Agreement. The information contained in this Agreement, the Schedules, and the Exhibits is disclosed solely for purposes of this Agreement, and no information contained in this Agreement, the Schedules,

304753461.7

or the Exhibits will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of Contract.

Section 10.11 **Complete Agreement**. This Agreement, together with the Confidentiality Agreements and other agreements expressly referred to herein, and the other Transaction Agreements, contains the entire agreement of the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the Transactions and supersedes all prior agreements and documents among the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the Transactions. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the other Transaction Agreements will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions of this Agreement or the intent of the Parties, and will be deemed joint work product of the Parties.

Section 10.12 **Specific Performance**. The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any Action required of it under this Agreement. It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in Section 10.13 without proof of damages or otherwise, this being in addition to any other remedy to which the Parties are entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the Transactions and without that right, neither Seller nor Purchaser would have entered into this Agreement. The Parties acknowledge and agree that either Seller or Purchaser pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this Section 10.12 will not be required to provide any bond or other security in connection with any such Order. The remedies available to Seller pursuant to this Section 10.12 will be in addition to any other remedy to which they were entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit Seller from seeking to collect or collecting damages. If, prior to the Outside Date, any Party brings any Action, in each case in accordance with Section 10.13, to enforce specifically the performance of the terms and provisions hereof by any other Party, the Outside Date will automatically be extended (i) for the period during which such Action is pending, plus ten (10) Business Days or (ii) by such other time period established by the court presiding over such Action, as the case may be. In no event will this Section 10.12 be used, alone or together with any other provision of this Agreement, to require Sellers to remedy any breach of any representation or warranty made by Seller herein.  For the avoidance of doubt, Seller shall not have the right hereunder to obtain an injunction, specific performance or other equitable relief to cause Purchaser to consummate the Closing unless and until (A) all of the conditions to Closing set forth in Section 7.1 and Section 7.2 have been satisfied, (B) Seller has delivered an irrevocable written notice to Purchaser certifying that it is ready, willing and able to consummate the Closing, and (C) Purchaser does not consummate the Closing within five (5) Business Days after its receipt of such written notice from Seller.

304753461.7

**Section 10.13  Jurisdiction and Exclusive Venue**. Each of the Parties irrevocably agrees that any Action of any kind whatsoever, including a counterclaim, cross-claim, or defense, regardless of the legal theory under which any Liability or obligation may be sought to be imposed, whether sounding in contract or in tort or under statute, or whether at law or in equity, or otherwise under any legal or equitable theory, that may be based upon, arising out of, or related to this Agreement, the negotiation, execution, or performance of this Agreement, or the Transactions and any questions concerning the construction, interpretation, validity, and enforceability of this Agreement (each, an "Agreement Dispute") brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the Court of Chancery of the State of Delaware (or if such court lacks jurisdiction, any other state or federal court sitting in the State of Delaware) (clauses (a) and (b), the "Chosen Courts"). Each of the Parties irrevocably submits to the exclusive jurisdiction of the Chosen Courts for the pendency of the Chapter 11 Cases for itself and with respect to its property, generally and unconditionally, with regard to any Agreement Dispute. No Party shall commence any Agreement Dispute except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree, or award rendered by any Chosen Courts, and no Party will file a motion to dismiss any Agreement Dispute filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non-conveniens*. The Parties irrevocably agree that venue would be proper in any of the Chosen Courts, and each Party hereby irrevocably waives any objection that any Chosen Court is an improper or inconvenient forum for resolving any Agreement Dispute. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 10.3. Nothing in this Agreement will affect the right of any Party to serve process in any other manner permitted by Law.

**Section 10.14  Governing Law; Waiver of Jury Trial**.

(a)     Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement and any Agreement Dispute will be governed by and construed in accordance with the internal Laws of the State of Delaware without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

(b)     EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY AGREEMENT DISPUTE IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY AGREEMENT DISPUTE. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH AGREEMENT DISPUTE WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY AGREEMENT DISPUTE, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE

304753461.7

OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>Section 10.14(b)</u>.

**Section 10.15 <u>Counterparts and PDF</u>**. This Agreement and any other Transaction Agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party to such Transaction Agreement, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of a .PDF, DocuSign, or other electronic transmission, will be treated in all manner and respects as an original Contract and will be considered to have the same binding legal effects as if it were the original signed version of such Contract delivered in person. Minor variations in the form of the signature page to this Agreement or any Transaction Agreement, including footers from earlier versions of any such other document, will be disregarded in determining the effectiveness of such signature. At the request of any party to any Transaction Agreement, each other party to such Transaction Agreement will re-execute original forms of such Transaction Agreement and deliver them to all other parties. No party to any such Transaction Agreement will raise the use of a .PDF, DocuSign, or other electronic transmission to deliver a signature or the fact that any signature or Contract was transmitted or communicated through the use of PDF, DocuSign, or other electronic transmission as a defense to the formation of a Contract and each such party forever waives any such defense.

**Section 10.16 <u>Publicity</u>**. Neither Seller nor Purchaser shall issue any press release or public announcement concerning this Agreement or the Transactions without obtaining the prior written approval of the other Party (which approval will not be unreasonably conditioned, withheld, or delayed), unless, in the reasonable judgment of the applicable disclosing Party, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of any stock exchange on which Purchaser or Seller (or their respective Affiliates) lists securities; <u>provided</u> that the Party intending to make such release shall use its reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other Party with respect to the contents of such release. However, a copy of this Agreement will be filed with the Bankruptcy Court.  For the avoidance of doubt, the parties hereto acknowledge and agree that Purchaser and its Affiliates may provide general information about the Business and the subject matter of this Agreement in connection with Purchaser's or its Affiliates' fund raising, marketing, informational, reporting activities or efforts to obtain incentives or consents from any Governmental Body, subject, in each case, to customary confidentiality obligations by the recipient of such information.

**Section 10.17 <u>Bulk Sales Laws</u>**. The Parties intend that pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets of the Debtors shall be free and clear of any Encumbrances in the Acquired Assets (including any Encumbrances claims arising out of any "bulk sales," "bulk transfers," or similar Laws), except Permitted Encumbrances, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order. In furtherance of the foregoing, each Party hereby waives compliance by the Parties with any "bulk sales," "bulk transfers," or similar Laws in respect of the Transactions.

## ARTICLE XI
### ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS

**Section 11.1   Certain Definitions**.

(a)      "Action" means any action, suit, claim, charge, inspection, inquiry, litigation, arbitration, mediation, audit, proceeding (including any civil, criminal, administrative, public, private, arbitral, investigative or appellate proceeding), prosecution of any kind whatsoever whether sounding in contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, and any subpoena, request for information, notice of violation, deficiency notice, or similar enforcement or investigative communication, commenced, brought, conducted or heard by or before any Governmental Body.

(b)      "Advisors" means, with respect to any Person as of any relevant time, any directors, officers, employees, investment bankers, financial advisors, accountants, agents, attorneys, consultants, or other representatives of such Person.

(c)      "Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management, affairs and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

(d)      "Alternative Transaction" means any transaction (or series of transactions), whether direct or indirect, whereby any Person or group of Persons (other than Seller and its Affiliates or Purchaser and its Affiliates) acquires (i) beneficial ownership of a majority of the Equity Interests of Seller or (ii) any Acquired Assets (other than a de minimis amount), in each case whether by merger, sale of assets or equity, transfer, exchange, recapitalization, plan of reorganization or otherwise. A liquidation or wind-down of Seller's estates (or a plan in the Chapter 11 Cases approving a liquidation or wind-down) shall not be an Alternative Transaction.

(e)      "Alternative Transaction Offer" has the meaning set forth in Section 7.5 of this Agreement.

(f)      "Alternative Transaction Proposal" has the meaning set forth in Section 7.5 of this Agreement.

(g)      "Anti-Corruption Laws" means the U.S. Foreign Corrupt Practices Act of 1977, as amended (15 U.S.C. §§ 78dd-1, et seq.), the U.K. Bribery Act 2010, and any other applicable anti-bribery and anti-corruption Laws.

(h)      "Applicable Law" means, with respect to any Person, any transnational, domestic or foreign federal, state, provincial, municipal or local law (statutory, common or otherwise, and including international conventions, protocols and treaties), act, statute, constitution, treaty, convention, ordinance, code, policy, rule, regulation, Order, or other similar requirement enacted, issued, adopted, promulgated, implemented, enforced or applied by or under

304753461.7

any Governmental Body that is binding upon or applicable to such Person or its properties, as amended unless expressly specified otherwise.

(i)     "Assumed Environmental Liabilities" has the meaning set forth in Section 1.3(b) of this Agreement.

(j)     "Auction" shall have the meaning ascribed to such term in the Bidding Procedures Order.

(k)     "Avoidance Actions" means, collectively, any and all claims or causes of action arising under or pursuant to chapter 5 of the Bankruptcy Code or any other similar state or federal statutes or common law, including fraudulent transfer or fraudulent conveyance law.

(l)     "Backup Bidder" has the meaning set forth in the Bidding Procedures Order.

(m)     "Balance Sheet Date" means March 31, 2026.

(n)     "Bankruptcy Code" has the meaning set forth in the preamble of this Agreement.

(o)     "Bankruptcy Court" has the meaning set forth in the preamble of this Agreement.

(p)     "Bidding Procedures" means the procedures employed with respect to the proposed sale of the Assets and the assumption of the Assumed Liabilities set forth on Exhibit 1 to the Bidding Procedures Order.

(q)     "Bidding Procedures Order" means the Order *(A) Approving Bid Procedures, (B) Authorizing Designation of a Stalking Horse Bidder, (C) Scheduling an Auction, Related Deadlines, and a Sale Hearing, and (D) Granting Related Relief Docket No. 120.*

(r)     "Bluegrass" means Bluegrass Infrastructure Partners Holdings, LLC.

(s)     "Business" means the business operations of Seller conducted at the Acquired Leased Real Property.

(t)     "Business Day" means any day other than a Saturday, Sunday or other day on which banks in New York City, New York are authorized or required by Law to be closed.

(u)     "Business Employee" means each employee of Seller or its Affiliates providing services to the Business.

(v)     "Business Service Provider" means each individual independent contractor (whether providing services directly or through an entity wholly owned by them), consultant, or other natural Person, other than a Business Employee, providing services to the Business.

304753461.7

(w)     "Cash and Cash Equivalents" means all of Seller's cash or cash equivalents (including checks and deposits in transit, demand deposits, money markets or similar accounts), checking account balances, marketable securities, bankers' acceptances, and any cash equivalents whether on hand, in transit, in banks or other financial institutions, or otherwise held, including, for the avoidance of doubt, all deposits, cash security deposits, cash held as a guarantee in respect of performance of, and other cash collateral posted with counterparties, in each case to support Existing Letters of Credit.

(x)     "Cause of Action" means any and all claims, demands, Actions, causes of action, choses in action, counterclaims, judgments, costs, expenses, damages, and liabilities (whether known or unknown), including Avoidance Actions.

(y)     "Confidentiality Agreement" means that certain Non-Disclosure Agreement, effective from March 26, 2026, by and between Seller and Purchaser.

(z)     "Consent" means any approval, consent, ratification, permission, waiver or authorization, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

(aa)    "Contract" means any contract, indenture, note, bond, lease, sublease, mortgage, agreement, guarantee, or other agreement, commitment or understanding that is binding upon a Person or its property.

(bb)    "Covington IP License" means the non-terminable, irrevocable, royalty-free, transferrable license to use any Intellectual Property used by Seller in connection with the Business prior to the Petition Date, granted by Bluegrass to Seller pursuant to that certain Third A&R Asset Purchase Agreement with Seller, as such license shall be transferred from Seller to Purchaser pursuant to the Covington IP License Agreement.

(cc)    "Covington IP License Assignment" means an agreement among Seller, Purchaser and Bluegrass, whereby Seller assigns to Purchaser the Covington IP License, and Bluegrass consents to such assignment and grants Purchaser direct contract and enforcement rights against Bluegrass under the Covington IP License and otherwise establishes direct privity of contract between Bluegrass and Purchaser.

(dd)    "Cure Costs" has the meaning set forth in Section 1.3(d) of this Agreement.

(ee)    "Debtors" means, collectively, the debtors-in-possession in the Chapter 11 Cases.

(ff)    "Designation Notice" has the meaning given to such term in Section 1.5(b).

(gg)    "Documents" means all written information, databases, files, documents, instruments, papers, books, reports, emails, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, reports, studies, and documents, Tax Returns, ledgers, journals, customer lists, regulatory filings, plans, research materials, technical documentation (architectural drawings, design specifications, engineering information, test results, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working

304753461.7

papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), proprietary documentation and other similar materials, in each case whether or not in electronic form.

(hh)    "DPA" means Section 721 of the Defense Production Act of 1950, as amended, including all implementing regulations.

(ii)    "Employee Benefit Plan" means each "employee benefit plan" within the meaning of Section 3(3) of ERISA, each other deferred compensation, bonus or incentive compensation, pension, retiree medical, disability or life insurance plan, program, Contract, agreement or arrangement, each employment, severance, change-of-control and each other employee benefit or compensation plan, program, Contract, agreement or arrangement, in each case that is maintained, sponsored, administered or contributed or required to be contributed to by Seller or any of its Subsidiaries for the benefit of Business Employees or former Business Employees; provided that the term "Employee Benefit Plan" shall not include any statutory benefit plan to which Seller or any of its Subsidiaries or any Acquired Entity is required to participate in or comply with that is sponsored or administered by a Governmental Body (such as Social Security) or any "multiemployer plan" as defined in Section 3(37) of ERISA.

(jj)    "Encumbrance" means any liens, claims, defenses (including rights of setoff and recoupment), and interests, in each case, in, on, or related to the Acquired Assets, including security interests or similar interests of whatever kind or nature, liens as defined in Section 101(37) of the Bankruptcy Code, encumbrances, mortgages, deed of trust, conditional sales or other title retention agreements, pledges, deeds of trust, hypothecations, mechanic's, workmen's, repairmen's, materialmen's, warehousemen's, carrier's and other similar statutory or inchoate lien, assignments, preferences, debts, easements, charges, suits, licenses, options, profit sharing interest, rights of recovery, judgments, right of way, encroachment, right of first offer, right of first refusal, purchase, or repurchase right or option, orders and decrees of any court or foreign or domestic governmental entity, taxes (including foreign, state, and local taxes), licenses, covenants, restrictions, indentures, instruments, leases, options, off-sets, causes of action, contract rights and claims, to the fullest extent of the law, in each case, of any kind or nature in, on, or related to the Acquired Assets (including all "claims" as defined in Section 101(5) of the Bankruptcy Code), known or unknown, whether prepetition or postpetition, secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, statutory or non-statutory, matured or unmatured, legal or equitable, including any and all such liabilities, causes of action, contract rights and claims arising out of the Debtors' continued operations following the Closing Date.

(kk)    "Environmental Credits" means all air emissions credits, allowances, offsets, or other environmental attributes held by Seller at any point in the year prior to the Effective Date.

(ll)    "Environmental Laws" means all Laws concerning Hazardous Materials, pollution or protection of natural resources, the environment, or human or worker health and safety.

304753461.7

(mm)   "Equipment" means equipment, computers, furniture, furnishings, fixtures, office supplies, vehicles and other fixed assets.

(nn)   "Equity Interests" means, with respect to a Person, any (a) membership interests, partnership interests, profits interests, capital stock or other equity securities (including profit participation features or stock or equity appreciation rights, "phantom" stock rights, stock-based performance units, or other similar rights) or other ownership interests of such Person, or (b) any securities (including debt securities or other indebtedness), options, warrants, rights to subscribe to, purchase rights, calls or commitments relating to the issuance, purchase, or sale or repurchase of or exercisable or exchangeable for or convertible into, or other rights to acquire any of the items in clause (a) of such Person.

(oo)   "ERISA" means the Employee Retirement Income Security Act of 1974.

(pp)   "Excluded Contracts" means, collectively, all Contracts to which Seller or any of its Affiliates is a party, or in respect of which any assets or properties of Seller or any of its Affiliates is subject to or bound, other than the Assigned Contracts, in each case subject to, for the avoidance of doubt, Section 1.5.

(qq)   "Excluded Tax Returns" means Tax Returns (or any portion of any Tax Return) and other books and records related to any consolidated, combined, affiliated or unitary group for Tax purposes that includes Seller or any of its Affiliates.

(rr)   "Existing Letter of Credit" or "Existing Letters of Credit" each has the meaning set forth in Section 6.13(a).

(ss)   "Final Order" means a judgment or Order of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Chapter 11 Cases (or the docket of such other court), which is in full force and effect, which has not been modified, amended, reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari,* or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for *certiorari* or motion for new trial, stay, reargument or rehearing is then pending or (b) if an appeal, writ of *certiorari* new trial, reargument or rehearing thereof has been sought, such Order or judgment of the Bankruptcy Court or other court of competent jurisdiction has been affirmed by the highest court to which such Order was appealed, or *certiorari* has been denied, or a new trial, stay, reargument or rehearing has been denied or resulted in no modification of such Order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing has expired, as a result of which such order has become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such Order, will not cause such Order not to be a Final Order as long as such motion has not been filed.

(tt)   "Fraud" means fraud with respect to the representations and warranties set forth in Article III or Article IV of this Agreement, as interpreted by Delaware courts applying Delaware law.

304753461.7

(uu)    "GAAP" means United States generally accepted accounting principles as in effect from time to time.

(vv)    "Governmental Authorization" means any permit, license, certificate, approval, consent, permission, clearance, designation, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law.

(ww)    "Governmental Body" means any government, quasi-governmental entity, or other governmental, administrative, or regulatory body, of any nature, whether foreign or domestic, federal, state, provincial, or local, or any agency, branch, department, official, entity, instrumentality, political subdivision, or authority of any of the foregoing, or any court, tribunal, judicial, or arbitral body of competent jurisdiction.

(xx)    "Government Official" means (i) any official, employee, agent or representative of, or any Person acting in an official capacity for or on behalf of, any Governmental Body, (ii) any official, employee, agent or representative of, or any Person acting in an official capacity for or on behalf of, a company, business, enterprise or other entity owned, in whole or in part, or controlled by any Governmental Body or (iii) any official, employee, agent or representative of, or any Person acting in an official capacity for or on behalf of, a public international organization.

(yy)    "Hazardous Material" means any material, substance or waste that is listed, regulated, or defined as "hazardous," "toxic," "radioactive," or as a "pollutant" or "contaminant," under, or for which liability or standards of conduct may be imposed pursuant to, Environmental Laws, including but not limited to petroleum, petroleum products and by-products, asbestos or asbestos-containing materials, per- and polyfluoroalkyl substances, polychlorinated biphenyls, radioactive materials, noise, odor, lead, urea formaldehyde, radon gas or mold.

(zz)    "HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976 and the rules and regulations promulgated thereunder.

(aaa)    "Intellectual Property" means (i) patents, patent applications, and patent disclosures, and continuations, continuations-in-part, divisionals, renewals, extensions, reexaminations, revisions, substitutions, provisionals and reissues thereof; (ii) trademarks, service marks, trade dress, logos, corporate names, and Internet domain names, together with all associated goodwill; (iii) copyrights and copyrightable subject matter (including literary works and any other original works of authorship fixed in any tangible medium, whether or not published); (iv) issuances, registrations and applications for any of clauses (i) through (iii); (v) trade secrets and other rights in confidential proprietary information, including know-how, inventions, processes, formulae, models and methodologies, techniques, protocols, source code, algorithms, layouts, specifications and databases; (vi) rights in software; (vii) rights in drawings, schematics, and other technical plans; (viii) sui generis rights to databases; (ix) raw data, reports, test sheets, procedures, studies, and any other related or similar data, whether or not published; and (x) all other intellectual property in any jurisdiction in the world.

(bbb)   "International Trade Laws" means (a) all applicable trade, export control, import, and antiboycott Laws imposed, administered, or enforced by the U.S. government, including the Arms Export Control Act (22 U.S.C. § 1778), the International Emergency Economic Powers Act (50 U.S.C. §§ 1701–1706), Section 999 of the Internal Revenue Code, the U.S. customs laws at Title 19 of the U.S. Code, the Export Control Reform Act of 2018 (50 U.S.C. §§ 4801-4861), the International Traffic in Arms Regulations (22 C.F.R. Parts 120–130), the Export Administration Regulations (15 C.F.R. Parts 730-774), the U.S. customs regulations at 19 C.F.R. Chapter 1, and the Foreign Trade Regulations (15 C.F.R. Part 30); and (b) all applicable trade, export control, import, and antiboycott Laws imposed, administered or enforced by any other country, except to the extent inconsistent with U.S. Law.

(ccc)   "Inventory" means all inventory (including finished goods, supplies, raw materials, work in progress, spare, replacement and component parts) maintained or held by, stored by or on behalf of, or in transit to, Seller or the Subsidiaries, including any such inventory (i) being held by customers of the Business pursuant to consignment arrangements, or (ii) being held by suppliers of the Business under tolling or similar arrangements.

(ddd)   "IT Assets" means all hardware, computers, storage media, databases, applications, websites, software, servers, workstations, routers, hubs, switches, circuits, networks, computer network equipment or systems, data communications lines, and all other information technology equipment and assets including parts of any of the foregoing such as firmware, screens, terminals, disks, cabling, related infrastructure, and other peripheral and associated electronic equipment and services that are owned, licensed, leased, or used or accessed on a different legal basis, or controlled by Seller or any of its Affiliates.

(eee)   "Knowledge of Seller", or words of like import, means the actual knowledge, after due inquiry of direct reports of Linh Austin, Ahmed Allouache, Eric Gratz, Adam Titus, Tomasz Poznar, Deacon Powell, and Barbara Knight, none of whom shall have any personal Liability or obligations regarding such knowledge.

(fff)   "Law" means any domestic, foreign, international, transnational, multinational, federal, state, provincial, local, municipal, or other law, statute, legislation, constitution, principle of common law, ordinance, code, decree, treaty, convention, rule, protocol, regulation, act, Order, or other similar requirement in each case, issued, enacted, adopted, promulgated, implemented, enforced, applied or otherwise put into effect by or under the authority of any Governmental Body.

(ggg)   "Lease" means all leases, subleases, licenses, concessions and other agreements pursuant to which any Person holds any Leased Real Property (including all amendments, assignments, renewals, guarantees and other agreements with respect thereto).

(hhh)   "Leased Real Property" means all real property used in the Business that is leased, subleased, licensed or otherwise occupied by Seller.

(iii)   "Liability" means, as to any Person, any debt, adverse claim, liability, duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or

304753461.7

unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

(jjj)   "Material Adverse Effect" means (x) a material adverse effect on the business, condition (financial or otherwise), or operations of the Acquired Assets and Assumed Liabilities, taken as whole or (y) an Effect that individually or in the aggregate, has prevented or materially delayed or would prevent or materially delay the Transactions or has materially impaired or would materially impair the ability of the Seller to consummate the Transactions; provided that none of the following, either alone or in combination, shall constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect with respect to the foregoing clause (x) solely as it relates to Article VII: any matter, event, change, development, occurrence, circumstance or effect (each, an "Effect") in, arising from, or relating to (i) general business or economic conditions; (ii) national or international political or social conditions, including tariffs, trade wars, Sanctions or International Trade Laws, riots, protests, the engagement by the United States or any other country in hostilities or the escalation of any hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military or terrorist (whether or not state-sponsored) attack upon the United States or any other country, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, Equipment, or personnel of the United States or of any other country; (iii) any fire, flood, hurricane, earthquake, tornado, windstorm, other calamity or act of God, global or national health concern, epidemic, pandemic (whether or not declared as such by any Governmental Body), viral outbreak (including "Coronavirus" or "COVID-19") or the worsening of any outbreak, or any quarantine or trade restrictions related thereto or any other force majeure; (iv) to financial, banking, or securities markets (including (A) any disruption of any of such markets, (B) any change in currency exchange rates, (C) any decline or rise in the price of any security, commodity, Contract, or index, and (D) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the Transactions); (v) changes in GAAP or interpretation of GAAP; (vi) changes in Laws or other binding directives or determinations issued or made by any Governmental Body and any change in the terms or enforcement of any of the foregoing; (vii) the negotiation, announcement, or pendency of this Agreement or the Transactions (except any Effects arising from or related to the breach or inaccuracy of the representations and warranties set forth in Section 3.3); (viii) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or Advisors) and any other failure to win or maintain customers or business (provided that this clause (viii) shall not prevent a determination that any effect, change, event, condition or occurrence underlying such failure to meet projections, forecasts or budgets has resulted in a Material Adverse Effect (to the extent such effect, change, event, condition or occurrence is not otherwise excluded from this definition of Material Adverse Effect) (ix) any action taken by Purchaser or its Affiliates with respect to the Transactions or the financing of the Transactions or any breach by Purchaser of this Agreement; or (x) the commencement or pendency of the Chapter 11 Cases. However, any adverse Effect resulting or arising from any matter described in clauses (i) through (vi) shall be taken into account in determining whether there has been a Material Adverse Effect to the extent that such Effect has had a disproportionate adverse effect on Seller or the Business relative to similarly situated participants in the industries and geographic areas in which Seller or the Business operates.

304753461.7

(kkk)   "Offer Employees" has the meaning set forth in Section 6.4(a).

(lll)   "Order" means any order, injunction, judgment, decree, ruling, writ, assessment, subpoena, directive, determination, or award entered, enacted, or enforced by a Governmental Body, including any order entered by the Bankruptcy Court in the Chapter 11 Cases (including the Sale Order) and any consent, settlement, or compliance order of, or settlement or conciliation agreement with, and any interpretation thereof, by any Governmental Body

(mmm)"Ordinary Course" means the ordinary and usual course of operations of the Business, taken as a whole, taking into account the contemplation, commencement and pendency of the Chapter 11 Cases and recent past practice in response to any tariffs, Sanctions, or International Trade Laws implemented by any Governmental Body.

(nnn)   "Organizational Documents" means, with respect to any Person other than a natural person, the constituent documents or agreements by which such Person was organized (such as a certificate of incorporation, certificate of formation, certificate of limited partnership or articles of organization, and including any certificates of designation for preferred stock or other forms of preferred equity) or that relate to the internal governance of such Person (such as bylaws, a partnership agreement or an operating, limited liability or members agreement).

(ooo)   "Permitted Encumbrances" means (i) Encumbrances for Taxes not yet due and payable and that are being contested in good faith by appropriate proceedings and for which appropriate reserves have been established in accordance with GAAP, or the nonpayment of which is permitted or required by the Bankruptcy Code, (ii) easements, rights of way, restrictive covenants, encroachments, and similar non-monetary Encumbrances or non-monetary impediments against any of the Acquired Assets, in each case, that do not, individually or in the aggregate, adversely affect the operation of the Acquired Assets and, in the case of the Acquired Leased Real Property, that do not, individually or in the aggregate, adversely affect the use or occupancy of such Acquired Leased Real Property as it relates to the operation of the Business, (iii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law that (a) are not violated by the current use or occupancy of the applicable Acquired Leased Real Property as it relates to the operation of the Business, or (b) the violation of which would not reasonably be expected to adversely affect the use or occupancy of the applicable Acquired Leased Real Property as it relates to the operation of the Business, (iv) solely prior to Closing, any Encumbrances that will be removed or released by operation of the Sale Order, or (v) matters that would be disclosed by an accurate survey or inspection of the Acquired Leased Real Property, in each case, that do not, individually or in the aggregate, adversely affect the use or occupancy of such Acquired Leased Real Property as it relates to the operation of the Business.

(ppp)   "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, organization, estate, Governmental Body or other entity or group.

(qqq)   "Personal Information" means any data or information (i) that identifies, relates to, describes, is reasonably capable of being associated with, or would reasonably be linked, directly or indirectly, with a particular individual or household or (ii) that is otherwise subject to a Law relating to privacy or security of data or information (including such data or information that

304753461.7

constitutes or is defined as "personal information" or "personal data" or other equivalent term under any such Law).

(rrr)   "Post-Closing Tax Period" mean any Tax period beginning after the Closing Date and that portion of a Straddle Period beginning after the Closing Date.

(sss)   "Pre-Closing Matters" means occurrences or events on or prior to the Closing.

(ttt)   "Pre-Closing Tax Period" means any Tax period ending on or before the Closing Date and the portion of any Straddle Period through the end of the Closing Date.

(uuu)   "Purchase Option Notice" has the meaning set forth in Section 6.14.

(vvv)   "Purchaser Group" means Purchaser, any Affiliate of Purchaser and each of their respective former, current or future Affiliates, officers, directors, employees, partners, members, managers, agents, Advisors, successors or permitted assigns.

(www)   "Purchaser's Allocated Portion" has the meaning set forth in Section 1.5(a)(i).

(xxx)   "Release" means any actual or threatened release, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, placing, discarding, abandonment, disposing or migration.

(yyy)   "Replacement Letter of Credit" has the meaning set forth in Section 6.13(b).

(zzz)   "Required Consent" has the meaning set forth in Section 1.5(d)(ii).

(aaaa)   "Sale Order" means a Final Order of the Bankruptcy Court granting the Sale Motion and approving the terms of the Transactions free and clear of all liens, claims, encumbrances, and other interests pursuant to Sections 105, 363, 365, 503, and 507 of the Bankruptcy Code. Bankruptcy Rules 2002, 6004, 6006, 9006, 9007, 9008, and 9014, Bankruptcy Local Rules 2002-1 and 4002-1, and the *Procedures for Complex Cases in the Southern District of Texas*, substantially in the form attached hereto as **Exhibit A**, which shall be, in form and substance, satisfactory to Purchaser.

(bbbb)   "Sanctioned Country" means at any time, a country or territory that is itself the target of comprehensive Sanctions (currently, Cuba, Iran, North Korea, Syria (before July 1, 2025), the Crimea region of Ukraine, the so-called Donetsk People's Republic, and so-called Luhansk People's Republic).

(cccc)   "Sanctioned Person" means (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury ("OFAC") or the U.S. Department of State, the United Nations Security Council, the European Union, any Member State of the European Union, or the United Kingdom; (b) any Person operating, organized, or resident in a Sanctioned Country; (c) the government of a Sanctioned Country or the Government of Venezuela; or (d) any Person 50% or

304753461.7

more owned or controlled by any such Person or Persons or acting for or on behalf of such Person or Persons.

(dddd) "Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by OFAC or the U.S. Department of State, or (b) the United Nations Security Council, the European Union, any European Union member state or the United Kingdom.

(eeee) "Seller Parties" means Seller and its former, current, or future Affiliates, officers, directors, employees, partners, members, equityholders, controlling or controlled Persons, managers, agents, Advisors, successors or permitted assigns.

(ffff) "Straddle Period" means any taxable period that includes but does not end on the Closing Date.

(gggg) "Subsidiary" or "Subsidiaries" means, with respect to any Person, any corporation, limited liability company, or other entity of which a majority of the total voting power of shares of stock or other Equity Interests entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, trustees, or other governing body of such Person is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or any partnership, association, or other business entity of which a majority of the partnership or other similar ownership interest is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof.

(hhhh) "Successful Bidder" has the meaning set forth in the Bidding Procedures.

(iiii) "Tax" or "Taxes" means any and all federal, state, local, non-U.S. (or any governmental unit, agency, or political subdivision of any of the foregoing) or other taxes, customs, duties, charges, fees, levies, or other like assessments of whatever kind or nature, including all income, corporate, profits, employment (including Social Security, unemployment insurance and employee income tax withholding), franchise, license, gross receipts, sales, use, transfer, stamp, occupation, property, capital, severance, premium, alternative minimum, windfall profits, ad valorem, value added, excise, payroll, withholding, recapture and escheat payments; including any interest, penalty, fine or addition with respect thereto, that are imposed, assessed or collected by any Governmental Body, in each case, whether disputed or not and including any express or implied obligations to indemnify or otherwise assume or succeed to the liability of any other Person for any such amounts.

(jjjj) "Tax Code" means the United States Internal Revenue Code of 1986, as amended.

(kkkk) "Tax Return" means any return, claim for refund, report, statement or information return relating to Taxes filed or required to be filed with a Governmental Body, including any schedule or attachment thereto, and including any amendments thereto.

304753461.7

(llll) "<u>Taxing Authority</u>" means any U.S. federal, state, local, municipal, or foreign government, any subdivision, agency, commission or authority thereof or any quasi-Governmental Body exercising Tax regulatory authority.

(mmmm) "<u>Terminated Letter of Credit</u>" has the meaning set forth in <u>Section 6.13(b)</u>.

(nnnn) "<u>Transaction Agreements</u>" means this Agreement and any other agreements, instruments or documents entered into pursuant to this Agreement.

(oooo) "<u>Transactions</u>" means the transactions contemplated by this Agreement and the other Transaction Agreements.

(pppp) "<u>Transfer Offer</u>" has the meaning set forth in <u>Section 6.4(a)</u>.

(qqqq) "<u>Transferred Employees</u>" has the meaning set forth in <u>Section 6.4(a)</u>.

(rrrr) "<u>Transferred Letter of Credit</u>" has the meaning set forth in <u>Section 6.13(b)</u>.

(ssss) "<u>Transition Services Agreement</u>" has the meaning set forth in <u>Section 2.3(g)</u>.

(tttt) "<u>Willful Breach</u>" means a knowing and intentional material breach of this Agreement that is a consequence of an act taken by the breaching Party, or the failure by the breaching Party to take an act it is required to take under this Agreement, in each case with actual knowledge that the taking of, or the failure to take, such act would, or would reasonably be expected to, cause a breach of this Agreement.

304753461.7

**Section 11.2**   **Index of Defined Terms**.

Acquired Assets - 1

Agreement - 1

Agreement Dispute - 53

Alternative Transaction Offer - 44

Alternative Transaction Proposal - 44

Assignment and Assumption Agreement - 14

Assumed Environmental Liabilities - 5

Bankruptcy Code - 1

Bankruptcy Court - 1

Chapter 11 Case - 1

Chosen Courts - 53

Closing Date - 14

Cure Costs - 5

Dataroom - 25

Disclosure Schedule - 15

Effective Date - 1

Express Seller Representations - 25

Information Presentation - 25

Material Contract - 18

Non-Recourse Person - 51

Outside Date - 44

Parties - 1

Party - 1

Permits - 18

Petition Date - 1

Projections - 38

Purchaser - 1

Seller - 1

**Section 11.3**   **Rules of Interpretation**. Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules and any Transaction Agreement.

(a)     The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, Schedule, and Exhibit references in this Agreement are references to Sections, clauses, Schedules and Exhibits in or to this Agreement, unless otherwise specified. All Exhibits and Schedules annexed to this Agreement or referred to in this Agreement are incorporated in and made a part of this Agreement as if set forth in full in this Agreement. Any capitalized terms used but not defined in any Schedule or Exhibit shall be defined as set forth in this Agreement.

(b)     Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation," whether or not such words are actually included. Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(c)     The words "to the extent" shall mean "the degree by which" and not simply "if."

(d)     When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(e)     Words denoting any gender will include all genders, including the neutral gender. Where a word is defined herein, references to the singular will include references to the plural and vice versa.

304753461.7

(f)     The word "will" will be construed to have the same meaning and effect as the word "shall". The words "shall," "will," or "agree(s)" are mandatory. The word "May" is permissive.

(g)     References to "$" and dollars will be deemed to refer to United States currency unless otherwise specifically provided.

(h)     References to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(i)     Any document or item will be deemed "delivered," "provided" or "made available" by Sellers, within the meaning of this Agreement if such document or item is (i) included in the Dataroom at least 24 hours prior to the execution of this Agreement or (ii) actually delivered or provided to Purchaser or any of Purchaser's Advisors.

(j)     Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

(k)     Any reference to any particular Bankruptcy Code or Tax Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; _provided_ that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Bankruptcy Code or Tax Code section or Law, the reference to such Bankruptcy Code or Tax Code section or Law means such Bankruptcy Code or Tax Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(l)     A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and assigns, but only if such successors and assigns are not prohibited by this Agreement.

(m)     A reference to a Person in a particular capacity excludes such Person in any other capacity or individually.

[_Signature pages follow._]

304753461.7

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**PURCHASER:**

R3 LITHIUM, INC.

By: _____

Name:  Jacques-Alexandre Gerber

Title:   Director

**SELLER:**

ASCEND ELEMENTS, INC.


By: *Linh Austin*
Linh Austin (Jun 19, 2026 13:38:47 PDT)
Name: Linh Austin
Title:   Chief Executive Officer

## EXHIBIT A

FORM OF SALE ORDER

[*See attached.*]

304753461.7

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ASCEND ELEMENTS, INC. *et al.*,[1] | ) | Case No. 26-90440 (CML) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**ORDER (I) APPROVING THE SALE OF
CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR
OF CLAIMS, LIENS, AND ENCUMBRANCES, (II) APPROVING
THE ASSUMPTION AND ASSIGNMENT OF DESIGNATED EXECUTORY
CONTRACTS AND UNEXPIRED LEASES AND (III) GRANTING RELATED RELIEF**

Upon the motion [Docket No. 50] (the "Motion")[2] filed by the debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases") seeking, among other things, entry of an order (this "Order") approving the sale of the Debtors' assets and approving the assumption and assignment of certain contracts, and upon the *Declaration of Linh Austin in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") [Docket No. 11], the *Declaration Of Michael O'Hara Of Jefferies LLC In Support Of The Debtors' Emergency Motion For Entry Of Order (I)(A) Approving Bid Procedures, (B) Authorizing Designation Of A Stalking Horse Bidder, (C) Scheduling An Auction, Related Deadlines, And A Sale Hearing, And (D) Granting Related Relief; And (II)(A) Approving The Sale Of The Debtors' Assets, (B) Approving The Assumption And Assignment Of Certain*

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Ascend Elements, Inc. (2893) and Ascend Elements US, LLC (8309).  The location of the Debtors' service address is: 133 Flanders Road, Westborough, MA 01581.

[2]   Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Motion or the Asset Purchase Agreement (as hereinafter defined), as applicable.

- 1 -

*Contracts, And (C) Granting Related Relief*, ("O'Hara Bid Procedures Declaration") [Docket No. 88] and upon the *Order (A) Approving Bid Procedures (B) Authorizing Designation of a Stalking Horse Bidder, (C) Scheduling an Auction, Related Deadlines, and a Sale Hearing, and (D) Granting Related Relief* [Docket No. 120] (the "Bid Procedures Order"); and that certain Asset Purchase Agreement, dated as of June 19, 2026 (together with all other agreements and other instruments deliverable thereunder or attached thereto or referenced therein, and as may be amended, modified, or supplemented, the "Asset Purchase Agreement"), a copy of which is attached hereto as **Exhibit 1**, by which R3 Lithium, Inc. (the "Purchaser") submitted the highest or best bid for the Acquired Assets (as defined in the Asset Purchase Agreement) as determined by the Debtors (such offer, the "Successful Bid"); and the Debtors naming the Purchaser the Successful Bidder for the Acquired Assets, and the Court having conducted a hearing to consider certain relief requested in the Motion on June [•], 2026 (the "Sale Hearing"), at which time all interested parties were offered an opportunity to be heard with respect to the Motion; and the Court having reviewed and considered (i) the Motion; (ii) the Asset Purchase Agreement; (iii) the Bid Procedures Order, (iv) the First Day Declaration, (v) the O'Hara Bid Procedures Declaration, (vi) the *Declaration of Michael O'Hara in Support of Entry of an Order (I) Approving the Sale of the Debtors' Interests in the Covington, Georgia Assets Free and Clear of Encumbrances, Claims, Interests and Encumbrances, (II) Approving the Assumption and Assignment of Associated Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [Docket No. [•]], (vii) the *Declaration of Adam Titus in Support of Entry of an Order (I) Approving the Sale of the Debtors' Interests in the Covington, Georgia Assets Free and Clear of Encumbrances, Claims, Interests and Encumbrances, (II) Approving the Assumption and*

- 2 -

PRIVILEGED/CONFIDENTIAL
NRF DRAFT AS OF 6.19.26

*Assignment of Associated Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [Docket No. [•]], ((vi) – (vii) collectively, the "Sale Declarations"), (viii) the *Notice of Auction for the Sale of the Debtors' Covington, Georgia Assets Free and Clear of Any and All Claims, Interests, and Encumbrances* [Docket No. [•]] (the "Sale and Auction Notice"), (ix) the *Notice of Successful Bidder and Backup Bidder* [Docket No. [•]] (the "Notice of Successful Bidder"), (x) the *First Notice to Contract Parties to Potentially Assumed Executory Contracts and Unexpired Leases* [Docket No. 240] (the "Assumption and Assignment Notice"), and (xi) the arguments of counsel made, and the evidence proffered or adduced at the Sale Hearing; and after due deliberation the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interest of the Debtors, their estates and their creditors, and the Debtors having demonstrated good, sufficient and sound business justifications for the relief granted herein;

**IT IS HEREBY FOUND AND DETERMINED THAT:**[4]

A. <u>Jurisdiction and Venue</u>. The Court has jurisdiction to hear and consider the Motion and the relief requested therein pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of Texas*, dated May 24, 2012. Without limiting the generality of the foregoing, this Court has exclusive *in rem* jurisdiction over the Acquired Assets pursuant to 28 U.S.C. § 1334(e), as such Assets are property of the Debtors' chapter 11 estates, and, as a result of such jurisdiction, this Court has all necessary power and authority to grant the relief contained herein. This is a core proceeding under 28 U.S.C.

---

[4] The findings and conclusions of law set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.

#111838121v1

§ 157(b), and the Court may enter a final order hereon under Article III of the United States Constitution. Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      Final Order.  This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).

C.      Statutory Predicates.  The statutory and other legal predicates for the relief sought by the Motion are sections 105(a), 363, 365, and 503 of title 11 of the United States Code, as amended (the "Bankruptcy Code"), Bankruptcy Rules 2002, 6004, 6006, 9006, 9007, 9008 and 9014, Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Southern District of Texas 2002-1 and 4002-1, and the Procedures for Complex Cases in the Southern District of Texas (the "Complex Case Procedures").

D.      Bid Procedures. On April 17, 2026, the Court entered the Bid Procedures Order, which among other things, (i) approved the Bid Procedures (as defined in the Motion), (ii) authorized the Debtors, in their discretion to designate one or more Stalking Horse Bidders for some or all of the Assets, to enter into one or more stalking horse asset purchase agreements, and to seek approval of any Bid Protections, (iii) scheduled (a) an auction in connection with a sale of the Assets (the "Auction") if the Debtors receive one or more timely and acceptable Qualified Bids, (b) a hearing to consider approval of one or more Sale Transactions as necessary, and (c) the objection deadline for approval of one or more Sale Transactions (the "Sale Objection Deadline"); (iv) approved the form and manner of notice of Sale and Auction Notice; (v) approved the form and manner of notice of the Successful Bidder; (vi) approved procedures (the "Assumption and Assignment Procedures") for the assumption and assignment of certain executory contracts and unexpired leases in connection with a Sale Transaction (collectively, the "Assigned Contracts"); and (vii) approved the form and manner of notice to each relevant non-Debtor counterparty (each,

- 4 -

a "Contract/Lease Counterparty") to an executory contract or unexpired lease regarding the Debtors' proposed assumption and assignment of the Assigned Contracts, including notice of proposed amounts (the "Cure Costs") necessary to cure any defaults thereunder (the "Assumption and Assignment Notice"). The Bid Procedures were substantively and procedurally fair to all parties and all potential bidders and afforded notice and a full, fair and reasonable opportunity for any person to make a higher or otherwise better offer to purchase the Debtors' assets. The Debtors conducted the sale process in accordance with the Bid Procedures and without collusion.

E. Notice and Opportunity to Be Heard. As evidenced by the certificates of service filed with respect to the Bid Procedures Order [Docket Nos. 110, 134, and 145], the Assumption and Assignment Notice, the *Notice of Auction for the Sale of the Debtors' Convington, Georgia Assets Free and Clear of Any and All Claims, Interests, and Encumbrances; Auction Scheduled for [•].* [Docket No. [•]] (the "Auction Notice"), the Notice of Successful Bidder, and as demonstrated by the evidence presented at the Sale Hearing, the Debtors have complied with the Bid Procedures and otherwise have provided proper, timely, adequate and sufficient notice of, and a fair and reasonable opportunity to object and be heard with respect to, the Motion, the Bid Procedures, the Auction, the Sale Hearings, the Assumption and Assignment Procedures, the sale of the Acquired Assets pursuant to the Asset Purchase Agreement (the "Sale Transaction") free and clear of all Encumbrances (as defined in the Asset Purchase Agreement) other than the Permitted Encumbrances (also as defined in the Asset Purchase Agreement), and the assumption and assignment of the Assigned Contracts to be assumed and assigned to Purchaser at Closing pursuant to this Order and the terms of the Asset Purchase Agreement, in accordance with sections 102(1), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002(a), 4001, 6004, 6006, 9007 and 9014, and the Bid Procedures Order, to all persons and entities entitled to such

#111838121v1

notice, and all other persons and entities as directed by the Court.  Such notice was good, sufficient and appropriate under the circumstances and reasonably calculated to reach and apprise all holders of Encumbrances, claims, and other interests, including, without limitation, rights or claims based on any successor, transferee, derivative, or vicarious liabilities of their right to appear and be heard, and was provided in accordance with the applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the procedural due process requirements of the United States Constitution. With respect to parties in interest whose identities could not be reasonably ascertained by the Debtors, the Publication Notice (as defined in the Bid Procedures Order) published in *The New York Times* on April 16, 2026 [Docket No. 127], and April 23, 2026 [Docket No. 134], was sufficient and reasonably calculated to provide notice to such parties under the circumstances.  No other or further notice of, opportunity to object to, or other opportunity to be heard regarding the Motion, the Sale Hearing, the Asset Purchase Agreement, the Sale, the Sale Transactions, the transactions contemplated by the Asset Purchase Agreement, or of the entry of this Sale Order is necessary or shall be required.

F.  Disclosures.  The disclosures made by the Debtors in the Bid Procedures Motion, the Motion, the Sale and Auction Notice, the Assumption and Assignment Notice, the Notice of Successful Bidder, and all other related notices and documents filed with the Court concerning the Asset Purchase Agreement and Sale Transaction were complete and adequate.

G.  Sound Business Purpose.  The Debtors, having determined that the Successful Bid was the highest and best offer for the Acquired Assets made by the Purchaser, have demonstrated good, sufficient and sound business purposes and justifications that approval and entry into the Sale Transaction, the Asset Purchase Agreement and any ancillary agreements thereto (i) are a result of due deliberation by the Debtors and constitute a sound and reasonable

- 6 -

exercise of the Debtors' business judgment consistent with their fiduciary duties; (ii) provide value and are beneficial to the Debtors' estates, and are in the best interests of the Debtors, their estates and their stakeholders; and (iii) are reasonable and appropriate under the circumstances. Business justifications for entry into the Sale Transaction and the Asset Purchase Agreement include, but are not limited to, (a) the Asset Purchase Agreement constitutes the highest or best offer received for the Acquired Assets; (b) the Asset Purchase Agreement presents the best opportunity to maximize the value of the Acquired Assets on a going-concern basis and to avoid decline and devaluation as a result of delay or liquidation; (c) failure to consummate the Sale Transaction expeditiously, as provided under the Asset Purchase Agreement, could materially diminish creditor recoveries; and (d) the immediate consummation of the Sale Transaction is necessary to maximize the value of the Debtors' estates.

H.    Compliance with Bid Procedures.   The Debtors conducted an open and fair Sale Process. The Sale Process was non-collusive in all respects, and all interested parties were provided a full, fair and reasonable opportunity to make an offer to purchase the Acquired Assets. The Debtors, the Purchaser and their respective counsel and other advisors have complied with the Bid Procedures and the Bid Procedures Order in all respects to the extent such are applicable.

I.    Highest or Best Value.   The Debtors determined, in their reasonable business judgment, in a manner consistent with their fiduciary duties and in consultation with the Consultation Parties, that the Purchaser's Successful Bid, as documented in the Asset Purchase Agreement, was the highest or otherwise best Qualified Bid for the Acquired Assets. Consummating the Sale Transaction will yield greater value to the Debtors' estates than would have been provided by any other available alternative transaction. The Debtors have demonstrated that entry into and consummation of the Sale Transaction constitutes the exercise by the Debtors

- 7 -

of sound business judgment, and such acts are in the best interests of the Debtors, their estates, and creditors, and all parties in interest, and the Debtors, and their respective current members, managers, officers, directors, employees, advisors, professionals or agents (in each case, solely in their capacity as such), shall have or incur no liability to the estates or any stakeholder in or against the Debtors or their assets for any act or omission in connection with, related to, or arising out of the negotiations or the consummation of the Sale Transaction, other than liability arising out of or relating to any fraud, as determined by a court of competent jurisdiction.

J.       Fair Consideration.  The consideration to be paid by the Purchaser under the Asset Purchase Agreement constitutes (i) fair and reasonable consideration for the Acquired Assets; and (ii) reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, the Uniform Voidable Transactions Act and other laws of the United States, any state, territory, possession thereof or the District of Columbia.

K.       Sufficiency of Marketing. As demonstrated by the Motion, the O'Hara Bid Procedures Declaration, the Sale Declarations, and the evidence set forth at the Sale Hearing, the Debtors and their professionals adequately marketed the Debtors' assets and conducted the marketing and sale process as set forth in and in accordance with the Motion and the Bid Procedures and conducted a fair and open sale process. The sale process and the Bid Procedures were non-collusive, duly noticed, and provided a full, fair, and reasonable opportunity for any entity to make an offer to purchase the assets, and the process conducted by the Debtors pursuant to the Bid Procedures Order obtained the highest or otherwise best value for the Debtors' assets, and there was no other transaction available or presented that would have yielded a higher or better result. Based upon the record of these proceedings, all creditors and other parties in interest and

#111838121v1

all prospective Bidders have been afforded a reasonable and fair opportunity to bid for the assets and/or file an objection to the Sale Transaction. The marketing process undertaken by the Debtors and their professionals and each of their respective agents and other representatives with respect to the assets has been adequate and appropriate and reasonably calculated to maximize the value for the benefit of all of the Debtors' stakeholders in all respects.

L.      Free and Clear Sale.  The Debtors are authorized to sell the Acquired Assets free and clear of all Encumbrances (unless otherwise expressly assumed under, or expressly permitted by, the Asset Purchase Agreement), because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  Any holders of Encumbrances that objected to the Sale Transaction or the Motion and that have a Encumbrance on the Acquired Assets could be compelled in a legal or equitable proceeding to accept money in satisfaction of such Encumbrance pursuant to section 363(f)(5), or fall within one or more of the other subsections of section 363(f) and, therefore, are adequately protected by having their Encumbrances on the Acquired Assets attach solely to the proceeds of the Sale Transaction ultimately attributable to the sale of the property in which such holders have a Encumbrance, in the same order of priority, and with the same validity, force and effect that such Encumbrances had prior to the consummation of the Sale Transaction, subject to any rights, claims or defenses of the Debtors and their estates.  Any holders of Encumbrances that did not object, or that withdrew their objections, to the Motion or the Sale Transaction, are deemed to have consented to the sale of the Acquired Assets free and clear of their respective Encumbrances on the Acquired Assets pursuant to section 363(f)(2) of the Bankruptcy Code.

M.      Purchaser's Reliance on Free and Clear Sale.  The Purchaser would not have entered into the Asset Purchase Agreement and would not consummate the Sale Transaction or the

other transactions contemplated thereby if the sale of the Acquired Assets were not free and clear of all Encumbrances, or if the Purchaser would, or in the future could, be liable for any such Encumbrances.  A sale of the Acquired Assets other than one free and clear of all Encumbrances would adversely impact the Debtors, their estates and their creditors, and would yield substantially less value for the Acquired Assets and the Debtors' estates, with less certainty than provided by the Sale Transaction.  The total consideration to be provided under the Asset Purchase Agreement reflects the Purchaser's reliance on this Order to provide it, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, with title to and possession of the Acquired Assets free and clear of all Encumbrances, including, without limitation, any potential derivative, vicarious, transferee or successor liability Encumbrances.

N.       No Successor or Other Derivative Liability.  By consummating the Sale Transaction pursuant to the Asset Purchase Agreement, the Purchaser is not a mere continuation of any of the Debtors or any Debtor's estate, and there is no continuity of enterprise or otherwise or common identity between the Purchaser and any Debtor.  The Purchaser is not holding itself out as a continuation of any Debtor.  The Purchaser is not a successor to any Debtor or any Debtor's estate by reason of any theory of law or equity, and the Sale Transaction does not amount to a consolidation, merger or de facto merger of the Purchaser and the Debtors or any of their estates. Neither the Purchaser nor any of its affiliates or their respective successors, assigns, members, partners, principals or shareholders (or the equivalent thereof) shall assume or in any way be responsible for any obligation or liability of any Debtor (or any affiliate of any Debtor) or any Debtor's estate, except as expressly provided in the Asset Purchase Agreement.  The sale and transfer of the Acquired Assets to the Purchaser, including the assumption by the Debtors and assignment, transfer and/or sale to the Purchaser of any of the Assigned Contracts, will not subject

- 10 -

the Purchaser to any liability with respect to the operation of the Debtors' businesses prior to the Closing or by reason of such transfer, except that, upon the Closing, the Purchaser shall remain liable for the applicable Assumed Liabilities (as defined in the Asset Purchase Agreement).

O.  Good Faith.  The Debtors, the Purchaser and their respective counsel and other advisors have negotiated and entered into the Asset Purchase Agreement and each of the transactions contemplated thereby in good faith, without collusion and from arms'-length bargaining positions.  The Purchaser is a good-faith purchaser and is acting in good faith within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby.  The Debtors were free to deal with any other party interested in acquiring all or some of the Acquired Assets.  Neither the Debtors nor the Purchaser have engaged in any conduct that would cause or permit the Sale Transaction, the Asset Purchase Agreement or any of the transactions contemplated thereby to be avoided or subject to monetary damages under section 363(n) of the Bankruptcy Code, or that would prevent the application of sections 363(m) or 364(e) of the Bankruptcy Code. The Purchaser has not violated section 363(n) of the Bankruptcy Code by any action or inaction.  Specifically, the Purchaser has not acted in a collusive manner with any person or entity, and the Purchaser's participation in and bidding at the Auction (to the extent held) were not controlled by any agreement among bidders.  All payments to be made by the Purchaser and all agreements entered into by the Purchaser and the Debtors and any other Seller under the Asset Purchase Agreement in connection with the Sale Transaction have been disclosed and are appropriate.  The Asset Purchase Agreement was not entered into for the purpose

- 11 -

#111838121v1

of hindering, delaying or defrauding creditors under laws of the United States, any state, territory, possession or the District of Columbia.

P.     Insider Status.  The Purchaser is not an "insider" of any Debtor, as that term is defined in section 101(31) of the Bankruptcy Code.  No common identity of directors or controlling stockholders (or the equivalent thereof) exists between the Purchaser and any of the Debtors.

Q.     Assumption and Assignment of Contracts.  The assumption and assignment of the Assigned Contracts are an integral part of the Sale Transaction, are in the best interests of the Debtors and their estates and represent the valid and reasonable exercise of the Debtors' sound business judgment.  Specifically, the assumption and assignment of the Assigned Contracts (i) are necessary to sell the Acquired Assets to the Purchaser as contemplated by the Asset Purchase Agreement, (ii) allow the Debtors to sell the Acquired Assets to the Purchaser as a going concern, (iii) limit the losses suffered by the Contract/Lease Counterparties to the Assigned Contracts and (iv) maximize the recoveries of other creditors of the Debtors by avoiding claims against the Debtors' estates that would arise from the Debtors' rejection of the Assigned Contracts.  Any Contract/Lease Counterparty to any Contract that has not actually filed with the Court and served on the Objection Notice Parties (as defined in the Bid Procedures) an objection to the assumption and/or assignment of such Assigned Contract as of the applicable date specified in the Bid Procedures Order (as such date may have been modified or extended in accordance with the terms of the Bid Procedures Order) is deemed to have consented to the assumption and assignment of the Assigned Contract.

R.     Compliance with Section 365 of the Bankruptcy Code.  The Debtors have met all requirements of section 365(b) of the Bankruptcy Code with respect to the assumption and

assignment of each of the Assigned Contracts. The Debtors have provided adequate assurance (within the meaning of section 365(b)(1) of the Bankruptcy Code) of cure of any default existing under any of the Assigned Contracts on or before the Closing Date (as defined in the Asset Purchase Agreement). The Purchaser has demonstrated adequate assurance of future performance of and under the Assigned Contracts within the meaning of sections 365(b)(1)(C), 365(f)(2)(B) and 365(b)(3) (to the extent applicable) of the Bankruptcy Code. The notice and opportunity to object provided to the Contract/Lease Counterparties to such Assigned Contracts and to other parties in interest, as set forth in the Assumption and Assignment Procedures contained in the Bid Procedures Order, fairly and reasonably protects any rights that such Contract/Lease Counterparties and other parties in interest may have with respect to such Assigned Contracts. Pursuant to section 365(f) of the Bankruptcy Code, the Assigned Contracts shall be assigned and transferred to, and remain in full force and effect for the benefit of, the Purchaser, notwithstanding any provision in the Assigned Contracts or other restrictions prohibiting their assignment or transfer.

S. <u>Property of the Estates</u>. The Acquired Assets constitute property of the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.

T. <u>Validity of the Sale Transaction</u>. The consummation of the Sale Transaction is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including sections 105(a), 363(b), 363(f), 363(m), 365(b) and 365(f) and all of the applicable requirements of such sections have been complied with in all respects in connection with the Sale Transaction. As of the Closing, the transfer of the Acquired Assets to the Purchaser will be a legal, valid and effective transfer of the Acquired Assets, including the Assigned Contracts, and will vest the Purchaser with all right, title and interest of the Debtors in and to the

- 13 -

Acquired Assets free and clear of all Encumbrances (unless otherwise expressly assumed under, or expressly permitted by, the Asset Purchase Agreement). The Debtors have full corporate or other applicable authority to execute the Asset Purchase Agreement and all other documents contemplated thereby, and the Sale Transaction has been duly and validly authorized by all necessary corporate action of the Debtors. Upon entry of this Order, other than any consents identified in the Asset Purchase Agreement, no consent or approval from any other person, entity or legal authority is required to consummate the Sale Transaction.

U.      No *Sub Rosa* Plan. Neither the Sale Transaction nor the Asset Purchase Agreement impermissibly restructures the rights of any of the Debtors' creditors or impermissibly dictates the terms of a liquidating plan of reorganization of the Debtors. Neither the Sale Transaction nor the Asset Purchase Agreement constitutes a sub rosa or de facto plan of reorganization or liquidation, as neither proposes to (i) impair or restructure any existing debt of, or equity interests in, the Debtors; (ii) impair or circumvent voting rights with respect to any plan proposed by the Debtors; (iii) circumvent chapter 11 safeguards, such as those set forth in sections 1125 and 1129 of the Bankruptcy Code; or (iv) classify claims or equity interests or extend debt maturities.

V.      No Stay of Order. Time is of the essence to implement the Asset Purchase Agreement and consummate the Sale Transaction. The Sale Transaction must be approved and consummated promptly in order to preserve the value of the Acquired Assets and to ensure the Debtors' compliance with their obligations under their post-petition financing agreements. The Debtors have demonstrated compelling circumstances and sound business justifications for the immediate approval and consummation of the Sale Transaction as contemplated by the Asset Purchase Agreement. Notwithstanding the provisions of Bankruptcy Rules 6004(h), 6006(d), and

- 14 -

7062 or any applicable provisions of the Local Rules, this Order shall not be stayed and shall be effective and enforceable immediately upon entry.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1. <u>Motion Granted</u>.  The Motion and the relief requested therein (to the extent not previously granted by the Court pursuant to the Bid Procedures Order or otherwise) are GRANTED and approved as set forth herein.

2. <u>Objections Overruled</u>.  Any objections to the Motion or the relief requested therein that have not been withdrawn, waived or settled and all reservations of rights included such objections are hereby overruled on the merits with prejudice.

3. <u>Sale Transaction Approved</u>.  The Asset Purchase Agreement and all transactions contemplated thereby are APPROVED. The Debtors have satisfied all requirements of sections 363(b) and 363(f) of the Bankruptcy Code, and all other requirements and standards applicable to a sale outside the ordinary course of business, free and clear of all liens, claims, encumbrances, and interests.

4. <u>Debtors' Performance Authorized</u>.  Pursuant to sections 105(a), 363(b) and 363(f) of the Bankruptcy Code, the Debtors are hereby authorized to enter into and perform their obligations under the Asset Purchase Agreement, and to take such other actions as may be necessary or desirable to effectuate the terms of the Asset Purchase Agreement and other instruments or documents that may be reasonably necessary or desirable to implement and effectuate the terms of the Asset Purchase Agreement, the Sale Transaction or this Order, including, without limitation, deeds, assignments, stock powers, transfers of membership interests and any other instruments of transfer, without further order of the Court.  The Debtors are hereby further authorized to take all other actions as may reasonably be requested by the Purchaser or

- 15 -

otherwise for the purpose of assigning, transferring, granting, conveying and conferring to the Purchaser, or reducing to the Purchaser's possession any or all of the Acquired Assets, including the Assigned Contracts, as may be necessary or appropriate for the Debtors to perform their obligations under the Asset Purchase Agreement and consummate the Sale Transaction, without further order of the Court.

5.      Debtors' Effectuation of Asset Purchase Agreement. The Debtors are hereby authorized and empowered to cause to be executed and filed such statements, instruments, releases and other documents with respect to the Acquired Assets that are necessary or appropriate to effectuate the Asset Purchase Agreement, the Sale Transaction or this Order, including, as applicable, amended and restated certificates or articles of incorporation and by-laws or certificates or articles of amendment, and all such other actions, filings or recordings as may be required under appropriate provisions of the applicable laws of all applicable governmental units or as any of the officers of the Debtors may determine are necessary or appropriate.

6.      Valid Transfer.  Effective as of the Closing Date, the sale and assignment of the Acquired Assets and the Assigned Contracts by the Debtors to the Purchaser shall constitute a legal, valid and effective transfer of the Acquired Assets and the Assigned Contracts, notwithstanding any requirement for approval or consent by any person, and will vest the Purchaser with all right, title and interest of the Debtors in and to the Acquired Assets and the Assigned Contracts, free and clear of all Encumbrances (unless otherwise expressly assumed under, or expressly permitted by, the Asset Purchase Agreement), pursuant to section 363(f) of the Bankruptcy Code.

7.      Free and Clear Sale.  Except to the extent specifically provided in the Asset Purchase Agreement, upon the Closing Date, the Debtors shall be, and hereby are, authorized and

- 16 -

empowered, pursuant to sections 105, 363(b) and 363(f) of the Bankruptcy Code, to sell and transfer to the Purchaser the Acquired Assets. The sale and transfer of the Acquired Assets to the Purchaser shall vest the Purchaser with all right, title and interest of the Debtor in and to the Acquired Assets free and clear of any and all Encumbrances of any person or entity (unless otherwise expressly assumed under, or expressly permitted by, the Asset Purchase Agreement), with all such Encumbrances to attach to the net proceeds of the Sale Transaction ultimately attributable to the sale of the property in which such holders have a Encumbrance, in the same order of priority, and with the same validity, force and effect that such Encumbrances had prior to the consummation of the Sale Transaction, subject to any rights, claims or defenses of the Debtors or their estates. Following the Closing, no holder of any Encumbrance on any of the Acquired Assets shall interfere with the Purchaser's use or enjoyment of any of the Acquired Assets based on or related to such Encumbrance or any actions that the Debtors have taken or may take in their Chapter 11 Cases.

8.      Sale Effective. At Closing, the transfer of the Acquired Assets to the Purchaser, including, without limitation, the assumption, assignment and transfer of the Assigned Contracts, will be a legal, valid, and effective transfer thereof, and vest the Purchaser with all right, title, and interest of the Debtors in and to the Acquired Assets, to the greatest extent permitted by applicable law, free and clear of all Encumbrances accruing or arising any time prior to the Closing Date, and except as expressly set forth in the Asset Purchase Agreement with respect to the Assumed Liabilities or Permitted Encumbrances. Except as expressly permitted by the Asset Purchase Agreement or this Order, all persons and entities holding Encumbrances of any kind or nature whatsoever (other than the Permitted Encumbrances and Assumed Liabilities) are hereby forever barred, estopped, and permanently enjoined from asserting their respective Encumbrances

- 17 -

against the Purchaser, any of the Purchaser's Stakeholders, any of its or their respective representatives, and each of their respective Acquired Assets and assets.

9. Sale Self-Effectuating. The provisions of this Order authorizing the sale and transfer of the Acquired Assets free and clear of Encumbrances shall be self-executing, and neither the Debtors nor the Purchaser shall be required to execute or file releases, termination statements, assignments, consents or other instruments in order to effectuate, consummate or implement the provisions of this Order.  For the avoidance of doubt, on or after the Closing Date, the Debtors and/or the Purchaser shall be authorized, but not directed, to file any such releases, termination statements, assignments, consents or other instruments in any jurisdiction to record the release, discharge and termination of Encumbrances on the Acquired Assets pursuant to the terms of this Order.

10. Direction to Creditors.  This Order shall be (a) effective as a determination that, as of the Closing Date, all Encumbrances on the Acquired Assets (unless otherwise expressly assumed under, or expressly permitted by, the Asset Purchase Agreement) shall be unconditionally released, discharged and terminated as to the Purchaser and the Acquired Assets; and (b) binding upon all persons and entities, including all the Debtors' creditors and any holder of a Encumbrance in any of the Acquired Assets, and all such persons and entities are hereby authorized and directed to execute such documents and take all other actions as may be reasonably necessary to release their respective Encumbrances on the Acquired Assets, if any.  If any person or entity that has filed a financing statement, mortgage, mechanics lien, lis pendens or other document, instrument, notice or agreement evidencing any Encumbrance on the Acquired Assets has not delivered to the Debtors on or before the Closing, in proper form for filing and executed by the appropriate parties, termination statements, releases or instruments of satisfaction that the person or entity has with

- 18 -

#111838121v1

respect to the Acquired Assets, the Debtors and/or the Purchaser are authorized to (x) execute and file such termination statements, releases, instruments of satisfaction or other documents with respect to the Acquired Assets on behalf of the applicable person or entity; and (y) file, register or otherwise record a certified copy of this Order which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Encumbrances on the Acquired Assets. This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, local, tribal or foreign government agency, department or office.

11.     Direction to Recording Officers.  This Order shall be binding upon all persons and entities, including filing agents or officers, title agents or companies, recorders of mortgages or deeds, registrars, administrative agencies, governmental units or departments, secretaries of state, governmental officials and all other persons or entities that may be required by operation of law, the duties of their office or contract to accept, file, register or otherwise record or release any documents or instruments regarding the Acquired Assets or who may be required to report or insure any title or state of title in or to the Acquired Assets, (collectively, the "Recording Officers").  All Recording Officers are hereby authorized and directed to (a) accept any and all documents or instruments necessary and appropriate to consummate the Sale Transaction or to record and reflect that the Purchaser is the owner of the Acquired Assets free and clear of all Encumbrances (unless otherwise expressly assumed under, or expressly permitted by, the Asset Purchase Agreement) and (b) strike all recorded Encumbrances on the Acquired Assets from their records.

12.     Direction to Surrender the Acquired Assets.  All persons or entities in possession or control of any of the Acquired Assets, either presently or on or before the Closing

- 19 -

Date, are directed to surrender possession or control of the Acquired Assets to the Purchaser on the Closing Date.

13.     No Successor Liability.  The Purchaser and its affiliates and their respective predecessors, successors, assigns, members, partners, officers, directors, principals and shareholders (or the equivalent thereof) are not and shall not be (a) deemed a "successor" in any respect to any of the Debtors or any of their estates as a result of the consummation of the Sale Transaction or any other event occurring in the Debtors' Chapter 11 Cases under any theory of law or equity; (b) deemed to have, de facto or otherwise, merged or consolidated with or into any of the Debtors or any of their estates; (c) deemed to be an alter ego of or have a common identity with the any of the Debtors; (d) deemed to have a continuity of enterprise with any of the Debtors; or (e) deemed to be a continuation or substantial continuation of any of the Debtors or any enterprise of any of the Debtors, including (with respect to clauses (a) through (e) of this paragraph) within the meaning of any foreign, federal, state or local revenue, pension, ERISA, tax, labor, employment, environmental, products liability or other law, doctrine, rule or regulation (including any filing requirements under any such laws, rules or regulations) with respect to the Debtors' liability under such law, doctrine, rule or regulation.

14.     No Assumption by Purchaser. The Purchaser shall not assume, nor be deemed to have assumed or in any way be responsible for, any liability or obligation of any of the Debtors or any of their estates including, but not limited to, any Excluded Liabilities (as defined in the Asset Purchase Agreement), any bulk sales law, successor or vicarious liability, liability or responsibility for any claim against any of the Debtors or against any insider of any of the Debtors or similar liability, except as otherwise expressly provided in the Asset Purchase Agreement, and the Motion, the Notice of Successful Bidder, the Sale and Auction Notice, or the Assumption and

- 20 -

Assignment Notice, which contain sufficient notice of such limitation in accordance with applicable law. Except for the Assumed Liabilities (as defined in the Asset Purchase Agreement), the transfer of the Acquired Assets and the Assigned Contracts to the Purchaser under the Asset Purchase Agreement shall not result in (a) the Purchaser, its affiliates or any of their respective predecessors, successors, assigns, members, partners, officers, directors, principals or shareholders (or the equivalent thereof) or any of the Acquired Assets having any liability or responsibility for any claim against any of the Debtors or against any insider of any of the Debtors (including, without limitation, Excluded Liabilities); (b) the Purchaser, its affiliates or any of their respective predecessors, successors, assigns, members, partners, officers, directors, principals or shareholders (or the equivalent thereof) or any of the Acquired Assets having any liability whatsoever with respect to, or being required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or indirectly, any Encumbrances or Excluded Liabilities; or (c) the Purchaser, its affiliates or any of their respective predecessors, successors, assigns, members, partners, officers, directors, principals or shareholders (or the equivalent thereof) or any of the Acquired Assets having any liability or responsibility to any of the Debtors except as is expressly set forth in the Asset Purchase Agreement. Pursuant to the Asset Purchase Agreement, the Purchaser shall maintain certain rights to modify the Acquired Assets and Excluded Liabilities in accordance with the terms thereunder, including any Assigned Contracts; *provided that* the Purchaser may not remove any Acquired Asset or add any Excluded Liability if such asset is otherwise restricted pursuant to the Chapter 11 Cases.

15. <u>Prohibition on Proceeding Against Purchaser</u>. Effective upon the Closing Date, all persons and entities are forever prohibited and enjoined from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial,

#111838121v1

administrative, arbitral or other proceeding against the Purchaser, its assets (including the Acquired Assets) or its successors or assigns, with respect to any (a) Encumbrance on the Acquired Assets or (b) successor, transferee, vicarious or other similar liability or theory of liability, including (i) commencing or continuing any action or other proceeding pending or threatened, in any manner or place, that does not comply with, or is inconsistent with, the provisions of this Order or other orders of the Court or the agreements or actions contemplated or taken in respect hereof or thereof; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any Encumbrance; (iv) asserting any setoff, right of subrogation or recoupment of any kind; or (v) revoking, terminating or failing or refusing to renew any license, permit or authorization to operate any of the Acquired Assets or conduct any of the businesses operated with the Acquired Assets.

16.     Assumption and Assignment of Contracts.  Under sections 105(a), 363 and 365 of the Bankruptcy Code, and subject to and conditioned upon the closing of the Sale Transaction, the Debtors' assumption and assignment of the Assigned Contracts to the Purchaser free and clear of all Encumbrances pursuant to the terms of the Asset Purchase Agreement, as modified by the terms of any amendments reached by the Purchaser and the respective Counterparty, is hereby approved, and the requirements of sections 365(b)(1), 365(f)(2) and 365(b)(3) (to the extent applicable) of the Bankruptcy Code with respect thereto are hereby deemed satisfied.  Upon the Debtors' assumption and assignment of the Assigned Contracts to the Purchaser, each applicable Contract/Lease Counterparty shall be forever barred, estopped and permanently enjoined from raising or asserting against the Debtors, the Purchaser or their respective property, any assignment fee, default, breach, claim, pecuniary loss, liability or obligation (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or

- 22 -

non-contingent, known or unknown, liquidated or unliquidated senior or subordinate) arising under or out of, in connection with or in any way related to, the Assigned Contracts existing as of the Closing Date or arising by reason of the Closing.  Upon the Debtors' assumption and assignment of the Assigned Contracts to the Purchaser, the Purchaser shall be fully and irrevocably vested with all right, title and interest of the Debtors in and to the Assigned Contracts and, pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability with respect to the Assigned Contracts.  The Debtors' assumption and assignment of the Assigned Contracts to the Purchaser shall not constitute a default under or a termination of any Contract.

17.     Payment of Certain Indebtedness.[5] Upon Closing, any M&A Transaction Fee payable to Jefferies LLC and Completion Fee payable to Alvarez & Marsal North America, LLC shall be paid or otherwise satisfied, escrowed or segregated from the proceeds of the Sale Transaction pursuant to and as set forth in the Bid Procedures Order.

18.     Cure Obligations.   Unless such Cure Costs are subject to any timely objection, the Cure Costs as to Assigned Contracts are hereby fixed at the amounts set forth in the Assumption and Assignment Notice or any Supplemental Assumption and Assignment Notice. Any defaults or other obligations under the Assigned Contracts shall be deemed cured by the Debtors' or the Purchaser's (as applicable) payment or other satisfaction of the Cure Costs, if any, associated with the Assigned Contracts.  Payment of the applicable Cure Costs (if any), including any subsequent payments made after the Court's resolution of any dispute regarding the Cure Cost, shall, pursuant to section 365 of the Bankruptcy Code and other applicable law, (i) effect a cure, or provide adequate assurance of cure, of all defaults existing thereunder as of the Closing and (ii)

---

[5]     Capitalized terms used in paragraph [17] but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Bid Procedures Order.

#111838121v1

compensate, or provide adequate assurance of compensation, for any actual pecuniary loss to such non-Debtor party resulting from such default.  Accordingly, on and as of the Closing Date, other than such payments, neither the Debtors nor the Purchaser shall have any further liabilities or obligations to the non-Debtor parties to the Assigned Contracts with respect to, and the non-Debtor parties to the Assigned Contracts shall be forever enjoined and barred from seeking, any additional amounts or claims (as defined in section 101(5) of the Bankruptcy Code) as a result of any defaults that arose, accrued or were incurred at any time on or prior to the Closing.

19.     Cure Objections.  Except as provided herein, all objections to the Debtors' calculation of Cure Costs with respect to any of the Assigned Contracts (each such objection, a "Cure Objection") have been overruled, withdrawn, waived, settled or otherwise resolved.  Any Cure Objections as to applicable Cure Costs that have not been resolved by the parties may be heard at a later date as set by the Court.  The pendency of a dispute relating to a particular Contract shall not prevent or delay the assumption or assignment of any other Contract or the closing of the Sale Transaction.

20.     Disputed Contracts. In the event of an objection by a Contract/Lease Counterparty to the Cure Costs asserted by Debtors or to the Debtors' ability to assume and assign or reject any Contract (such contract, a "Disputed Contract"), and such objection has not been resolved by the Closing, then the Debtors, with the consent of the Purchaser, and in accordance with the Asset Purchase Agreement or this Order, may elect to (a) not assume and assign such Disputed Contract; or (b) postpone the assumption of such Disputed Contract until the resolution of such objection; *provided that*, in no event shall any Debtor settle a Cure Costs objection with regard to any Disputed Contract without the express written consent of Purchaser (with an email consent being sufficient).  In the event that a dispute regarding a Disputed Contract has not been

- 24 -

resolved, pending resolution of the dispute pursuant to this Order, the Contract/Lease Counterparty to such Disputed Contract shall not have any claim against the Debtors or the Purchaser (or any of its Designees) for breach, infringement or any other similar type of claim for the use of any rights by the Purchaser under such Disputed Contract.

21.      Adequate Assurance.  The Purchaser has provided adequate assurance of future performance under the Assigned Contracts within the meaning of sections 365(b)(1)(C), 365(f)(2)(B) and 365(b)(3) (to the extent applicable) of the Bankruptcy Code.  Any Assumption and Assignment Objections (as defined in the Bid Procedures) that have not been withdrawn, waived or settled and all reservations of rights included in such objections are hereby overruled on the merits with prejudice.  All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the Debtors' assumption and assignment of the Assigned Contracts to the Purchaser have been satisfied in accordance with the terms of this Order.

22.      Anti-Assignment Provisions Unenforceable.  No section or provision of any Contract that purports to (a) prohibit, restrict or condition the assignment of a Contract, including, but not limited to, the conditioning of such assignment on the consent of any Contract/Lease Counterparty to such Contract; (b) authorize the termination, cancellation or modification of a Contract based on the filing of a bankruptcy case, the financial condition of the Debtors or similar circumstances; (c) declare a breach or default as a result of a change in control in respect of the Debtors; or (d) provide for additional payments, profit sharing, penalties, conditions, renewals, extensions, charges or other financial accommodations in favor of the Contract/Lease Counterparty to a Contract, or modification of any term or condition upon the assignment of a Contract or the occurrence of the conditions set forth in subsection (b) above, shall have any force or effect, and any such section or provision constitutes an unenforceable anti-assignment provision

- 25 -

under section 365(f) of the Bankruptcy Code and/or is otherwise unenforceable under section 365(e) of the Bankruptcy Code.

23. **Direction to Contract Counterparties.** All Contract/Lease Counterparties to Assigned Contracts assigned to the Purchaser in accordance with the terms of this Order and the Asset Purchase Agreement shall cooperate with, and expeditiously execute and deliver upon, any reasonable request of the Purchaser for any instruments, applications, consents or other documents that may be required or requested by any governmental unit or other public or quasi-public authority or other party to effectuate the applicable transfers in connection with the Debtors' assumption and assignment of the Assigned Contracts to the Purchaser or the Purchaser's assignment to its designee(s) pursuant to this Order, as applicable.

24. **Licenses and Permits.** To the extent provided in the Asset Purchase Agreement and available under applicable law, the Purchaser shall be authorized, as of the Closing Date, to operate under any license, permit, registration and any other governmental authorization or approval of the Debtors with respect to the Acquired Assets and the Assigned Contracts, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to the Purchaser as of the Closing Date. To the extent any license or permit necessary for the operation of the Acquired Assets is determined not to be an executory contract that may be assumed and assigned under section 365 of the Bankruptcy Code, the Purchaser shall apply for and obtain any necessary license or permit promptly after the Closing Date, and such license or permit of the Debtors shall remain in place for the Purchaser's benefit until a new license or permit is obtained. To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relating to the operation of the Acquired Assets sold, transferred or conveyed to the

- 26 -

Purchaser on account of the filing or pendency of these Chapter 11 Cases or the consummation of the Sale Transaction.

25.     Good-Faith Purchaser.  The Purchaser is a good-faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and is entitled to all of the protections afforded thereby.  Pursuant to section 363(m) of the Bankruptcy Code, if any or all of the provisions of this Order are hereafter reversed, modified or vacated by a subsequent order of this Court or any other court, such reversal, modification or vacatur shall not affect the validity or enforceability of any sale, transfer or assignment under the Asset Purchase Agreement or obligation or right granted pursuant to the terms of this Order (unless stayed pending appeal prior to the Closing Date) and, notwithstanding any reversal, modification or vacatur, any sale, transfer or assignment under the Asset Purchase Agreement, shall be governed in all respects by the original provisions of this Order or the Asset Purchase Agreement, as applicable.

26.     No Avoidance.  Neither the Sale Transaction nor the Asset Purchase Agreement is subject to avoidance, and no party is entitled to any damages or other recovery in connection therewith under section 363(n) of the Bankruptcy Code.

27.     Bulk Sales.  No bulk sales law, bulk transfer law or similar law of any state or other jurisdiction shall apply in any way to the Sale Transaction.

28.     Amendments.   The Asset Purchase Agreement may be amended, supplemented or otherwise modified by the parties thereto and in accordance with the terms thereof, without further order of the Court; provided that, any such amendment, supplement or modification shall not have a material adverse effect on the Debtors' estates.

29.     Binding Order.  This Order and the Asset Purchase Agreement shall be binding upon and govern the acts of all persons and entities, including without limitation, the

- 27 -

#111838121v1

Debtors and the Purchaser, their respective successors and permitted assigns, including, without limitation, any chapter 11 trustee hereinafter appointed for the Debtors' estates or any trustee appointed in a chapter 7 case of any of the Debtors if any of these Chapter 11 Cases is converted from a case under chapter 11 to a case under chapter 7, all creditors of any and all of the Debtors (whether known or unknown), all Contract/Lease Counterparties to any Assigned Contracts and all Recording Officers.  Neither the Sale Transaction nor the Asset Purchase Agreement shall be subject to rejection or avoidance under any circumstances.  This Order and the Asset Purchase Agreement shall inure to the benefit of the Debtors, their estates, their creditors, the Purchaser and its respective successors and assigns.

30.      Failure to Specify Provisions; Conflicts.  The failure specifically to include or mention any particular provision of the Asset Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court, the Debtors and the Purchaser that the Asset Purchase Agreement be authorized and approved in its entirety, including any amendments thereto as may be made by the parties thereto in accordance with the terms thereof and this Order.

31.      Further Assurances.  From time to time, as and when requested, all parties to the Sale Transaction shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as the requesting party may reasonably deem necessary or desirable to consummate the Sale Transaction, including such actions as may be necessary to vest, perfect, confirm, record or otherwise in the Purchaser its right, title and interest in and to the Acquired Assets and the Assigned Contracts.

32.     Automatic Stay.   The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby modified to the extent necessary, without further order of the Court, to allow the Purchaser to deliver any notice provided for in the Asset Purchase Agreement and to take any and all actions permitted or required under the Asset Purchase Agreement in accordance with the terms and conditions thereof.

33.     No Stay of Order.   Notwithstanding Bankruptcy Rules 6004(h), 6006(d), and 7062 and any applicable Local Rules, this Order shall not be stayed and shall be effective and enforceable immediately upon entry.   The provisions of this Order shall be self-executing.   Time is of the essence in implementing the Asset Purchase Agreement and closing the Sale Transaction. Any party objecting to this Order or any of the relief granted herein must exercise due diligence in filing an appeal and obtaining a stay prior to the Closing of the Sale Transaction or risk its appeal being foreclosed as moot.

34.     Governing Terms.   To the extent this Order is inconsistent with any prior order or pleading in these Chapter 11 Cases, the terms of this Order shall govern.   To the extent there is any inconsistency between the terms of this Order and the terms of the Asset Purchase Agreement, the terms of this Order shall govern.

35.     Retention of Jurisdiction.   This Court shall retain exclusive jurisdiction to (a) interpret, implement and enforce the terms and provisions of this Order, the Asset Purchase Agreement, including all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith; and (b) decide any issues or disputes concerning this Order, the Asset Purchase Agreement or the rights and duties of the parties hereunder or thereunder, including the interpretation of the terms, conditions and provisions hereof and thereof, and the status, nature and extent of the Acquired Assets and the Assigned Contracts.

- 29 -

36.     Debtors' Authorization.  The Debtors are authorized and empowered to take all actions necessary or appropriate to implement the relief granted in this Order.

37.     Government Treatment.  Notwithstanding any provision to the contrary in this Order, the Asset Purchase Agreement, or any other sale document (collectively, "Sale Documents"), nothing shall: (i) release, nullify, preclude, or enjoin the enforcement of any police or regulatory power or any liability that any entity would be subject to as the owner, lessor, lessee, or operator of property that such entity owns, operates, or leases after the date of entry of this Order; (ii) affect the setoff or recoupment rights of the United States; (iii) confer exclusive jurisdiction to the Bankruptcy Court except to the extent set forth in 28 U.S.C. § 1334 (as limited by any other provisions of the United States Code); (iv) authorize the assumption, assignment, sale, or other transfer of any federal or state (a) grants, (b) grant funds, (c) property acquired or improved with grant funds, (d) contracts, (e) agreements, (f) awards, (g) task orders, (h) property, (i) intellectual property, (j) patents, (k) leases, (l) certifications, (m) applications, (n) registrations, (o) billing numbers, (p) national provider identifiers, (q) provider transaction access numbers, (r) licenses, (s) permits, (t) covenants, (u) inventory, (v) guarantees, (w) indemnifications, (x) data, (y) records, or (z) any other interests belonging to the United States or any state (collectively, "Governmental Interests") without compliance by the Debtors and the Purchaser with all terms of the Governmental Interests and with all applicable non-bankruptcy law; (v) be interpreted to set cure amounts or to require the United States or any state to novate, approve, or otherwise consent to the sale, assumption, assignment, or other transfer of any Governmental Interests; (vi) expand the scope of 11 U.S.C.§ 525; (vii) waive, alter, or otherwise limit the United States' rights with respect to any licenses in the Acquired Assets arising pursuant to applicable non-bankruptcy law, including any rights arising under the Bayh-Dole Act (35 U.S.C. 201 *et seq.*); or (viii) affect the

#111838121v1

Debtors' or Purchaser's requirements to comply with applicable non-bankruptcy law, including, but not limited to, the Bayh-Dole Act (35 U.S.C. 201 *et seq.*).

38.     <u>DOE Specific Language</u>.  Notwithstanding any provision to the contrary in the Sale Documents, nothing shall affect or impair the rights or interests of the U.S. Department of Energy with respect to any property funded, purchased, improved or developed with the Assistance Award DE-MS0000002 (the "<u>Funded Property</u>") pursuant to the terms and conditions of the Assistance Award DE-MS0000002, and the Funded Property shall continue to be subject to all the terms, conditions, and restrictions imposed by Assistance Award DE-MS0000002, its terms and conditions and 2 C.F. R. Parts 200 and 910. Any future disposition of or other action concerning the Funded Property shall comply with the Assistance Award DE-MS0000002's terms and conditions and all applicable non-bankruptcy law.  Notwithstanding the foregoing, all of Purchaser's rights are reserved with respect to the foregoing, including the Assistance Award DE-MS0000002.

39.     <u>Conflict</u>.  In the event of an inconsistency or conflict between any provision of the Sale Documents and any provision of this Order, as to the United States or any state, the provisions of this Order and federal and state law shall govern.

Signed: June ____, 2026

_____
CHRISTOPHER LOPEZ
UNITED STATES BANKRUPTCY JUDGE

- 31 -

# **EXHIBIT B**

FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

[*To be mutually agreed to by Seller and Purchaser between the Effective Date and the Closing Date.*]

304753461.7

## EXHIBIT C

FORM OF LEASE ASSIGNMENT AGREEMENT

[*To be mutually agreed to by Seller and Purchaser between the Effective Date and the Closing Date.*]

## EXHIBIT D

FORM OF COVINGTON IP LICENSE AGREEMENT

[*To be mutually agreed to by Seller and Purchaser between the Effective Date and the Closing Date.*]

## EXHIBIT E

FORM OF TRANSITION SERVICES AGREEMENT

[*To be mutually agreed to by Seller and Purchaser between the Effective Date and the Closing Date.*]

304753461.7